UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,                )
                          Plaintiff,     )
                                         )
                    v.                   )     **FILED UNDER SEAL**
                                         )
                                         )     Civil Action No.
434 MAIN STREET, TEWKSBURY,              )
MASSACHUSETTS,                           )
                          Defendant.     )     **09 CA 11635 RGS**


**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

    The United States of America, by its attorney, Michael K.

Loucks, Acting United States Attorney for the District of

Massachusetts, in a civil action of forfeiture pursuant to Title

21, United States Code, Section 881(a)(7), alleges that:

    1.    This Court has jurisdiction in this matter pursuant to

28 U.S.C. §§ 1345 and 1355.  Venue is appropriate pursuant to 28

U.S.C. § 1395.

    2.    The defendant property consists of the real property

located at  434 Main Street, Tewksbury, Massachusetts, including

all buildings, appurtenances and improvements thereon, as

described in more detail in a deed recorded in Book 2056, Page

118 of the Middlesex North County Registry of Deeds (hereinafter,

the "Defendant Property").

    3.    As detailed in the Affidavit of Tewksbury Police

Department Detective Sergeant Thomas M. Casey, attached as

Exhibit A and herein incorporated by reference, and the Affidavit

of Special Agent Vincent T. Kelly of the United States Drug

Enforcement Administration, attached as Exhibit B and herein

incorporated by reference, the United States has probable cause to believe that the Defendant Property was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of 21 U.S.C. §§ 841, 846 and/or 856, and is, therefore, subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(7).

4.   By virtue of the facts set forth above and in the attached Affidavits, the Defendant Property is, therefore, subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(7).

WHEREFORE, the United States of America prays:

1.   That a Warrant and Monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts commanding him to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2.   That judgment of forfeiture be decreed against the Defendant Property;

3.   That thereafter, the Defendant Property be disposed of according to law; and

4.   For costs and all other relief to which the United

States may be entitled.

Respectfully submitted,

MICHAEL K. LOUCKS
Acting United States Attorney

By: _____
SONYA A. RAO
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
Date: September 29, 2009     (617) 748-3100

3

## VERIFICATION

I, Vincent T. Kelly, Special Agent, United States Drug Enforcement Administration, state that I have read the foregoing Verified Complaint for Forfeiture in Rem and the attached affidavits, and that the contents thereof are true to the best of my knowledge, information and belief.

_____
Vincent T. Kelly, Special Agent
United States Drug Enforcement Administration

Date: September 29, 2009

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                               Boston

Then personally appeared before me the above-named Vincent T. Kelly, Special Agent, United States Drug Enforcement Administration, who acknowledged the foregoing to be true to the best of his knowledge, information and belief, on behalf of the United States of America.

Subscribed to and sworn to before me this 29th day of September 2009.

_____  March 23, 2012
Notary Public
My commission expires:

GLORIA K. BRUNO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 23, 2012

4

## EXHIBIT A

### AFFIDAVIT OF THOMAS M. CASEY

I, Thomas M. Casey, state the following under oath:

1.   I am a Detective Sergeant with the Tewksbury Police Department ("TPD").  I have been employed full-time with the TPD for approximately the past ten years.  (Prior to December 6, 1999, I worked as a part-time reserve office for the TPD for approximately fourteen months.)  During my tenure as a police officer, I have been involved in a number of investigations that have resulted in the arrest and conviction of individuals for state narcotics violations.  Since approximately October 2006, I have been assigned to the Criminal Bureau of the TPD as a supervisor.  As such, I have investigated various forms of criminal activity, including violations of the Massachusetts Controlled Substance Act ("CSA"), Mass. Gen. Laws ch. 94C.  I have completed an eighty hour basic narcotics school conducted by the United States Drug Enforcement Administration ("DEA").  During my employment with the TPD, I have personally participated in all aspects of narcotics investigations, including surveillance, the execution of state search warrants, undercover and controlled purchases of narcotics, and at least one hundred drug-related arrests.

2.   As a result of my training and experience, I have observed numerous types of controlled substances (including,

1

heroin, cocaine, methamphetamine, and marijuana), and I am
familiar with the packaging, paraphernalia, pricing structure,
distribution methods, and vernacular associated with their sale
and use.  I and other detectives of the TPD Criminal Bureau are
acquainted with the methods by which a person may seek to
disguise the subject of their conversations and operations
regarding illegal narcotics, and are familiar with the methods,
practices, and techniques by which narcotics users and
distributors transport and distribute controlled substances.  I
have also interviewed and interrogated numerous informants,
defendants, and suspects who were users and sellers of controlled
substances.

> 3.   I submit this Affidavit in support of a Complaint for
Forfeiture _in Rem_ against the real property located at 434 Main
Street,[1] Tewskbury, Massachusetts, including all buildings,
appurtenances, and improvements thereon, as described in more
detail in a deed recorded in Book 2056, Page 118 of the Middlesex
North County Registry of Deeds[2] (hereinafter, "the Defendant

---

[1]   An online search for the property, commonly known and
operated as "The Motel Caswell," lists the property's street
address as 450 Main Street in Tewksbury, Massachusetts.  However,
a title search conducted by the United States Marshal Service
indicates that the property's address is actually 434 Main
Street.

[2]   A title search by the United States Marshal Service
reveals that this is the most recent Book and Page Number
associated with the property.

Property").

4.   The Defendant Property consists of two one-level buildings, each containing several motel rooms with parking spots in front of the entrances to the rooms.  The Defendant Property is operated as the Motel Caswell.

5.   The Defendant Property has been the subject of over one hundred narcotics investigations (including investigations involving the trafficking, distribution, and possession of illegal narcotics) conducted by the TPD Criminal Bureau since 1994.  These investigations included surveillance of the Defendant Property, controlled purchases of narcotics by confidential informants at the Defendant Property, undercover narcotics purchases by law enforcement officers at the Defendant Property, and the execution of Massachusetts state search warrants at the Defendant Property.  The factual statements made in this affidavit are based on: (a) my own participation in the TPD Criminal Bureau's investigations of the Defendant Property; (b) my participation in searches at the Defendant Property; (c) information provided to me by other law enforcement officers; (d) my personal knowledge, training, and experience; and (e) my review of public records.  This affidavit is submitted for the limited purpose of establishing probable cause that the Defendant Property is subject to forfeiture, and, therefore, this affidavit does not set forth all the facts developed during the course of

3

these investigations.

**A.   The February 2001 Investigation**

6.   On February 8, 2001, TPD Detective Sergeant Robert
Budryk ("Det. Sgt. Budryk") received information from a
confidential informant ("CI-1") regarding illegal narcotic
activity at the Defendant Property.  CI-1 stated that s/he
purchased illegal narcotics at the Defendant Property from a
Hispanic male living in Room 240 at the Defendant Property and
that the Hispanic male drove a green Nissan Maxima.  During the
coversation with Det. Sgt. Budryk, CI-1 stated that the Hispanic
male was en route (about fifteen minutes away) to meet him/her in
Room 241 of the Defendant Property with a quantity of heroin and
cocaine for sale.

7.   CI-1 subsequently agreed to allow Det. Sgt. Budryk and
Lowell Police Department ("LPD") Detective Jim Hodgdon ("Det.
Hodgdon") to conduct surveillance from CI-1's room (_i.e.,_ Room
241 at the Defendant Property).  Other TPD and LPD officers also
surveyed the parking lot for the Nissan Maxima.

8.   Shortly after setting up surveillance in the nearby
vicinity, the TPD and LPD officers saw a green Nissan Maxima
arrive at the Defendant Property and park in front of Room 240.
The officers observed two male subjects get out of the vehicle
and enter Room 240.  A short time later, one of the males, later
identified by his identification card as Miguel Cotto ("Cotto"),

4

exited Room 240 and entered Room 241 with a clear plastic bag
that contained several smaller clear plastic bags, each
containing a powder substance that the surveillance officers,
based upon their training and experience, believed to be cocaine
and heroin.  Det. Sgt. Budryk and Det. Hodgdon then identified
themselves to Cotto, seized the plastic bags from him, and
arrested him.

    9.   Det. Sgt. Budryk and Det. Hodgdon then approached the
door to Room 240, which was ajar, and observed the second male in
Room 240, later identified as Israel Cortez ("Cortez"), using a
straw to ingest a white powder substance (that the officers,
based on their training and experience, believed to be heroin)
from an ashtray located on an end table.  Once Cortez saw the
officers at the door, he dropped the straw he was using to ingest
the white powder substance and attempted to flee, but Det. Sgt.
Budryk caught and arrested him.

    10.  Upon Cortez's arrest, Det. Sgt. Budryk seized the
following items from Cortez and Room 240: (a) one large plastic
bag of white powder and two smaller clear plastic bags of white
powder that, based on his training and experience, Det. Sgt.
Budryk believed to be cocaine; (b) a clear plastic bag that
contained one hundred and ninety smaller heat sealed bags, all
containing a white powder that, based on his training and
experience, Det. Sgt. Budryk believed to contain heroin; (c) a

5

fresh-lock heat sealing machine of the type commonly used in the packaging of illegal narcotics; (d) several empty clear plastic bags; (e) a large clear plastic and a smaller clear plastic bag, both of which contained an off-white colored powder that, based on his training and experience, Det. Sgt. Budryk believed to be heroin; (f) Cortez's ashtray filled with an off-white powder that, based on his training and experience, Det. Sgt. Budryk believed to be heroin; (g) two small clear plastic bags that contained empty plastic wrappers commonly used to store heroin; (h) a black digital scale, a small metal strainer, and an electric coffee grinder, all commonly used in the packaging and distribution of illegal narcotics; and (i) two more clear plastic bags (each containing several more unopened plastic bags) of the type commonly used to package and store heroin.  Officers also seized eight hundred twenty-one dollars ($821.00) from Cortez's person, which they believed to be proceeds from the illegal distribution of controlled substances.

     11.  Seven of the smaller plastic bags carried by Cotto, as described in paragraph 8, above, were tested by the Massachusetts State Laboratory Institute ("MSLI"); the testing confirmed that the bags contained cocaine.  Thirty of the smaller plastic bags carried by Cotto, as described in paragraph 8, above, were tested at the MSLI; the testing confirmed that the bags contained heroin.

6

12.  The bags seized from Cortez and Room 240, as described in paragraph 10, above, were tested by the MSLI.  The testing indicated that the one large plastic bag of white powder, the two smaller clear plastic bags, the one hundred and ninety smaller heat sealed bags, and the ashtray in Room 240 tested positive for heroin.  The rest of the bags tested positive for cocaine, and one bag tested positive for procaine.  Based on my training and experience, I know that narcotics traffickers often use procaine as a "cutting agent" for heroin and cocaine.[3]

13.  Cortez was indicted in Middlesex Superior Court for trafficking of cocaine and heroin, possession of a Class A substance, and possession of a Class B Substance.  On July 29, 2009, he pled guilty and received a three-year sentence for the trafficking of a controlled substance.

14.  On December 2, 2002, Cotto was also indicted in Middlesex Superior Court for possession with intent to distribute heroin and cocaine trafficking and received a three-year sentence.

B.  **The November 2004 Investigation**

15.  In November 2004, TPD Detective Thomas Cooke ("Det. Cooke") received information from another confidential informant ("CI-2") regarding narcotic activity taking place at the

---

[3]  A cutting agent is used to add bulk when packaging illegal narcotics.

7

Defendant Property.  CI-2 stated that s/he was drug dependent and had purchased heroin from two individuals, William Mercier ("Mercier") and Lydia Farrell ("Farrell"), who were actively involved in the sale and distribution of heroin while staying at the Defendant Property in Room 223.  CI-2 further stated that s/he had purchased heroin from Mercier and Farrell from Room 223 at the Defendant Property within the past week.

16.  Also in November 2004, TPD Lieutenant Detective Dennis J. Peterson ("Lt. Det. Peterson") met with another confidential informant ("CI-3"), who confirmed CI-2's story and stated that s/he also had purchased heroin from Mercier on many occasions over the past few years, but most recently from Room 223 at the Defendant Property.  S/he also said that Farrell, a diabetic, sold needles.

17.  Based on the information provided by CI-2 and CI-3, Lt. Det. Peterson organized a controlled purchase of heroin from Room 223 at the Defendant Property; CI-3 agreed to make the controlled purchase.  Prior to the controlled purchase, TPD Detective James Hollis ("Det. Hollis") searched CI-3 with negative results for contraband.  The TPD officers then provided CI-3 with a quantity of United States currency for use in the controlled purchase and subsequently observed CI-3 enter Room 223 of the Defendant Property.  Soon after entering Room 223, TPD officers observed CI-3 exiting Room 223 and followed him/her to a pre-arranged

8

location, where CI-3 gave Lt. Det. Peterson a number of clear
plastic bags which contained a brownish powder that, based on his
training and experience, Lt. Det. Peterson believed to be heroin.
CI-3 informed Lt. Det. Peterson that s/he had purchased the
heroin from Mercier in Room 223, with Farrell present in the
room, using the United States currency provided by the TPD.

18.  Within twenty-four hours of the first controlled
purchase, CI-3 participated in another controlled purchase from
Mercier at the Defendant Property under the supervision of Det.
Hollis and Det. Cooke.  Prior to the controlled purchase, Det.
Hollis searched CI-3 with negative results for contraband.  The
TPD officers then provided CI-3 with a quantity of United States
currency for use in the controlled purchase and set up
surveillance in the vicinity of the Defendant Property.  TPD
officers subsequently observed CI-3 enter the Defendant
Property's lobby and then walk to Room 209 of the Defendant
Property.  CI-3 placed the money provided by the TPD under Room
209's door and retrieved a package from under the door.

19. TPD officers then followed CI-3 to a pre-arranged
location, where CI-3 gave officers a tin foil package which
contained a brown powder that, based upon their training and
experience, the officers believed to be heroin.  CI-3 told the
TPD officers that, upon entering the Defendant Property lobby,
the motel clerk informed him/her that Mercier had changed rooms,

9

from 223 to 209, due to suspected police activity.  CI-3 then
stated that s/he spoke with Mercier over the phone, who told CI-3
to slip money under the door of Room 209 in exchange for
narcotics.

20.  Based on the information obtained during the
investigation and the controlled purchases described in
paragraphs 15 through 19, above, TPD detectives applied for, and
received, a Massachusetts state search warrant for Room 209 of
the Defendant Property on November 19, 2004.  TPD officers,
including Lt. Det. Peterson, Det. Hollis, and Det. Cooke,
executed the search warrant on November 20, 2004.

21.  On November 20, 2004, immediately prior to executing
the search warrant, TPD officers conducted surveillance of Room
209.  During that surveillance, officers observed Mercier leave
Room 209 at the Defendant Property, walk to the liquor store
across the street, and walk back toward the Defendant Property.
Det. Hollis and Det. Cooke detained Mercier in the parking lot of
the Defendant Property, while Lt. Det. Peterson proceeded to Room
209, where he found Farrell and placed her under arrest.

22.  Lt. Det. Peterson, Det. Hollis, and Det. Cooke then
searched Room 209 and discovered a small green plastic box
containing forty-eight small clear plastic bags, each with a
brown powdery substance that, based upon their training and
experience, the officers believed to be heroin.  Mercier was then

10

arrested, and officers seized fifty small clear plastic bags concealed in Mercier's sock, each containing a brown powdery substance that, based upon their training and experience, the officers believed to be heroin.  Officers also seized two cellular Nokia telephones and one journal containing notes regarding drug use and transactions.

23.  The substances in the clear plastic bags and tin foil, provided by CI-3 to the TPD, as described in paragraphs 17 and 19, above, were subsequently tested at the MSLI; the testing confirmed that the substance contained heroin.  The substances in the forty-eight small clear plastic bags found in Room 209, described in paragraph 22, above, were tested at the MSLI; the testing confirmed that the substances contained heroin.  The substances in the fifty small clear plastic bags concealed in Mercier's sock, described in paragraph 22, above, were tested at the MSLI; the testing confirmed that the substances contained heroin.

24.  Based on the events described in paragraphs 15 through 23, above, Mercier was indicted in Middlesex Superior Court for possession and distribution of a Class A substance and received a two-year sentence.  Based on the events described in paragraphs 15 through 23, above, Farrell was indicted in Middlesex Superior Court for possession of a Class A substance, possession with intent to distribute a Class A substance, and conspiracy to

11

violate the CSA and received an eighteen-month sentence.

## C.  The October 2005 Investigation

25.  On October 9, 2005, TPD Sergeant Mark Perry ("Sgt. Perry") responded to the Shell Gas Station near the Defendant Property, where he met TPD Detective Marckus McMahon ("Det. McMahon") to investigate the passing of counterfeit money by an individual named Sara Anderson Kover ("Kover").  Upon arrival at the Defendant Property, Sgt. Perry arrested Kover, who resided at Room 255 of the Defendant Property.  Kover told Det. McMahon that she was with another individual and pointed to Steven Ervin ("Ervin"), who was standing by a blue pick-up truck in the parking lot of the Shell Gas Station.  Det. McMahon approached Ervin in the gas station parking lot, and Ervin informed him that he had been to Room 255 of the Defendant Property visiting a man named David Bates ("Bates").  Ervin further stated that Bates was operating a methamphetamine lab in Room 255 of the Defendant Property.  Ervin then agreed to accompany Det. McMahon and TPD Officer Peter Regan ("Officer Regan"), TPD Officer Arthur Piccolo, and Sgt. Perry to Room 255 of the Defendant Property.

26.  Ervin and the TPD officers subsequently walked over to Room 255 of the Defendant Property and knocked on the door, which Bates answered.  When Bates opened the door, Sgt. Perry observed a thick smoke coming from the room with a strong chemical smell. Bates tried to push past the TPD officers in an attempt to flee

12

from Room 255, but was apprehended and arrested in the parking lot by Officer Regan.  Subsequent to his arrest, TPD officers found on Bates's person a clear plastic jar in the shape of a half of an hourglass, containing a white crystal substance that, based on their training and experience, the officers believed to be methamphetamine.

27.  Sgt. Perry then entered Room 255 at the Defendant Property to determine where the smoke was coming from.  Inside the room, he observed a hot plate on a desk with a clear liquid. In the bathroom, he observed a glass jar containing a blue and green substance on top of the toilet and a clear round bowl on the toilet seat.  In the shower, he observed a soda bottle with a blue and green liquid in it, and a clear substance on the bottom of it.  On the sink, he observed a $1 bill baking in liquid. While leaving the room, Sgt. Perry observed a can of Coleman Fuel and a can of acetone that, based upon his training and experience, Sgt. Perry recognized to be materials commonly used as cutting agents in the production of methamphetamine.

28.  Approximately twenty minutes later, Massachusetts State Police Trooper Shawn Murray ("Trooper Murray") of the DEA Drug Task Force arrived at Room 255.  Based on Trooper Murray's training and experience, he confirmed that the occupants in Room 255 of the Defendant Property were actively involved in the manufacture of methamphetamine.

13

29.  The crystal substance retrieved from Bates's person was subsequently tested at the Massachusetts Department of State Police Crime Laboratory ("MSPCL"); the testing confirmed that the substance contained methamphetamine.  The aforementioned items found in Room 255, as described in paragraph 27, above, were also tested at the MSPCL; the testing confirmed that the items all contained traces of methamphetamine.

30.  Based at least in part on the events described in paragraphs 25 through 29, above, Bates was indicted in Middlesex Superior Court on charges of possession with intent to distribute a Class B Substance, conspiracy, and resisting arrest.  He pled guilty and received a three-year sentence.

31.  Based at least in part on the events described in paragraphs 25 through 29, above, Kover was indicted in Middlesex Superior Court on charges of possession with intent to distribute a Class B Substance and manufacturing of a Class B substance. Kover pled guilty and received an eighteen-month sentence.

D.  **The February 2006 Investigation**

32.  In February 2006, TPD Det. Hollis received information from a past confidential informant ("CI-4"), regarding a large-scale heroin operation being operated out of Room 239 at the Defendant Property by John Martineau ("Martineau"). CI-4 informed Det. Hollis that s/he had previously bought heroin from, and used heroin with, Martineau.

14

33. Det. Hollis and other members of the TPD began to conduct periodic surveillances of Room 239, during which the officers observed individuals (including one known habitual drug user who visited several times) enter Room 239 for a short period of time and then leave. Based on their training and experience, the officers recognized this activity to be consistent with the sale and distribution of narcotics.

34. CI-4 subsequently agreed to participate in two controlled purchases of heroin from Martineau at the Defendant Property. Prior to the first controlled purchase, TPD officers searched CI-4 with negative results for contraband and subsequently gave CI-4 a quantity of United States currency for use in the controlled purchase. TPD officers then observed CI-4 enter Room 239 for a short period of time. Upon leaving Room 239, officers observed CI-4 until s/he met Det. Hollis at a predetermined location. At the predetermined location, CI-4 handed Detective Hollis a quantity of a substance that s/he stated was purchased from Martineau in Room 239 with the United States currency provided by the TPD; based upon his training and experience, Detective Hollis believed the substance to be heroin. CI-4 also informed the officers that s/he observed a quantity of heroin in a plastic bowl on the dresser in Room 239 at the Defendant Property

35. Prior to the second controlled purchase, TPD officers

15

searched CI-4 with negative results for contraband.  The TPD
officers then gave CI-4 a quantity of United States currency for
use in the controlled purchase and set up surveillance in the
vicinity of the Defendant Property.  TPD officers then observed
CI-4 enter Room 239 for a short period of time.  Upon leaving
Room 239, officers observed CI-4 until s/he met Det. Hollis at a
predetermined location.  At the predetermined location, CI-4
handed Detective Hollis a quantity of a substance that s/he
stated was purchased from Martineau in Room 239 with the United
States currency provided by the TPD; based upon his training and
experience, Detective Hollis believed the substance to be heroin.

36.  Based on the information obtained during the
investigation and the two controlled purchases made by CI-4, as
described in paragraphs 32 through 35, above, TPD detectives
applied for, and received, a Massachusetts state search warrant
for Room 239 of the Defendant Property on February 1, 2006.  On
February 2, 2006, the search warrant was executed, and Martineau,
who was present in Room 239 during the search, was arrested.

37.  During the search, the following items, among others,
were seized from Room 239: (a) one white/blue pill on the night
stand; (b) one open box of baking soda in a hole in the wall
that, based upon their training and experience, the officers
recognized as a cutting agent; (c) several plastic bags at the
bottom of the night stand; (d) thirty-four pink pills inside a

16

gym bag; (e) one open plastic bag containing a brown powder on
the night stand; (f) four white pills on the desk; (g) one open
plastic bag containing a white powder on the desk; (h) one bottle
cap with a brown paste on the desk; (i) fourteen pink pills on
the bed; (j) one plastic bag containing brown powder on the desk;
six plastic bags (each containing brown powder) inside a wool cap
on the desk; (k) one spoon with a small brown rock substance
that, based upon their training and experience, the officers
believed to be heroin; and (l) several hypodermic needles on the
night stand, desk, and bed.

38.   The items seized during the search described in
paragraph 37, above, were tested at the MSLI; MSLI testing
revealed that these items contained various narcotics, including
Venlafaxine (a prescription anti-depressant), Oxycodone (a
Schedule II substance under the CSA), heroin, and cocaine.

39.   Based at least in part on the events described in
paragraphs 32 through 38, above Martineau was indicted in
Middlesex Superior Court for possession with intent to distribute
a Class A substance and possession of a Class B substance.   On
March 16, 2006, he was found guilty of both charges and received
a one-year sentence.

E.   **The November 2008 Investigations**

40.   On or about November 9, 2008, I initiated an
investigation into the distribution of heroin from Room 219 of

the Defendant Property with TPD Detective Jessica Mulvey ("Det.
Mulvey"), stemming from the information of a reliable
confidential informant ("CI-5"). During the investigation, Det.
Mulvey and I confirmed that Keith Moran ("Moran") and Elizabeth
Yandow ("Yandow") were residing at the Defendant Property in Room
219.

41. On November 12, 2008, CI-5 agreed to participate in a
controlled purchase of heroin at Room 219 of the Defendant
Property. Prior to the controlled purchase, Det. Mulvey and I
searched CI-5 with negative results for contraband, and then
provided s/he with a quantity of United States currency for use
in the controlled purchase. We subsequently set up surveillance
across the street from the Defendant Property and observed CI-5
enter Room 219 of the Defendant Property. After CI-5 entered the
room, we observed a green Pontiac Grand Prix (the "Grand Prix")
bearing Massachusetts license plates enter the parking lot and
park in front of Room 219. A female exited the Grand Prix and
entered Room 219, while a Hispanic male remained in the vehicle.
A few moments later, the female returned to the vehicle. CI-5
subsequently exited Room 219, and Det. Mulvey and I followed
him/her to a predetermined location. At the predetermined
location, CI-5 handed us one plastic bag containing a quantity of
a substance that s/he stated was purchased from Moran in Room 219
with the United States currency previously provided by the TPD;

18

based on our training and experience, Det. Mulvey and I believed the substance in the plastic bag to be heroin.

42.  On November 13, 2007, CI-5 agreed to participate in another controlled puchase of heroin at Room 219 of the Defendant Property.  Prior to the controlled purchase, Det. Mulvey and I searched CI-5 with negative results for contraband, and then provided s/he with a quantity of United States currency for use in the controlled purchase.  We subsequently set up surveillance across the street from the Defendant Property and observed CI-5 enter Room 219 to make another purchase of heroin.  Moments later, I observed Moran, Yandow, and CI-5 exit Room 219 and approach the Grand Prix, which was parked across the street from the Defendant Property.  When Moran approached the Grand Prix, I observed him engage in a hand-to-hand transaction with the same Hispanic male and white female observed during the previous controlled transaction (described in paragraph 41, above).  Moran then returned to Room 219, followed by CI-5; CI-5 exited Room 219 shortly thereafter.

43.  After CI-5 exited Room 219, Det. Mulvey and I followed him/her to a pre-arranged location, where CI-5 handed us one plastic bag containing a substance that, based upon our training and experience, we believed to be heroin.  CI-5 informed us that s/he had purchased the heroin from Moran in Room 219 with the United States currency previously provided by the TPD.

44.  On November 14, 2008, I was notified by CI-5 that Moran was leaving the Defendant Property for the Tewksbury Wal-Mart to purchase heroin from the same couple in the Grand Prix.  The TPD set up surveillance of the Defendant Property and the Wal-Mart parking lot.  Soon after surveillance was established, TPD officers observed Moran walk from the Defendant Property to the Wal-Mart.  Moran stood by the entrance to the store for approximately twenty minutes, looking at the vehicles entering the lot.  Thereafter, TPD Detective Sergeant Robert Westaway ("Sgt. Westaway") and I observed the Grand Prix enter the parking lot.  The same female from the two prior observed transactions, described in paragraphs 41 and 42, above, was operating the Grand Prix and two males accompanied her.  One of the male occupants in the vehicle exited the Grand Prix and entered the Wal-Mart, followed by Moran.  Given our experience and the controlled heroin transactions of the two previous days, described in paragraphs 41 to 42, above, we reasonably believed a narcotics transaction took place inside the Wal-Mart.  Soon after entering the store, we observed the male occupant of the Grand Prix leave the Wal-Mart, and return to the vehicle.

45.  TPD Patrol Supervisor Sergeant Robert Field ("Sgt. Field") effected a traffic stop of the Grand Prix after it exited the Wal-Mart parking lot.  The individuals in the Grand Prix, including the male who entered the Wal-Mart, as described in

20

paragraph 44, above, were identified as Miguel Franco ("Franco"), Luz Maldanado ("Maldanado"), and Christie Sanchez ("Sanchez"). Sanchez was also identified as the female who entered Room 219 at the Defendant Property two days prior, as described in paragraph 41, above. Sanchez admitted to the distribution of heroin at the Defendant Property.

46. Subsequent to the motor vehicle stop, TPD Sergeant Timothy W. Kelly ("Sgt. Kelly") and his trained K-9 partner, "Ali,"[4] arrived on the scene to conduct a dog sniff of the Grand Prix. Sanchez stated she was unaware of the presence of narcotics in the vehicle, although we observed numerous air fresheners, which are typically used to mask narcotic odors, in the passenger compartment floors. Ali alerted to a trap in the center console between the two front seats. The console held: (a) numerous clear plastic bags containing a white substance that, based on my training and experience, I believed to be cocaine; and (b) numerous clear plastic bags containing a brown powder substance that, based on my training and experience, I believed to be heroin. TPD officers seized the Grand Prix, the above-described drugs, and one hundred ninety-seven dollars ($197.00) in United States currency from the three occupants of the vehicle.

---

[4] Ali is a German Shepherd certified in detecting the ordors of marijuana, cocaine, heroin, hash, and methamphetamine.

47.  Based on the investigation described in paragraphs 40 through 46, above, a Massachusetts state search warrant was obtained on November 14, 2008 for Room 219, and executed that same day.  Moran was detained in Room 219, and was advised of his rights under <u>Miranda</u>.  Moran advised TPD officers that he had bought heroin from Franco on numerous occasions, including that same day inside the Wal-Mart.  Moran provided Franco's cell phone number; Det. O'Neill dialed the number, and the Nokia cell phone seized from Franco during the traffic stop described in paragraph 45, above, was alerted.

48.  Based on the events described in paragraphs 40 through 47, above, Moran was arraigned in Middlesex District Court for two counts of distribution of a Class A substance.  He received two years probation; however, he subsequently violated the terms of his probation and thereafter received a ninety-day sentence.

49.  During the week of November 16, 2008, members of the TPD initiated an investigation into the distribution of illegal narcotics by a black male, Vincent Cecil ("Cecil"), after receiving information from a confidential informant that Cecil was selling narcotics from the Defendant Property.  Cecil had been residing at the Defendant Property in various rooms, including Room 254, for well over one year.

50.  On November 28, 2008, I telephoned the motel clerk at the Defendant Property, identified myself using a name that a

22

confidential source used when s/he purchased cocaine and heroin from Cecil on November 18, 2008, and asked to be transferred to Cecil in Room 254. When Cecil answered the phone, he told me to come to his room, and I advised him that my "girlfriend" (i.e., Det. Mulvey in an undercover capacity) would arrive to make the purchase in a few hours.

51. TPD officers then provided Det. Mulvey with a quantity of United States currency for use during the undercover purchase. TPD officers, in a van parked in front of Room 254, then observed Det. Mulvey enter Room 254 of the Defendant Property. Soon after entering Room 254, TPD officers observed Det. Mulvey exit Room 254 and followed her to a pre-arranged location across the street from the Defendant Property. At the pre-arranged location, Det. Mulvey informed me that she had provided Cecil with the United States currency previously provided by the TPD and had informed Cecil that she would return shortly to pick up narcotics from him. Det. Mulvey further stated that Cecil gave her his cell phone number and told her to call him in about one hour.

52. Approximately one hour later, Det. Mulvey, still under TPD surveillance and in an undercover capacity, called Cecil's cell phone number and subsequently returned to Room 254 of the Defendant Property. Soon after entering Room 254, TPD officers observed Det. Mulvey exit Room 254. She went to the TPD surveillance van, where she handed TPD Detective Brian O'Neill

23

("Det. O'Neill") and TPD Detective Patrick Harrington ("Det. Harrington") one clear plastic bag containing a white powdery substance that, based upon their training and experience, the officers believed to be cocaine.

53. Shortly thereafter, Det. O'Neill, Det. Harrington, and I arrested Cecil in Room 254 and seized the United States currency used in Detective Mulvey's undercover transaction (described in paragraphs 50 through 52, above) from Cecil's person.

54. Cecil consented to a search of Room 254. The search of Room 254 revealed one clear plastic bag containing a white powdery substance that the TPD officers on the scene, based upon their training and experience, believed to be cocaine.[5]

55. The substances purchased in the undercover purchase (described in paragraphs 50 through 52, above) and found during the search of Room 254 (described in paragraph 54, above) have been submitted to the MSLI for analysis, but the results are not yet available.

56. Based on the events described in paragraphs 49 through 54, above, Cecil was arraigned at Middlesex District Court for distribution of a Class B substance and possession with intent to distribute a Class B substance. Cecil's state case is still pending.

---

[5] The bag was found in the pocket of a jacket in the closet of Room 254.

24

57.   On November 30, 2008, Det. O'Neill was patrolling the
rear parking lot of the Defendant Property after receiving
information from a confidential informant ("CI-6") that occupants
in Room 232 of the Defendant Property had been distributing
heroin and cocaine.   CI-6 had stated that s/he had purchased an
amount of cocaine from the occupants of Room 232 within the past
forty-eight hours.   CI-6 identified the drug distributor as a
female named "Melanie," who was accompanied by a male, possibly
of Asian descent.

58.   Prior to leaving the parking lot of the Defendant
Property, Det. O'Neill observed a female he recognized as Melanie
Quadros ("Quadros") standing in the doorway of Room 232.   He
exited his vehicle and began a conversation with Quadros in the
doorway of Room 232.   A male who Det. O'Neill recognized as
Quadros's boyfriend, Yonny Sean ("Sean"), was also present during
Det. O'Neill's conversation with Quadros.

59.   Sean and Quadros consented to a search of Room 232.
The search of Room 232 revealed the following materials, among
other items, that are routinely used in the trafficking and
distribution of illegal narcotics: (a) hundreds of small, medium,
and large sized plastic baggies ("square apple baggies");[6] (b)

---

[6] Square apple baggies are small, square, plastic bags (the
smallest being appoximately one inch in length) with ziplock tops
and an apple stamp that are commonly used in the packaging and
distribution of illegal narcotics such as heroin and cocaine.

25

several plastic sandwich bags; (c) empty prescription bottles; (d) two smoking devices (commonly referred to as "crack pipes"); (e) hypodermic needles; and (f) three black digital scales with a white powder residue that, based upon his training and experience, Det. O'Neill believed to be cocaine.  The search of Room 232 also revealed other items, including: (a) on the night stand, one blue plastic bag containing a brown powdery substance that, based upon his training and experience, Det. O'Neill believed to be heroin; (b) in the front bureau, one clear plastic bag containing a white powder substance that, based upon his training and experience, Det. O'Neill believed to be cocaine, as well as one orange pill that, based upon his training and experience, Det. O'Neill believed to be Oxycodone; (c) one white plastic bag containing a substance that, based upon his training and experience, Det. O'Neill believed to be heroin; and (d) one plastic bag[7] containing a substance that, based upon his training and experience, Det. O'Neill believed to be cocaine.

60. The orange pill described in paragraph 59, above was identified in the field using the Drug Identification Bible to be Oxycodone.  The substances found during the search of Room 232, as described in paragraph 59, above, have been submitted to the

---

[7] This baggie was inside an empty green cap that was secured with other drug paraphernalia that contained what Det. O'Neill, based upon his training and experience, believed to be cocaine residue.

26

MSLI for analysis, but the results are not yet available.

61.   Based on the events described in paragraphs 57 through 60, above, TPD officers arrested Sean and Quadros.  Sean and Quadros were arraigned at Middlesex District Court for possession with intent to distribute a Class A substance, possession with intent to distribute a Class B substance, and possession of a Class B substance.  The case against Sean was dismissed because the certified test results for the seized items were not available by her August 2009 court date.  Quadros's state case is still pending.


Signed under the penalties of perjury this _2 9_ day of September, 2009.

Thomas M. Casey
Detective Sergeant
Tewksbury Police Department

27

## EXHIBIT B

### AFFIDAVIT OF VINCENT T. KELLY

I, Vincent T. Kelly, state the following under oath:

1.  I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration ("DEA"), and have served in this capacity for eighteen (18) years.  I am presently assigned to the Asset Forfeiture Unit at the Boston Field Division and have been so assigned for the last three (3) years. In connection with my duties and responsibilities as a DEA Special Agent, I have received extensive training in the field of narcotics investigation and enforcement.  I have also received specialized training in money laundering and asset forfeiture.  I have participated in various aspects of investigatory work, including undercover surveillance and undercover narcotics purchases.  I have also participated in approximately one hundred (100) narcotics-related arrests and the execution of approximately fifty (50) narcotics-related search warrants.

2.  I am familiar with the manner in which narcotics traffickers use telephones.  Furthermore, I understand coded, veiled, or slang-filled telephone conversations, electronic text-messages, pager messages, and coded pager messages.  I am also familiar with other means of communication used to facilitate illegal trafficking activities.  I am familiar with the vernacular used by drug traffickers, as well as with the methods

1

they use to disguise conversations and operations.

3.    I submit this Affidavit in support of a Complaint for Forfeiture in Rem (the "Complaint") against the real property located at 434 Main Street,[1] Tewksbury, Massachusetts, including all buildings, appurtenances and improvements thereon, as described in more detail in a deed recorded in Book 2056, Page 118 of the Middlesex North County Registry of Deeds[2] (hereinafter, the "Defendant Property").

4.    This affidavit is based on investigations conducted by members of the Tewksbury, Massachusetts Police Department ("TPD") between approximately February 8, 2001 and November 30, 2008. These investigations included surveillance of the Defendant Property by TPD officers, a number of controlled purchases of narcotics made by confidential informants at the Defendant Property, an undercover narcotics purchase made by law enforcement officers at the Defendant Property, an investigation of a clandestine methamphetamine laboratory at the Defendant Property, as well as the execution of state search warrants at the Defendant Property.   These investigations resulted in the

---

[1] An online search for the property, commonly known and operated as "The Motel Caswell," lists the property's street address as 450 Main Street.   However, a title search conducted by the United States Marshal Service indicates that the property's address is actually 434 Main Street.

[2]   A title search by the United States Marshal Service reveals that this is the most recent Book and Page Number associated with the property.

2

seizures of various controlled substances (including, but not limited to, heroin, cocaine, and methamphetamine) and various paraphernalia used to deliver and dispense these drugs. Furthermore, these investigations resulted in the arrests and convictions of several individuals who temporarily visited or resided at the Defendant Property.

5.   Based on the information detailed in the Affidavit of TPD Detective Sergeant Thomas Casey, attached to the Complaint as Exhibit A, which I have reviewed, and my own training and experience, I have probable cause to believe that the Defendant Property was used or intended to be used to commit, or to facilitate the commission of, a violation of 21 U.S.C. §§ 841, 846, and/or 856.  Therefore, I have probable cause to believe that the Defendant Property is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(7).

Signed under the penalties of perjury this 29th day of September, 2009.

Vincent T. Kelly
Special Agent
Drug Enforcement Administration

3