UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
PLAINTIFF,

VS.

434 MAIN STREET, TEWKSBURY,
MASSACHUSETTS
DEFENDANT.

RUSSELL H. CASWELL, Trustee of
the Tewksbury Realty Trust,
CLAIMANT.

CIVIL ACTION
NO. 09-11635-JGD

**CLAIMANT'S POST-TRIAL BRIEF**

**SCHLOSSBERG | LLC**
George W. Skogstrom, Jr. (BBO #552725)
Tiffany L. Pawson (BBO # 672713)
35 Braintree Hill Office Park, Suite 204
Braintree, MA 02184
Tel: (781) 848–5028
Fax: (781) 848–5096
Email: gskogstrom@sabusinesslaw.com;
tpawson@sabusinesslaw.com

*Local Counsel for Claimant*

**INSTITUTE FOR JUSTICE**
Scott G. Bullock, *pro hac vice*
Lawrence G. Salzman, *pro hac vice*
Darpana M. Sheth, *pro hac vice*
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682–9320
Fax: (703) 682–9321
Email: sbullock@ij.org;
lsalzman@ij.org; dsheth@ij.org

*Attorneys for Claimant*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

PROPOSED FINDINGS OF FACT ....................3

THE MOTEL CASWELL: A MOM-AND-POP MOTEL IN TEWKSBURY, MASSACHUSETTS ........3

THE UNITED STATES ATTEMPTS TO TAKE THE MOTEL THROUGH CIVIL FORFEITURE ..........4

MR. CASWELL IS AN INNOCENT OWNER ....................6

PROPOSED CONCLUSIONS OF LAW ....................7

I. THE UNITED STATES HAS FAILED TO PROVE THAT THE MOTEL IS EVEN SUBJECT TO FORFEITURE ....................7

A. The Government Failed to Prove That the Motel Was Used to Commit or Facilitate a Forfeitable Drug Offense Under Section 881(a)(7) ....................9

B. The Government Failed to Establish a Substantial Connection Between the Motel and the Forfeitable Drug Offenses ....................13

II. THE EVIDENCE ADDUCED AT TRIAL DEMONSTRATES THAT MR. CASWELL IS AN INNOCENT OWNER UNDER 18 U.S.C. § 983(d) BECAUSE HE SIMPLY DID NOT KNOW OF THE CONDUCT GIVING RISE TO FORFEITURE ....................16

A. Russell Caswell Had No Actual Knowledge of Drug Crimes Occurring on His Property Prior to Their Occurrence or During Their Occurrence ....................17

B. Russell Caswell Has Never Been Willfully Blind to Drug Crimes Occurring on His Property ....................22

III. MR. CASWELL TOOK REASONABLE STEPS TO STOP THE UNAUTHORIZED USE OF HIS PROPERTY FOR DRUG CRIMES ....................28

CONCLUSION ....................34

**TABLE OF AUTHORITIES**

**Page(s)**

**Case**

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011)....................22

*United States v. $10,694 in U.S. Currency*, 828 F.2d 233 (4th Cir 1987)....................18

*United States v. $11,552.73 in U.S. Currency*, No. 07-11759-PBS, 2009 WL 2045340 (D. Mass. June 10, 2009)....................24, 25

*United States v. $21,510.00 in U.S. Currency*, 144 Fed. Appx. 888 (1st Cir. 2005)....................11

*United States v. $463,497.72 in U.S. Currency*, 853 F. Supp. 2d 675 (E.D. Mich. 2012)....................17, 22, 24

*United States v. $4,255,000 in U.S. Currency*, 762 F.2d 895 (11th Cir. 1985)....................18

*United States v. One 1988 Checo Let 410 Turbo Prop Aircraft*, 282 F. Supp. 2d 1379 (S.D. Fla. 2003)....................22

*United States v. One 1989 Jeep Wagoneer*, 976 F.2d 1172 (8th Cir. 1992)....................24

*United States v. 2001 Honda Accord EX*, 245 F. Supp. 2d 602 (M.D. Pa. 2003)....................18, 22

*United States v. 6 Fox St., Windham, N.H.*, 480 F.3d 38 (1st Cir. 2007)....................14

*United States v. 15 Bosworth St., Boston, Mass.*, 236 F.3d 50 (1st Cir. 2001)....................30

*United States v. 28 Emery St., Merrimac, Mass.*, 914 F.2d 1 (1st Cir. 1990)....................9, 13

*United States v. 31 Endless St., Martinsville, Va.*, 8 F.3d 821, No. 92-1609, 1993 WL 441804 (4th Cir. 1993)....................15, 25

*United States v. 45 Claremont St., Central Falls, R.I.*, 395 F.3d 1 (1st Cir. 2004)....................13

*United States v. 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111 (1993)....................8

*United States v. 141st St. Corp.*, 911 F.2d 870 (2d Cir. 1990)....................30

*United States v. 143-147 E. 23rd St., N.Y., N.Y.*, 77 F.3d 648 (2d Cir. 1996)....................30

*United States v. 221 Dana Ave., Hyde Park, Mass.*, 261 F.3d 65 (1st Cir. 2001)....................8, 18, 19

*United States v. 352 Northrup St., Cranston, R.I.*, 40 F. Supp. 2d 74 (D.R.I. 1999)....................15

*United States v. 475 Cottage Drive, Mount Airy, Surrey Cnty., N.C.*, 433 F. Supp. 2d 647 (M.D.N.C. 2006 ) ....................14

*United States v. 710 Main St., Peekskill, N.Y.*, 753 F. Supp. 121 (S.D.N.Y. 1990) ....................30

*United States v. 755 Forest Rd., Northford, Conn.*, 985 F. 2d 70 (2d Cir. 1993)....................25

*United States v. 874 Gartel Drive, Walnut, Cal.*, 79 F.3d 918 (9th Cir. 1996) ....................18

*United States v. 1044 Cherry Drive, Elderon, Wis.*, No. 08-cv-564-bbc, 2010 WL 519861 (W.D. Wis. Feb 9, 2010)....................25

*United States v. 1813 15th St., NW, Washington, D.C.*, 956 F. Supp. 1029 (D.D.C. 1997)..........18

*United States v. 2659 Roundhill Drive, Alamo, Cal.*, 194 F.3d 1020 (9th Cir. 1999) ....................18

*United States v. 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841 (8th Cir. 2007)....................9, 14, 15

*United States v. 3402 53rd St.West, Bradenton, Fla.*, 178 Fed. Appx. 946 (11th Cir. 2006)........15

*United States v. 3639-2nd Street*, 869 F.2d 1093 (8th Cir. 1989)....................13

*United States v. 3855 S. April St., Montgomery, Ala.*, 797 F. Supp. 933 (M.D. Ala. 1992)..........30

*United States v. 5000 Palmetto Dr., Fort Pierce, Fla.*, 928 F.2d 373 (11th Cir. 1991) ....................18

*United States v. 6960 Miraflores Ave., Coral Gables, Fla.*, 995 F.2d 1558 (11th Cir. 1993).......18

*United States v. 7326 Highway 45 N., Three Lakes, Wis.*, 965 F.2d 311 (7th Cir. 1992) ..............18

*United States v. 13430 S.W. 1st St., Miami, Fla.*, 789 F. Supp. 387 (S.D. Fla. 1992)....................18

*United States v. 16328 South 43rd E. Ave., Bixby, Okla.*, 275 F.3d 1281 (10th Cir. 2002) ..........29

*United States v. All Those Certain Lots, Va. Beach, Va.*, 657 F. Supp. 1062 (E.D.V.A. 1987)....................10, 11

*United States v. Aquilla*, 976 F.2d 1044 (7th Cir. 1992) ....................9, 10

*United States v. Carrell*, 252 F.3d 1193 (11th Cir. 2001)....................17

*United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448 (7th Cir. 2005)....................11

*United States v. Hawkey*, 148 F.3d 920 (8th Cir. 1998) ....................10

*United States v. Heldeman*, 402 F.3d 220 (1st Cir. 2005) ....................16

*United States v. Littlefield*, 821 F.2d 1365 (9th Cir. 1987)....................8

*United States v. Lot Numbered One of the Lavaland Annex*, 256 F.3d 949 (10th Cir. 2001) .......30

*United States v. Mertilus*, 111 F.3d 870 (11th Cir. 1997)....................9

*United States v. Milbrand*, 58 F.3d 841 (2d Cir. 1995) ....................25

*United States v. One Parcel of Real Prop., Everett, Mass.*, 900 F.2d 470 (1st Cir. 1990)............13

*United States v. Real Prop., Santa Paula, Cal.*, 763 F. Supp. 2d 1175 (C.D. Cal. 2011) .......17, 18

*United States v. Santoro*, 866 F.2d 1538 (4th Cir. 1989)....................9, 15

*United States v. Schifferli*, 895 F.2d 987 (4th Cir. 1990)....................11, 12

*United States v. Stop Six Ctr., Located at 3340 Stallcup, Fort Worth, Tex.*, 794 F. Supp. 626 (N.D. Tex. 1992)....................18

*United States v. Two Tracts of Real Prop. with Bldgs., Appurtenances and Improvements Thereto, Located in Carteret Cty., N.C.*, 998 F.2d 204 (4th Cir. 1993)....................12, 14

**<u>Statutes and Codes</u>**

IOWA CODE § 809A.5(1)(a)....................22

R.I. GEN. LAWS § 21-28-5.04(a) ....................22

S.D. Codified Laws Ann. § 34-20B-73 ....................22

18 U.S.C. § 982(a) ....................10

18 U.S.C. § 983(c)(1)....................7

18 U.S.C. § 983(c)(3)....................8, 11, 13

18 U.S.C. § 983(d) ....................16, 17

18 U.S.C. § 983(d)(2)(A)....................22

18 U.S.C. § 983(d)(2)(B) ....................28, 29

18 U.S.C. § 983(d)(2)(B)(i)(II) ....................30, 33

18 U.S.C. § 1957 ....................10

Controlled Substance Act
21 U.S.C. § 801 *et seq*. ....................8

21 U.S.C. § 853(o) ....................8

21 U.S.C. § 881(a)(7) .................... *passim*

**Legislative Materials**

Civil Asset Forfeiture Reform Act, H.R. Rep. No. 106-192 (1999) ....................29

Claimant Russell Caswell respectfully submits this post-trial memorandum setting forth proposed findings of fact and conclusions of law.

**PRELIMINARY STATEMENT**

In an egregious abuse of its civil forfeiture authority, the United States attempts to take Mr. Caswell's family-run motel based on an unprecedented reading of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"). Under CAFRA, for property to even be subject to forfeiture, the United States must prove a substantial connection between the property and the forfeitable offense. Even if the United States meets this burden, CAFRA provides property owners with an affirmative defense against forfeiture if they, like Mr. Caswell, had no actual knowledge of the offense giving rise to forfeiture or took reasonable steps to stop the use of the property to commit or facilitate the forfeitable offense.

At trial, the only connection the Government was able to show between the Motel Caswell and a forfeitable drug offense was that over the course of two decades, a small number of the Motel's guests or their visitors surreptitiously engaged in various drug activities, unseen and unknown to Mr. Caswell at the time they occurred. The undisputed evidence also showed that Mr. Caswell was not involved in any of the crimes, never learned about some crimes, only learned of others after the fact, and unequivocally offered police assistance in curbing drug crimes on his property, including providing free motel rooms to police to conduct surveillance and perform controlled drug buys. Moreover, there was no evidence that the Tewksbury Police Department ever made a specific recommendation to Mr. Caswell related to mitigating drug crime at his motel. The undisputed evidence also demonstrated that the Town of Tewksbury never filed or threatened to file a nuisance action against the Motel, never withheld or threatened

to withhold an innkeeper's license, never warned the Motel about forfeiture, and never considered any means of reducing crime at the Motel as an alternative to forfeiture.

Unable to contest these key facts, the United States urges this Court to adopt a radically expansive theory of forfeiture under which a single drug transaction committed by anyone on the property of an establishment serving the general public subjects that property to forfeiture—regardless of the owner's lack of involvement or even prior knowledge of the drug crime. Under the Government's far-reaching theory, the mere showing that a property was the site of a drug crime because of the independent actions of unrelated third parties with no relationship to the owner satisfies its burden to prove forfeitability and then the burden shifts to Mr. Caswell to affirmatively prove his innocence. The expansiveness of the Government's theory is not limited to the issue of forfeitability, however. Taking a similarly radical view of the innocent owner defense, the Government argues that, because Mr. Caswell learned of some of the drug crimes after arrests were made, he is deprived of the first provision of the safe harbor that he lacked knowledge of the crimes. Then, according to the Government, Mr. Caswell must affirmatively put forth evidence that he undertook all actions in the Government's mind (even if unarticulated to him) to prevent drug crime in order to come within the purview of the second provision of the innocent owner safe harbor.

Accepting the Government's theory of forfeiture would subject to forfeiture countless establishments that serve the general public simply because they are the site of occasional drug crime. The Motel Caswell is a budget motel that struggles with a certain level of criminal activity in the same way, according to the Government's own witnesses, as does the Motel 6—less than three-quarters of a mile up the road from the Motel Caswell—and the Stadium Plaza parking lot, 1.3 miles from the Motel Caswell. Indeed, police officers consistently testified that,

in order to reduce crime, it was their practice to drive through and stop in at all of the motels and hotels in the area to establish a police presence and to check registration cards for outstanding warrants.

If government officials believe that the Motel Caswell has specific problems they want addressed, there are ample means at their disposal. But to deprive someone of their entire property through the draconian penalty of forfeiture, the Government must strictly adhere to the requirements of CAFRA. As detailed below, the Government does not meet those requirements. This Court should reject the Government's attempt to rewrite the law and obliterate the protections Congress enacted to protect against exactly this kind of governmental overreaching.

## PROPOSED FINDINGS OF FACT

Based on the evidence adduced at the bench trial held from November 5, 2012, through November 8, 2012, Claimant respectfully submits the following proposed findings of fact.

1. This is a federal *in rem* action brought by the United States to forfeit the property on which a family-run, budget motel, the Motel Caswell, is located. Claimant is Tewksbury Realty Trust which owns the property and is represented by Trustee, Russell H. Caswell. Mr. Caswell and his wife, Patricia Caswell, are beneficiaries of the Trust. (Joint Pretrial Memo. at 5 [Docket No. 105].)

### THE MOTEL CASWELL: A MOM-AND-POP MOTEL IN TEWKSBURY, MASSACHUSETTS.

2. Born in Fitchburg, Massachusetts, Mr. Caswell, currently 69 years old, has lived in Tewksbury, Massachusetts, since 1955. (Trial Tr. 4-19:17-25; 4-20:1-2.)[1]

3. When Mr. Caswell was about 11 years old, in 1955, his father built the Motel Caswell (the "Motel") at 434 Main Street in Tewksbury, Massachusetts. (Trial Tr. 4-21:9-16.) His father eventually sold the Motel to Mr. Caswell in 1984. (Trial Tr. 4-21:20-23.)

4. Since 1984, Mr. Caswell has owned and operated the family-run Motel. (Trial Tr. 4-21:5-8.)

[1] References to the transcript of the bench trial conform to the following format: Trial Tr. <day of trial>-<page number>:<line number>–<page number>:<line number>. For Day 2 of the bench trial held on November 6, 2012, the transcript for the morning session is designated as "2A" and the transcript for the afternoon session is designated as "2B."

5. Mr. Caswell lives with his wife of 48 years, Patricia, next to the Motel at 442 Main Street, Tewksbury, Massachusetts. (Trial Tr. 4-19:15-16; 4-24:13-17.) Mr. and Mrs. Caswell also live with Mr. Caswell's 92-year-old mother-in-law, their son, daughter-in-law, and 9-year-old granddaughter. (Trial Tr. 4-24:18–25:3.)

6. As part of his responsibilities in managing the Motel, Mr. Caswell oversees operations and does some of the maintenance, yard work, and general upkeep. (Trial Tr. 4-22:17-19.)

7. Mr. Caswell draws an annual salary of $72,000 operating the motel. (Trial Tr. 4-23:3-4.)

8. Mr. Caswell has no higher education, no experience in law enforcement, and no training in drug investigations. (Trial Tr. 4-20:3-11; 4-40:13-18.)

9. Mr. Caswell's children also work for the Motel. His son, Joseph "Jay" Caswell, assists with maintenance, works at the desk one night a week, and on occasion fills in as needed, while his daughter, Julie Gath, has done the bookwork since Mrs. Caswell took ill. (Trial Tr. 4-23:10-12; 17-19.)

10. Mr. Caswell generally has eight additional employees: four desk clerks and three to four housekeepers. (Trial Tr. 4-23:13-19.)

11. The Motel has 56 rooms and offers budget accommodations to a cross-section of society, including out-of-town working crews and people in between homes. (Trial Tr. 4-23:20–24:9.)

12. Over the last 20 years, Mr. Caswell has rented roughly 14,000 rooms per year. (Trial Tr. 4-24:10-12.)

**THE UNITED STATES ATTEMPTS TO TAKE THE MOTEL THROUGH CIVIL FORFEITURE.**

13. On September 29, 2009, the United States filed a complaint for forfeiture *in rem* against "the real property located at 434 Main Street, Tewksbury, Massachusetts, including all buildings, appurtenances and improvements thereon, as described in more detail in a deed recorded in Book 2056, Page 118 of the Middlesex North County Registry of Deeds" (the "Property"). (Compl. ¶ 2 [Docket No. 1]; Joint Pretrial Memo. at 5, ¶ 1.)

14. The Motel Caswell is situated on the Property. (Joint Pretrial Memo. at 5, ¶ 5.)

15. As noted, title to the Property is held by the Tewksbury Realty Trust. (Joint Pretrial Memo. at 5, ¶ 3.) Mr. Caswell is the trustee and both he and his wife are the beneficiaries of the trust. (Trial Tr. 4-21:24–22:7.)

16. The Property is unencumbered by any mortgages or liens, except the *lis pendens* filed by the United States as a result of its forfeiture complaint. (Trial Tr. 4-22:8-13; Joint Pretrial Memo. at 6, ¶ 11.)

17. The Complaint alleges that the Property is subject to forfeiture under 21 U.S.C. § 881(a)(7) because it was used or intended to be used, in any manner or part to commit, or to facilitate a violation of the Controlled Substances Act punishable by more than one year of imprisonment.  (Compl. ¶ 3.)

18. Over the course of two decades, a small number of guests or their visitors committed drug crimes behind closed doors of rooms of the Motel or on the premises out of plain sight. (Ex. 51.)

19. There is no evidence that Mr. Caswell was involved in or participated in any way in the illegal activities referenced in Exhibit 51.  (Trial Tr. 4-30:22–31:7.)

20. Indeed, Mr. Caswell has never been charged with any crime in his life.  (Trial. Tr. 4-32:6-11.)

21. Mr. Caswell did not know of any of the individuals involved in the drug crimes referenced in Exhibit 51.  (Trial Tr. 4-30:22–31:2.)

22. Mr. Caswell did not see any of the illegal activities referenced in Exhibit 51 occurring and was not present when they occurred.  (Trial Tr. 4-31:3-11.)

23. The Police Chief of the Tewksbury Police Department, testifying on behalf of the town, stated that it would be against policy to inform the public about a pending investigation or a pending case.  (Trial Tr. 4-6:16–7:2.)

24. The Town of Tewksbury never filed or threatened to file a nuisance action against the Motel.  (Trial Tr. 4-46:14-19; 4-16:7-9.)

25. The Town of Tewksbury never withheld an innkeeper's license from the Motel.  (Trial Tr. 4-46:8-13.)

26. The Town of Tewksbury never informed Mr. Caswell that he was operating the Motel in violation of state or local law.  (Trial Tr. 4-16:11-14.)

27. Mr. Caswell never received any warning and was never told by anyone from the town of Tewksbury or the United States Government that his property could be subject to forfeiture because of the actions of third parties.  (Trial Tr. 4-25:6–26:1.)

28. Indeed, the Town of Tewksbury never considered any means of reducing crime at the Motel Caswell as an alternative to the forfeiture action filed by the United States.  (Trial Tr. 4-85:4-8.)

29. Mr. Caswell first learned of the forfeiture complaint in September 2009 when he received a registered letter in the mail notifying him and his wife.  The letter shocked Mr. Caswell.  (Trial Tr. 4-25:6–26:1.)

**MR. CASWELL IS AN INNOCENT OWNER.**

30. At the time any guest checked in or at any point during their stay, Mr. Caswell did not know that a guest intended to or was committing drug crimes in the Motel.  (Trial Tr. 4-31:17-23.)

31. Mr. Caswell only learned of certain drug crimes after perpetrators were arrested. (*See, e.g.*, Trial Tr. 4-32:12–33:10.)

32. The Town of Tewksbury has no evidence that Mr. Caswell has ever rented a room at his motel to any person knowing that that person intended to commit a drug crime.  (Trial Tr. 4-84:10-13.)

33. The Town of Tewksbury has no evidence that Mr. Caswell has ever seen a drug crime on his property while it was occurring.  (Trial Tr. 4-83:22-24.)

34. The Town of Tewksbury has no evidence that Mr. Caswell ever ignored or failed to report to the Tewksbury Police Department any drug crime that he became aware of.  (Trial Tr. 4-84:7-9; 4-84:18-20.)

35. Mr. Caswell complied with state law in allowing police unfettered access to the Motel's registration cards. (Trial Tr. 4-44:3-4.)

36. When police asked Mr. Caswell to improve the method by which he registered guests to ensure that the information was legible and accurate, Mr. Caswell complied and instructed his employees to make copies of guest's driver licenses. (Trial Tr. 2B-10:7-24; 4-44:5–45:20.)

37. Mr. Caswell called the police to report suspicious activity, including drug activity.  (Trial Tr. 4-42:16–43:3.)

38. Mr. Caswell provided full and open access to all areas of the Motel, making keys to rooms available to Tewksbury police officers upon request, obviating the need for a warrant. (Trial Tr. 4-47:17-22.)

39. Mr. Caswell provided free rooms to Tewksbury police officers to conduct surveillance of guests suspected of drug activity and perform controlled drug buys that led to arrests of suspected criminals.  (Trial Tr. 4-47:7-16.)

40. Mr. Caswell ensures that a desk clerk is on duty 24 hours a day, seven days a week. (Trial Tr. 4-49:10-16.)

41. Mr. Caswell installed security cameras on his property—one in the office before the instant forfeiture action was filed—and additional security cameras in the parking lots a few years later.  (Trial Tr. 4-48:11–49:3.)

42. Mr. Caswell installed lighting in the front and back of the Motel to enhance security. (Trial Tr. 4-68:11–69:1.)

43. In the lobby of the Motel, there is a sign, which has been there approximately ten years, asking patrons to call the police if they see any suspicious activity. (Trial Tr. 4-47:23–48:10.)

44. The Town of Tewksbury never expressed a concern to Mr. Caswell that he should do more than he has done to discourage drug crimes on his property. (Trial Tr. 4-9:20–10:2.)

45. Indeed, no one from the Tewksbury Police Department made any specific recommendations to Mr. Caswell regarding mitigating crime. (Trial Tr. 4-11:10-13.)

46. No one from the Town of Tewksbury, the United States government or any other governmental body ever approached Mr. Caswell about taking steps to discourage drug activity at the Motel. (Trial Tr. 4-45:21–46:7.)

## PROPOSED CONCLUSIONS OF LAW

The evidence adduced at trial merits judgment in favor of Claimant. First, the United States failed to prove that the Motel is even subject to forfeiture under 21 U.S.C. § 881(a)(7). Second, the evidence demonstrates that Mr. Caswell is an innocent owner under 18 U.S.C. § 983(d) because at the time each of the illegal acts allegedly giving rise to forfeiture occurred, Mr. Caswell simply did not know that particular guests or their visitors were engaged in illegal activity. Third, to the extent this Court accepts the Government's unfounded attempt to graft a negligence theory of "constructive knowledge" onto the statute, and finds that Mr. Caswell "should have known" that a particular guest or visitor was engaging in illegal activity, the evidence is clear that Mr. Caswell took reasonable steps to discourage the use of his property for criminal activity.

### I. THE UNITED STATES HAS FAILED TO PROVE THAT THE MOTEL IS EVEN SUBJECT TO FORFEITURE.

The United States has failed to meet its burden, under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), to prove by a preponderance of the evidence that the Motel is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1). Here, the Government's sole basis of authority to

forfeit the Motel is a provision of the Controlled Substances Act that makes forfeitable "all real property . . . which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment." 21 U.S.C. § 881(a)(7). Despite the seemingly broad language of the provision, it is well-established that federal civil forfeiture statues "must be narrowly construed because of their potentially draconian effect." *United States v. 221 Dana Ave., Hyde Park, Mass.*, 261 F.3d 65, 74 (1st Cir. 2001) (citing *United States v. 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 122-23 (1993)).[2]

Because the Government's theory of forfeiture is that the Motel was used to commit or facilitate the commission of a criminal offense, the Government must also establish that there was a substantial connection between the Motel and the offense. *See* 18 U.S.C. § 983(c)(3). Thus, in order to meet its burden to prove that the Motel is forfeitable, the Government must demonstrate by a preponderance of the evidence that: (1) there was a violation of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, punishable by more than one year's imprisonment; (2) the Motel was used or intended to be used to commit or to facilitate the commission of those forfeitable drug offenses; and (3) the Motel is substantially connected to the forfeitable drug offenses. Although Claimant concedes that the Government adduced sufficient evidence at trial

[2] By relying on a pre-CAFRA case interpreting a *criminal* forfeiture statute not at issue in this case, the Government misstates the law, incorrectly arguing that Section 881(a)(7) should be broadly construed. *See* U.S. Trial Br. at 14, ¶ 14 (citing *United States v. Littlefield*, 821 F.2d 1365, 1367 (9th Cir. 1987)). In *Littlefield*, the Ninth Circuit relied on "Congress's explicit directive that the provisions of [21 U.S.C.] section 853 shall be liberally construed to effectuate its remedial purposes." 821 F.2d at 1367 (citing 21 U.S.C. § 853(o)). In contrast, Section 881(a)(7) is a civil forfeiture statute that, as Congress clarified in CAFRA, should be narrowly construed to require a substantial connection. Moreover, the issue in *Littlefield* was not whether the property was used to commit or facilitate a drug offense, but whether the criminal statute authorized forfeiture of an entire parcel of property rather than just the portion that was concededly used to commit a forfeitable offense. *Id*. at 1367 ("Absent the underscored language . . . it would be unclear whether Congress intended the forfeiture of a full parcel of property where only a portion is used for illegal purposes.").

of at least one controlled substance violation punishable by more than one year's imprisonment,[3] as detailed below, the Government failed to meet its burden of proving the remaining two elements of use to commit or facilitate drug felonies or a substantial connection to the drug felonies.

### A. The Government Failed to Prove That the Motel Was Used to Commit or Facilitate a Forfeitable Drug Offense Under Section 881(a)(7).

The evidence is clear that the Motel was not used to commit or facilitate drug crimes within the meaning of Section 881(a)(7), which requires that the property is instrumental or used in furtherance of the drug felony.

"[A] common sense interpretation of [Section 881(a)(7)], which is consonant with the congressional intent[, requires] that the instrumentalities of the drug trade be reached, while ensuring that property only fortuitously connected with drug trafficking be preserved." *United States v. Santoro*, 866 F.2d 1538, 1542 (4th Cir. 1989). The plain meaning of the term "facilitate . . . encompasses activity making the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 843 (8th Cir. 2007) (internal quotations omitted).[4] Analogous forfeiture provisions

[3] It is important to note that although the Government presented evidence of 15 drug-related incidents at trial, *see* Ex. 51, it only met its burden of proving a forfeitable drug offense under Section 881(a)(7) in at most 11 of these incidents. First, in two incidents, the testimony by the Government's own witnesses established that there was no crime giving rise to forfeiture. Trial Tr. 3-34:24–37:20 (describing accidental heroin overdose by guest of Motel on or around December 7, 2007); 3-53:17–58:10 (describing execution of search warrant on or around November 14, 2008, that turned up no controlled substances). Second, the Government failed to introduce any drug certifications for two other incidents on September 27, 2003, and February 13, 2004. Without such evidence, the Government has only shown "mere suspicion" and cannot meet its burden to prove forfeitability of the Motel. *See United States v. 28 Emery Street, Merrimac, Mass.*, 914 F.2d 1, 5 (1st Cir. 1990) ("Most tellingly, the record contains no evidence that any of the substances found in the search were determined to be drugs, rather than suspected of being drugs. We do not understand why tests were not conducted, or if they were, why the results were not introduced.") (reversing summary judgment in favor of government on the issue of forfeitability).

[4] Other provisions of the Controlled Substances Act confirm the plain meaning of the term facilitate. *See, e.g.*, *United States v. Mertilus*, 111 F.3d 870, 872 (11th Cir. 1997) ("To facilitate [under 21 U.S.C. § 843(b)] means that the government must establish that the telephone communication made the narcotics offense easier or less difficult and, thereby assisted or aided the crime."); *United States v. Aquilla*, 976 F.2d 1044, 1049 (7th Cir. 1992) (noting that plain meaning of facilitate is "to make easier or less difficult, or to assist or aid" in context of Section 843(b)

also require an instrumental connection between the "facilitating" property and the offense.  For

example, if an individual uses a personal computer to conduct "unlawful monetary transactions,

the personal computer would constitute property used to facilitate" a money laundering offense

under 18 U.S.C. §§ 982(a) and 1957.  *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir.

1998) ("[Facilitation] occurs when the property makes the prohibited conduct less difficult or

more or less free from obstruction or hindrance.") (internal quotations omitted).  Mere transient

use of the property, however, is not enough to subject property to forfeiture.  *See United States v.

All Those Certain Lots, Va. Beach, Va.*, 657 F. Supp. 1062, 1065 (E.D.V.A. 1987) (finding

criminal defendant's house was not subject to forfeiture under Section 881(a)(7) where cocaine

was stored in house for only a few hours).

Here, after three days of testimony by 13 witnesses and 35 exhibits, all the Government's

evidence proves is that, over two decades, the Motel fortuitously was the scene of a small

number of drug crimes because of the independent actions of transient third-party guests or

visitors.  There is no evidence that Mr. Caswell or any of his employees participated or had any

involvement in the crimes committed by transient third parties on or near the premises of the

Motel.  Trial Tr. 4-30:22–31:23.[5]  Far from being instrumental or aiding in the commission of

drug crimes, the overwhelming weight of evidence presented at trial demonstrates that, to the

contrary, the Motel was instrumental in ***curbing*** drug crimes by assisting police officers in their

investigations.  For example, the Government's own witnesses testified that officers of the

Tewksbury Police Department routinely used rooms of the Motel (provided free of charge, upon

---

prohibiting use of any communication facility to commit or facilitate a controlled substance offense) (internal quotations omitted).

[5]  The vague and unsubstantiated suspicions of retired Lieutenant Peterson and retired Detective Robert Budryk that certain former desk clerks were untrustworthy, *see* Trial Tr. 1-67:22–68:8 (Peterson); 3-53:19–54:14 (Budryk), are not credible in light of (1) the failure to investigate those generalized suspicions, *see* Trial Tr. 1-79:18-23. (Peterson); 3-54:9-14 (Budryk), and (2) the conflicting testimony of Tewksbury police officers that the Motel's desk clerks always cooperated with police investigations.  *See, e.g.*, Trial Tr. 3-64:7-15.

request, by Mr. Caswell) to conduct surveillance and perform controlled drug buys that led to arrests of the perpetrators of those crimes.[6]

Ignoring these salient facts, the Government misguidedly relies on a pre-CAFRA case[7] to support its argument that the Motel was used to commit or facilitate a drug offense.  *See* U.S. Trial Br. at 2 (citing *United States v. Schifferli*, 895 F.2d 987 (4th Cir. 1990)).  However, the very facts of *Schifferli* show that the Government has failed to establish the kind of direct connection required for property to be forfeitable under Section 881(a)(7).  In *Schifferli*, the Fourth Circuit concluded that the government had demonstrated probable cause that claimant Dr. Schifferli used his dentist office to commit or facilitate his convicted crimes of "illegally distributing and dispensing controlled substances by writing prescriptions that lacked legitimate medical purposes."  895 F.2d at 991.[8]  Specifically, after noting that Dr. Schifferli had used his office "over forty times during a four-month period to write illegal prescriptions for eight individuals," the court concluded:

---

[6]  In at least four incidents, police officers set up the controlled drug buys to occur at the Motel.  Consequently, in these instances, police chose the Motel as the location for the drug transaction.  *See All Those Certain Lots*, 657 F. Supp. at 1065 (finding no substantial connection between claimant's house and drug transaction where government informant was the one to insist on meeting at the house).  The Government's position that being the site of a drug transaction, by itself, subjects a property to forfeiture, puts innocent property owners like Mr. Caswell in an impossible Catch-22.  Either the property owner agrees to cooperate with law enforcement and the property becomes forfeitable, or the property owner does not agree and is deemed to have failed to take reasonable steps to prevent the crime, as discussed *infra* in Section III.

[7]  Forfeiture case law decided before the enactment of CAFRA applied the less-burdensome, "probable cause"standard.  Thus, any reliance on pre-CAFRA cases is subject to "the obvious caveat that the government must show more or stronger evidence establishing a link between forfeited property and illegal activity."  *United States v. $21,510.00 in U.S. Currency*, 144 Fed. Appx. 888, 890 n.2 (1st Cir. 2005) (*quoting United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 469 (7th Cir. 2005)).  The Government completely ignores this important caveat that it must meet current legal standards.

[8]  Although *Schifferli* uses the phrase "substantial connection" to define the required degree of nexus, its articulation of the substantial connection test is questionable after CAFRA.  In *Schifferli*, the Fourth Circuit held that "[u]nder the substantial connection test, the property either must be used or intended to be used to commit a crime, or must facilitate the commission of a crime."  895 F.2d at 990.  This definition does nothing to illuminate what "use" or "facilitate" means.  Moreover, CAFRA clarified that "substantial connection" means something more than use or facilitation.  *See* 18 U.S.C. § 983(c)(3).

> Dr. Schifferli's dentist office was hardly incidental to these illegalities; on the contrary, it provided an air of legitimacy and protection from outside scrutiny, precisely because a dentist office is where prescriptions are usually written. Thus, the office was actually used in the course of his crimes and made the crimes more or less free from obstruction or hindrance.

*Id*. The distinction between *Schifferli* and this case could not be more stark: In *Schifferli*, the claimant intended to and did in fact use his own private office to commit crimes closely resembling his lawful occupation. *See United States v. Two Tracts of Real Prop. with Bldgs., Appurtenances and Improvements Thereto, Located in Carteret Cty., N.C.*, 998 F.2d 204, 212 (4th Cir. 1993) (similarly distinguishing *Schifferli* and finding that government failed to establish substantial connection). That is a far cry from what occurred in this case: the unauthorized use of a public accommodation by transient third parties to engage in illicit drug activity.

Prescient of the kind of expansive interpretation urged by the Government here, the court in *Schifferli* was careful to cabin its holding:

> Cognizant of the severity of forfeiture, however, we do not hold that any writing of an illegal prescription on a given property automatically renders the property forfeitable. Instead, we believe that the facts of each case will determine whether forfeiture is appropriate. In this case, the ***direct and continuing relationship*** between the property and the crimes easily supports a finding of forfeiture under Section 881(a)(7).

895 F.2d at 99 (emphasis added). Contrary to the *Schifferli* court's admonition, the Government here urges this Court to hold that a drug transaction on any property "by anyone," regardless of the intent of the owner, automatically makes that property subject to forfeiture, putting the onus on the owner to affirmatively prove his innocence. Trial Tr. at 3-117:22–118:11; 3-119:18-22. The Government's interpretation was on narrow footing before Congress enacted CAFRA; after CAFRA codified the substantial connection test, the Government's interpretation has absolutely no basis.

**B. The Government Failed to Establish a Substantial Connection Between the Motel and the Forfeitable Drug Offenses.**

Whatever ambiguity or controversy existed prior to CAFRA as to the meaning of "use" or "facilitate" was resolved by Congress in 2000 when it made clear that the Government must show a "substantial connection" between the property sought to be forfeited and any forfeitable drug offense. 18 U.S.C. § 983(c)(3). Despite this plain language, the Government attempts to read the term "substantial" right out of the statute, making a circular argument that the substantial connection test "requires only [a] showing that the property was used or intended to be used to commit or to facilitate the commission of a drug violation punishable by more than one year [of imprisonment]." Trial Tr. 3-116:14-21; *see also* Trial Tr. 3-120:12-15 (arguing that the substantial connection test only means "[t]hat the property has to be connected to the criminal activity").

In determining whether there is a substantial connection, courts not only consider the "*quality* of the relationship between the property and the crime,"[9] but also the claimant's role in using the property to aid the forfeitable offense. *See, e.g., United States v. One Parcel of Real Prop., Everett, Mass.*, 900 F.2d 470, 471 (1st Cir. 1990) (finding claimants used home "to unlawfully store, conceal, possess, prepare, and distribute quantities of cocaine" and claimants did not dispute that they attempted to destroy and conceal cocaine during execution of search warrant in their home). As a consequence, courts find a substantial connection when the

[9] *United States v. 3639-2nd Street*, 869 F.2d 1093, 1098 (8th Cir. 1989) (R. Arnold, J., concurring) ("[T]he *quality* of the relationship between the property and the crime must be substantial.") (emphasis in original). Courts find a substantial connection when the property is instrumental to the drug felony but do not find a substantial connection when the property is only tangentially related to the drug felony. *Compare United States v. 45 Claremont Street*, *Central Falls, R.I.*, 395 F.3d 1, 2, 4 (1st Cir. 2004) (affirming substantial connection between claimant's house and drug trafficking of claimant's boyfriend where boyfriend used drug proceeds for down payment and renovations to house) *with United States v. Parcel of Land and Residence at 28 Emery Street, Merrimac, Mass.*, 914 F.2d 1, 4 (1st Cir. 1990) (holding that government failed to adduce sufficient proof to justify forfeiture of a convicted drug trafficker's residence where there was no evidence that the claimant sold, processed, produced, or stored drugs at his home).

claimant directly uses his or her property for the forfeitable offense, but do not find a substantial connection when the claimant is only fortuitously related to the forfeitable offense through third-party conduct.  *Compare United States v. 6 Fox St., Windham, N.H.*, 480 F.3d 38, 42-43 (1st Cir. 2007) (affirming district court's finding of a substantial connection between various parcels of real property and the claimant's convicted drug offenses where all the property was purchased, at least in part, with drug proceeds and claimant stored and distributed marijuana on five parcels of property as part of an ongoing drug-trafficking operation) *with 3234 Washington Ave., N.*, 480 F.3d at 846 (reversing summary judgment in favor of government on forfeitability of property where no evidence on role of claimant in forfeitable offenses) *and United States v. Two Tracts of Real Prop.*, 998 F.2d at 212 ("[W]e twice have rejected[] the notion that simply because land is the situs of crime, it is forfeitable.") (applying substantial connection test).

The Government can point to no authority post-CAFRA supporting its ability to subject to forfeiture a business that serves the public solely because of the illegal acts of transient third parties.[10]  The Government attempts to minimize this void by arguing that the substantial connection inquiry is limited to the role of the property and that the intent of the claimant is only related to the innocent owner affirmative defense.  *See, e.g.*, Trial Tr. at 3-118:1-11.  The Government's position is flatly wrong and contradicted by the very cases it cites in its trial brief. For example, in *United States v. 475 Cottage Drive, Mount Airy, Surrey County, North Carolina*, the court noted testimony of "hundreds of transactions in which [Claimant] bought, sold, or dispensed marijuana, cocaine, or cocaine base ('crack') at his residence" and that Claimant "admitted that he cut 'crack' cocaine in the first floor bathroom prior to selling it."  433 F. Supp. 2d 647, 655 (M.D.N.C. 2006 ).  "Based on the evidence presented, the Court concludes that the

---

[10]  The Government's failure to do so is not surprising in light of the clear legislative history.  *See* Claimant's Trial Br. at 4-8.

property was instrumental in facilitating Claimant Willis' drug trafficking activity in an integral and essential way, that Claimant Willis' use of the property in his drug activity was deliberate and planned, and that the involvement of the property was not simply incidental or fortuitous." *Id*. at 656.[11]

Moreover, in *3234 Washington Avenue North*, the United States sought forfeiture of real property that served as the clubhouse for the Minnesota chapter of the Hell's Angels Motorcycle Club where the Club's president had pled guilty to federal drug offenses. 480 F.3d at 842-43. Holding that "agency principles should govern determination of . . . [whether the government has] prove[d] a substantial connection between the institutional claimant's real property and drug trafficking," the court recognized that "it is not unrealistic to posit an institutional owner's otherwise innocent premises being used for illicit drug trafficking by agents misusing their right of access and authority." *Id*. at 846. Here, unlike the Club's president, Mr. Caswell was not involved in any illegal activity. Moreover, as distinguished from *3234 Washington Avenue North*, there is no agency relationship whatsoever between either claimant Tewksbury Realty Trust or Mr. Caswell, on the one hand, and the third-party perpetrators of the forfeitable drug offenses, on the other. Consequently, the actions of transient guests misusing their access to the Motel for unauthorized drug activity cannot establish a substantial connection to the Motel.

---

[11] *See also United States v. 3402 53rd St.West,Bradenton, Fla.*, 178 Fed. Appx. 946, 947-48 (11th Cir. 2006) (finding that substantial connection existed between criminal defendant's residence and his sale of "approximately sixty ounces of cocaine every two-weeks from his residence" where he was found guilty on numerous state drug violations and "admitted in a post-arrest statement that the drugs seized from his residence belonged to him and that he sold illegal narcotics"); *United States v. 31 Endless St., Martinsville,Va.*, 8 F.3d 821, No. 92-1609, 1993 WL 441804, at *2 (4th Cir. 1993) ("[I]t is beyond almost any question, based on the twenty or twenty-one episodes . . . that the pattern [of the Claimants] . . . was not to carry the drug on their person but to go into the house and either to cut it or have it stashed some place."); *Santoro*, 866 F.2d at 1542 ("While we conclude that there must be a substantial connection between this property and [claimant] Mrs. Santoro's actions, we find that ***her*** repeated use of the defendant property as a situs for conducting drug sales establishes this connection and thus, the property was used to facilitate her illegal conduct.") (emphasis added); *United States v. 352 Northrup St., Cranston, R.I.*, 40 F. Supp. 2d 74, 79-80 (D.R.I. 1999) ("[T]his Court has no trouble finding that the . . . pattern of asset concealment and money laundering between [claimant] and [his convicted] son is sufficient to establish probable cause [of a substantial connection].").

Indeed, it is this lack of agency or control that makes the connection to the property fortuitous, because the forfeitable drug offenses could have taken place anywhere that these particular criminals happened to stay.[12] *See* Claimant's Trial Br. at 14-16 (discussing why claimants' involvement or existence of special relationship with claimant is important for purposes of deterrence rationale for civil forfeiture).

Accepting the Government's position would give federal authorities *carte blanche* to initiate forfeiture proceedings against the owner of any establishment serving the general public because third parties made unauthorized use of the property and haul property owners into court, with all the expense that entails, to affirmatively prove their innocence. This Court should reject the Government's attempt to nullify the substantial connection test as contrary to the plain language of the statute, the governing case law, and the legislative history.

## II. THE EVIDENCE ADDUCED AT TRIAL DEMONSTRATES THAT MR. CASWELL IS AN INNOCENT OWNER UNDER 18 U.S.C. § 983(d) BECAUSE HE SIMPLY DID NOT KNOW OF THE CONDUCT GIVING RISE TO FORFEITURE.

After four days of testimony, not one of the Government's witnesses testified that Mr. Caswell had knowledge of even a single drug crime by guests on his property when it mattered: at the time such a crime was occurring or prior to its discovery by the police.[13] And despite the

---

[12] *United States v. Heldeman*, 402 F.3d 220 (1st Cir. 2005) is not to the contrary. In that case, dermatologist Dr. Marvin Heldeman was convicted of drug offenses arising out of his writing medically unnecessary prescriptions for steroids and Oxycodone in exchange for sexual favors. *Id.* at 221-22. Although Dr. Heldeman argued that the First Circuit should apply the civil forfeiture statute's substantial connection test, the First Circuit found that the evidence "amply supported" criminal forfeiture of the convicted defendant's residence "[w]hatever the exact degree of connection required by the criminal forfeiture statute." *Id.* at 222. Emphasizing Dr. Heldeman's role in using the property, the First Circuit relied on the following facts: all six of the drug offenses with which Heldeman was charged involved prescriptions written in his home; some of the sexual acts occurred in his home; Dr. Heldeman's prescription pads had his home address; and his business cards bore his home phone number and the inscription, "Dr. Marvin, The Bodybuilder's Friend." *Id.* While the First Circuit rejected Dr. Heldeman's claim that his activities "could have been undertaken elsewhere," it was because Dr. Heldeman himself had chosen to use his property to facilitate his drug offenses that the connection was not incidental or fortuitous.

[13] The failure to evince any such testimony is startling in light of the government's opening statement, which charged that Mr. Caswell and his "staff knew that drug crimes were occurring on the property," (Trial Tr. 1-17:10-13); that he "knew, or was, at best, willfully blind to the criminal drug activity," (Trial Tr. 1-20:13-15); and that "at

Government's contention that Mr. Caswell *should have known* of drug activity at the Motel, there is no evidence to suggest that he ever ignored suspicions or took deliberate actions to avoid learning of such activity.

**A. Russell Caswell Had No Actual Knowledge of Drug Crimes Occurring on His Property Prior to Their Occurrence or During Their Occurrence.**

Mr. Caswell's uncontradicted testimony at trial was that he did not personally know any of the individuals involved in the 15 drug incidents presented by the Government in support of its forfeiture action. Trial Tr. 4-26:13-22. He did not see a single one of the incidents as it occurred. Trial Tr. 4-26:21-22. He had no knowledge that any of the guests at his motel were going to commit a crime at the time they checked in and he never became aware of their crimes during their stay. Trial Tr. 4-31:17-23. He testified that he was not personally involved in any of the incidents—or any crime at the motel at all. Trial Tr. 4-31:12–4:32:11. And he has never seen anyone using or selling illegal drugs at the Motel. Trial Tr. 4-34:4-7.

No proposition is more certain in forfeiture law than the requirement that an owner must have actual knowledge of the conduct giving rise to forfeiture when the government is pursuing forfeiture on the theory that the property facilitated that conduct. *See United States v. Carrell*, 252 F.3d 1193, 1203 (11th Cir. 2001) ("The innocent owner defense is based on [the claimant's] actual knowledge, not constructive knowledge") (internal quotations omitted); *United States v. $463,497.72 in U.S. Currency*, 853 F. Supp. 2d 675, 690 (E.D. Mich. 2012) ("Actual, rather than constructive, knowledge of the wrongdoing is required to rule out the [innocent owner] defense."); *United States v. Real Prop., Santa Paula, Cal.*, 763 F. Supp. 2d 1175, 1192-93 (C.D. Cal. 2011) (holding that innocent owner defense failed because claimant's counsel "conceded

the end of [its] case, the evidence will clearly rebut any assertion by [Mr. Caswell] that [he] did not know about [or] was not willfully blind to the drug crimes at the motel." Trial Tr. 1-22:17-20.

that his client had actual knowledge of the unlawful use"); *United States v. 2001 Honda Accord EX*, 245 F. Supp. 2d 602, 611 (M.D. Pa. 2003) (rejecting constructive knowledge theory and upholding requirement of actual knowledge). Even prior to the enactment of CAFRA, most courts applied a standard of actual, rather than constructive knowledge, *see e.g.*, *United States v. 2659 Roundhill Dr., Alamo, Cal.*, 194 F.3d 1020, 1028 (9th Cir. 1999),[14] but there is no question that actual knowledge is the standard today.

Mr. Caswell plainly acknowledged at trial that he heard about some drug crimes at the motel *after they occurred*, when police made an arrest. Trial Tr. 4-32:12-25–33:1-7. He was informed by police, for instance, that methamphetamine was being clandestinely made in one room and of the requirements for the room's cleaning and inspection. Trial Tr. 4-37:19–38:17. But he did not have actual knowledge of conduct giving rise to forfeiture at any earlier time that might have been relevant to stop such conduct from occurring. Crucially, he had no knowledge of drug crime that occurred on the property either during its occurrence or prior to it occurring.

The First Circuit addressed a similar question of the timing of an owner's knowledge in *United States v. 221 Dana Avenue*, 261 F.3d at 72. That case involved a husband who,

---

[14] *See also United States v. 874 Gartel Dr., Walnut, Cal.*, 79 F.3d 918, 924 (9th Cir. 1996) (holding that Section 981 "only requires claimants to demonstrate ignorance" of conduct giving rise to forfeiture); *United States v. 6960 Miraflores Ave., Coral Gables, Fla.*, 995 F.2d 1558, 1561 (11th Cir. 1993) (stating that "innocent owner's defense turns on the claimant's actual, not constructive knowledge"); *United States v. 7326 Highway 45 N., Three Lakes, Wis.*, 965 F.2d 311, 315 (7th Cir. 1992) ("Nothing in Section 881(a)(7) suggests that a court must determine whether the claimant *should* have known of illegal activities taking place on the claimant's property. Instead, section 881(a)(7) focuses on the claimant's actual knowledge.") (citing *United States v. 5000 Palmetto Dr., Fort Pierce, Fla.*, 928 F.2d 373, 375 (11th Cir. 1991)); *United States v. $10,694 in U.S. Currency*, 828 F.2d 233, 234-35 (4th Cir 1987); *United States v. $4,255,000 in U.S. Currency*, 762 F.2d 895, 906 (11th Cir. 1985)); *United States v. 1813 15th St., NW, Washington, D.C.*, 956 F. Supp. 1029, 1036 (D.D.C. 1997) (forfeiture supported in circumstance where "the government offer[ed] overwhelming evidence of actual knowledge"); *United States v. Stop Six Center, Located at 3340 Stallcup, Fort Worth, Tex.*, 794 F. Supp. 626, 636 (N.D. Tex. 1992) ("Claimants must prove the absence of 'actual' rather than constructive knowledge of the illegal narcotics activity.") (citation omitted); *United States v. One Parcel of Real Estate Located at 13430 S.W. 1st St., Miami, Fla.*, 789 F. Supp. 387, 390 & n.3 (S.D. Fla. 1992) (holding that claimant was an innocent owner "under the 881(a)(7) 'facilitation' theory" because it did not have "actual knowledge that property would be used to facilitate a drug transaction" and noting that "the failure of the United States to offer any evidence to prove that [claimant] knew of a drug transaction . . . was an implicit recognition that the United States was not entitled to" forfeiture under 881(a)(7)).

unbeknownst to his wife, sold cocaine and had stored it in the bottom floor of their marital residence. *Id*. at 67. It was uncontested that his wife had no knowledge of her husband's drug activity until the day he was arrested and police searched her home to find the drugs. *Id*. Days after his arrest he drafted a new will, bequeathing the residence to his wife, and committed suicide. *Id.* The government sought to forfeit the entire house as having facilitated the husband's drug crime. *Id*. The question before the court was whether the wife was an innocent owner with respect to her interest in the property. *Id*. at 70. She had become aware of the past drug dealing upon her husband's arrest, after the unlawful conduct had occurred, but several days prior to her husband's writing of the new will. *Id*. at 67. The First Circuit held that the wife was indeed "an innocent owner because she did not have knowledge of, or consent to, [her husband's] criminal activity *at the time the activity occurred*." *Id*. at 73 (emphasis added). Just as in that case, Mr. Caswell came to know of some of the 15 incidents presented by the Government at trial only *after* the illegal conduct occurred. Trial Tr. 4-32:18–33:10. Consequently, he is an innocent owner as to the conduct of the transient third parties who used his property without his knowledge to commit drug crimes on his property.

The opposite rule would lead to precisely the kind of absurd and unjust result sought by the Government here. According to the Government's theory, a property owner who comes to know that a crime occurred on his property *after it has occurred* nevertheless has knowledge of drug activity for purposes of the forfeiture. If a motel owner merely knows that some unknown guests, at some unknown point in the future, are bound to violate drug laws, he must prevent those crimes, even if it turns out to be one or two people out of thousands staying at the motel, and even if it is behind closed doors. But what even moderately engaged owner of a fast-food franchise, convenience store, motel, hotel, or other common site of drug-related activity is

unaware of police arrests and activity on their property after such incidents occur? Combined with its sweeping and unfounded understanding of facilitation and substantial connection, the Government's theory of what constitutes knowledge would subject virtually every business that serves the public at large—and that might be the site of a hidden drug crime by transient third parties—to forfeiture despite the fact that such use of the property was unknown to the owner at the time the crime occurred. It would gut any plain meaning of the term "innocent" from the innocent owner defense, in flat contradiction of the stated reasons for Congress's passage of CAFRA. Thankfully, this is not the law.

In addition to Mr. Caswell's own testimony that he had no knowledge of any drug crime as it occurred—in fact, has never once seen illegal drugs used or sold at the property (Trial Tr. 4-26:21-22)—officers that were on the scene making arrests at the Property likewise testified that they had no facts or information to believe that Mr. Caswell was aware of drug activity in rooms prior to their arrest of guests of the Motel. For instance, retired Tewksbury Police Detective Dennis Peterson testified that he had "no facts" to support the claim that Mr. Caswell or his employees knew that there were drugs inside a room where he arrested one suspect in 1994. Trial Tr. 1-74:17-21. Similarly, retired Detective Robert Budryk testified that he had no facts or knowledge to support a belief that Mr. Caswell knew of the drug activity involved in arrests made by him at the motel. Trial Tr. 2-51:16-20 (involving arrest of Castro-Eusebio); *Id*. 2-52:23–53:3 (involving arrest of Israel Cortez). Deputy Chief John Voto testified that an arrest he made involved drugs concealed behind closed doors and not observable from outside the room. Trial Tr. 2B-4:3-7. Officer Markus McMahon testified that when he stumbled upon the "meth lab" in Room 255 he did not recognize it to be a meth lab, despite his extensive experience as a police officer investigating drug crimes. Trial Tr. 3-131:1-10. He testified that even when he

was standing directly in front of the door where the meth lab was located, he did not see or smell anything that would have alerted him to its existence behind closed doors. *Id*. DEA Agent Shawn Murray further noted that the entire meth lab was so small it would fit inside a file box or duffle bag and that some elements of the lab were in fact concealed in such a bag in the room until he unpacked them after the suspects were arrested. Trial Tr. 2B-108:7-24. He noted that his specialized training helped him recognize the collection of household items as the constituents of a meth lab. Trial Tr. 2B-108:24. Officer Brian O'Neill testified that for all of the arrests he made at the property he had no basis on which to believe that Mr. Caswell was aware of drug activity before an arrest or discovery of drugs by police. Trial Tr. 3-48:19-24.

Going beyond the testimony of individual officers, Lt. Thomas Casey, a veteran police officer with more than a decade's experience interacting with the Motel's staff and patrolling the property—and designated by the Town as its official representative for the matter—testified that the Tewksbury Police Department has no evidence that Mr. Caswell has *ever* rented a room at his motel to any person knowing that such a person intended to commit a drug crime (Trial Tr. 4-83:10-13); has no evidence that Mr. Caswell has *ever* seen a drug crime on his property while it was occurring (Trial Tr. 4-83:13-24); and has no evidence that Mr. Caswell *ever* ignored or failed to report to the Tewksbury Police Department any drug crime that he became aware of (Trial Tr. 4-84:7-9; 4-84:18-20).

Not one of the Government's witnesses challenged the fact that Mr. Caswell had no actual knowledge of any conduct giving rise to forfeiture at the Motel. At times, the Government attempted to characterize some testimony at trial as evidence of willful blindness, but again, the United States misunderstands the law. The evidence at trial does not support such a claim and

the Government's speculative assertions of what Mr. Caswell should have known or could have known are unavailing.

**B. Russell Caswell Has Never Been Willfully Blind to Drug Crimes Occurring on His Property.**

Although "the innocent owner defense under CAFRA does not have a provision for 'willful blindness,'" it has been held by courts that "knowledge includes a willful blindness component." *2001 Honda Accord EX*, 245 F. Supp. 2d at 611 n.8; *see also United States v. One 1988 Checo Let 410 Turbo Prop Aircraft*, 282 F. Supp. 2d 1379, 1382 (S.D. Fla. 2003) (noting the absence of willful blindness language in Section 983(d)(2)(A) after CAFRA, but holding that willful blindness is tantamount to actual knowledge).[15]

"Proof of willful blindness includes 'two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.'" *$463,497.12 in U.S. Currency*, 853 F. Supp. 2d at 690-91 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)).

By contrast to this high standard, the United States has merely argued that Mr. Caswell knew about some of the drug arrests that occurred on his property after suspects were arrested, or could have known about them (also after they occurred) through other means—such as reviewing the crime logbook at the police station each day. Trial Tr. 2A-91:21–92:14. Again,

---

[15] The Government is simply wrong that CAFRA contains a constructive knowledge or "should have known" standard. The test is actual knowledge which, in limited circumstances, can be demonstrated by proof of willful blindness. Had Congress intended to include a constructive knowledge standard in the law, it would have had many examples of language to that effect in state law. For instance, Rhode Island allows forfeiture in cases where the owner "had knowledge, actual or *constructive*." R.I. GEN. LAWS § 21-28-5.04(a) (emphasis added). Iowa holds an owner liable unless he or she "did not know and *could not reasonably have known* of the conduct or that the conduct was likely to occur." IOWA CODE § 809A.5(1)(a) (emphasis added). South Dakota makes property forfeitable "unless the owner knew or in the exercise of ordinary care *should have known*" that it was used to facilitate various crimes. S.D. Codified Laws Ann. § 34-20B-73 (emphasis added). No such language exists in federal forfeiture law.

according to the Government, this posthoc awareness, or mere possibility of awareness, makes Mr. Caswell willfully blind to subsequent drug activity engaged in by different, transient, and unrelated guests at the Motel.

Although the drug crimes themselves occurred behind closed doors, no one contests that some drug-related arrests at the Motel occurred in the parking lot, in public view, and that suspects were sometimes transported away from the Motel in marked cruisers by uniformed police officers. Mr. Caswell himself admitted to becoming aware of some incidents involving drugs on his property after police arrested the perpetrators. Trial Tr. 4-77:5-7. He even called the police to report suspected drug crimes. Trial Tr. 4-77:12–78:1. But Mr. Caswell has no particular training in law enforcement or drug detection to ferret out such suspects, Trial Tr. 4:40:13-18, and there was a complete absence of any evidence to even hint that Mr. Caswell deliberately turned his eyes away from drug activity on the property or failed to take action when he did become aware of such activity.

Mr. Caswell did not see a single one of the 15 incidents, or any other drug crime, occurring on his property. Trial Tr. 4-26:21-22; 4-31:3-7; 4-34:4-7. Mr. Caswell and his desk clerks cooperated with the Tewksbury Police when they investigated crimes at the property and no officers were ever refused access to any part of the property. *See, e.g.,* Trial Tr. 3-47:13-15; 3-64:10-12; 3-126:6-13; 4-84:21–85:3. Mr. Caswell, as well as his staff, far from ignoring crime, called police to the property when they saw crimes. Trial Tr. 4-43:1-3. Tewksbury's own police chief—a 27-year veteran of the force—stated that the Town of Tewksbury has never expressed a concern to Mr. Caswell that he should do more than he has done to discourage drug crime on the property. Trial Tr. 4:9-20–10:2. Lieutenant Casey stated that that the Town has no evidence on which to conclude that Mr. Caswell has ignored drug crimes on his property. Trial

Tr. 4-84:18-20. Chief Sheehan further testified that he is not aware of any citation that the Town has ever issued against the Motel Caswell for any matter concerning drug activity, Trial Tr. 4-13:20-25, belying the notion that he irresponsibly tolerated such activity on his property. Moreover, a charge of willful blindness simply does not fit with the paucity of drug-related incidents relative to the 14,000 rooms per year rented at the property. Trial Tr. 4-24:10-12.

The most recent federal forfeiture case to rule on the question of willful blindness is *$463,497.72 in U.S. Currency*, 853 F. Supp. 2d at 690-91. The United States sought to forfeit cash associated with a pharmacy that had distributed an unusual quantity of Oxycodone. *Id*. at 677-78. The claimant demonstrated that it had no actual knowledge of illicit prescriptions of the drug and, although it was aware of unusual spikes in order volume, there were reasonable explanations for those spikes. *Id*. at 686. After reviewing evidence, the court found that at "most . . . [the claimant] was negligent, albeit on several occasions" with respect to the drug distribution and held that "a showing of negligence alone will not support a finding of willful blindness." *Id*.; *see also United States v. One 1989 Jeep Wagoneer*, 976 F.2d 1172, 1175 (8th Cir. 1992) (warning that willful blindness is not to be equated with negligence in a pre-CAFRA case). The court in *$463,497.72 in U.S. Currency* found it persuasive that DEA agents testified that—like the Town of Tewksbury in the present case—they were "were not aware of any evidence that [claimant] ever deliberately ignored signs of criminal activity." 853 F. Supp. 2d at 688.

The Government cited a number of cases in addition to those already discussed to suggest that Mr. Caswell's actions are akin to the actions of other claimants that have been held by courts to be willfully blind.[16] In fact, *every case* cited by the Government demonstrates the opposite

[16] A special note should be made about *United States v. $11,552.73 in U.S. Currency*, a 2009 forfeiture case involving the structuring of money order purchases to avoid financial reporting regulations, cited by the Government

and shows Mr. Caswell's actions to be far removed from genuine willful blindness under the law. The cases cited by the Government involve claimants who had intimate relationships to the perpetrators of ongoing or repeated drug crimes, and had constant, open access to the often private locations of those crimes.[17] By contrast, the crimes at the Motel Caswell were committed almost entirely behind closed doors. It stands unrebutted that Mr. Caswell did not, in fact, ever see the crimes, and Mr. Caswell had no relationship with any of the transient third parties who used his property in an unauthorized manner for the drug activity. Trial Tr. 4-30:22–31:7.

During its closing argument the Government suggested that the fact that a few of the individuals involved in the 15 incidents it presented were arrested more than once at the property (particularly, Yonny Sean, Melanie Quadros, and Carmen Hardin) was proof of Mr. Caswell's alleged willful blindness. Trial Tr. 4-100:21–101:6. That is not a reasonable conclusion based on the evidence presented at trial.

---

in its trial brief, *see* U.S. Trial Br. at 4, and heard by this Court. No. 07-11759-PBS, 2009 WL 2045340 (D. Mass. June 10, 2009). As the Court may recall, the claimant and his family members in that case visited four different post offices to purchase 57 money orders in 23 separate transactions in less than a month. *Id*. at *2. The Court granted the government's motion for summary judgment because the claimant had admitted to intentionally making the money-order purchases in small amounts for the purpose of avoiding the filing of reporting forms that the claimant knew he would be required to fill out if he purchased money orders in amounts more than $3,000. *Id*. at *5. The court noted that "this is sufficient to establish his liability for structuring to avoid the reporting requirements of § 5325." *Id*. In that case the claimant was the wrongdoer and he took actions deliberately with knowledge that doing so would avoid financial reporting. The case is simply inapposite for any premise favoring the Government in the present case where there is no evidence of any wrongdoing by Mr. Caswell.

[17] *See also United States v. Milbrand*, 58 F.3d 841, 844-45 (2d Cir. 1995) (mother found willfully blind to her son's ongoing marijuana growing operation at her home consisting of nearly 1,000 plants on the property plus equipment stored in the house for growing and harvesting of those plants); *United States v. 31 Endless St., Martinsville, Va.*, No. 92-1609, 1993 WL 441804, at * 3 (4th Cir. 1993) (denying innocent owner status to claimant who participated in and set the terms of felony cocaine sales at the property where she lived); *United States v. 755 Forest Rd., Northford, Conn.*, 985 F. 2d 70, 72, 73 (2d Cir. 1993) (finding claimant wife to be willfully blind of her husband's drug dealing from inside their mutual residence where it was "uncontested that [drugs] were found on top of a dresser, in a jewelry box on the top of the dresser, in a dresser drawer, and on a closet floor, places to which she had easy and continual access"); *United States v. 1044 Cherry Dr., Elderon, Wis.*, No. 08-cv-564-bbc, 2010 WL 519861, at *3 (W.D. Wis. Feb 9, 2010) (holding that the owner of a home, rented to the claimant's son and used to store marijuana, was willfully blind where both father and son were partners in a marijuana growing operation and where the father instructed the son to take possession of the marijuana).

Deputy Chief Voto testified that that neither Mr. Caswell nor his desk clerks were informed of the investigation involving Yonny Sean in 2003 involving drugs. Trial Tr. 2A-102:19–103:14. Moreover, Mr. Sean was not the registered guest at the Motel at the time of the investigation, but was waiting outside near the parking lot for the registered guest, San Say. Trial Tr. 2A-99:22–101:19. When Mr. Sean was subsequently arrested at the property, *more than four years later*, he was the registered guest along with Melanie Quadros, a visitor to his room. Trial Tr. 3-45:24–46:2. The cause of the investigation was not drugs but their mutual involvement in a larceny that took place at Dunkin Donuts, although drugs were found in their room upon a search. Trial Tr. 3-38:8-20. Mr. Sean's case was ultimately dismissed by the Commonwealth. Trial Tr. 3-42:20-21.

Melanie Quadros was indeed arrested a second time at the Motel, but the event that led to her arrest on that occasion was again not suspected drug activity, but her apparent refusal to vacate her motel room at the end of her tenancy. Trial Tr. 3-90:14-18. Officer O'Keefe testified that when she approached Ms. Quadros to discuss the matter there was no reason to believe she was in possession of drugs—a fact learned only when Officer O'Keefe searched Ms. Quadros's pockets. Trial Tr. 3-90:19–91:14. Ms. Quadros was charged with possession of eight Ecstasy pills and, presumably out on bail, was arrested again at the Motel on a warrant related to the initial arrest. Trial Tr. 3-92:20–93:19. There is no evidence that she was a registered guest at any time other than when she was approached for overstaying her tenancy by Officer O'Keefe.

With respect to Carmen Hardin, retired Detective Budryk testified that he arrested her, along with an accomplice, about a half mile from the Motel in the Wal-Mart parking lot. Trial Tr. 2A-42:10-17. He later executed a search warrant on a room at the Motel where they had been staying for at least a few days and discovered drugs. Trial Tr. 2A-42:21– 43:12. The

Government did not introduce evidence that she was even a registered guest rather than a visitor to the room.  Ms. Hardin failed to appear in court on charges of drug distribution and was found approximately a week later staying in a room at the Motel, apparently without drugs on that occasion.  Trial Tr. 2A-45:11-20.

The Government's position is that Mr. Caswell is guilty of willful blindness to drug activity at the Motel if he does not track the names of all visitors, whether registered guests or not, and then make sure that no one who has been investigated or arrested, or visited anyone who has been investigated or arrested, ever stays at the Motel again.  It has identified a few people arrested or investigated more than once at the Motel during 14 years, but this is not willful blindness.  First, these rentals occurred in the context of more than 14,000 rooms being rented on average in any given year.  In Mr. Sean's case, the two incidents were years apart and he was not convicted of any crime in either case.  In Ms. Quadros's case, nothing in the record suggests anyone at the Motel was even aware that any of her arrests involved drugs.  Ms. Hardin returned to the Motel a week after police discovered drugs in the room she had occupied with another individual, but there is no evidence that any drugs were present when she was arrested the second time on the open warrant and the record is silent as to whether she was even known to the Motel as a registered guest during the first stay.  In every case, the testimony showed that Mr. Caswell or desk clerks were cooperative when police were looking for the individuals or needed access to their rooms.

In conclusion, there is no evidence to show that Mr. Caswell deliberately turned his eyes away from any drug activity at the Property.  Rather, the evidence showed that Mr. Caswell and his staff called the police when they saw crime, cooperated with the police when they came to investigate crime, and relayed suspicions about drug activity to police on such occasions as they

had them. Indeed, Mr. Caswell has every reason to discover and discourage crime at the Property: He lives right next door to the Motel with his wife, mother-in-law, son and daughter-in-law, and granddaughter. Trial Tr. 4-24:15-20. This appraisal of the situation is further bolstered by the fact that the Tewksbury Police Department itself has never even one time during all those years found it necessary to meet with, discuss, warn, suggest, or otherwise confer with Mr. Caswell about a perceived problem with drug crimes on his property.

The Government may believe that Mr. Caswell should have logged the names of all visitors to the property and ensured that none who had ever been investigated for drugs return as either a guest or a visitor, but that is not relevant under the statute where the facts have shown that Mr. Caswell did not have actual knowledge of the conduct giving rise to forfeiture presented at trial or take deliberate actions to avoid learning of those incidents.

## III. MR. CASWELL TOOK REASONABLE STEPS TO STOP THE UNAUTHORIZED USE OF HIS PROPERTY FOR DRUG CRIMES.

Even if this Court finds substantial connection and accepts the government's ill-founded negligence theory of knowledge, Mr. Caswell still prevails under CAFRA because he took reasonable steps to discourage and stop the unauthorized use of his property by third parties to commit or facilitate drug crimes.

CAFRA enumerates specific examples of reasonable steps taken by a property owner that would be sufficient to establish the innocent owner defense. 18 U.S.C. § 983(d)(2)(B). First, the statute provides a safe harbor for owners who notify police of the illegal conduct. Second, owners can take advantage of the safe-harbor by either: (1) making a good faith attempt to revoke permission to use the property; or (2) taking reasonable action in consultation with police

to discourage or prevent the illegal use of the property. *Id.*[18]

As noted in Claimant's Trial Brief, Congress singled out as improper the actions of a U.S. Attorney in attempting to forfeit the Red Carpet Inn:

> The government claimed the hotel deserved to be seized and forfeited because management had failed to implement all of the 'security measures' dictated by law enforcement officials, such as raising room rates. This failure to agree with law enforcement about what security measures were affordable and wise from a legitimate business-operating standpoint was deemed to be 'tacit approval' of illegality, subjecting the motel to forfeiture.

H.R. Rep. No. 106-192, at 10 (1999). The House Report noted the "absurdity and danger of this government forfeiture theory against legitimate business," concluding that no one should "forfeit their property because they have failed to do the work of law enforcement." *Id*. Additionally, the legislative history underscores that "the property owner is not required to take every conceivable action which could be considered reasonable, but only to take actions which are in total a reasonable response to the conduct giving rise to forfeiture." *Id*. at 23; *see also United States v. 16328 South 43rd E. Ave., Bixby, Okla.*, 275 F.3d 1281, 1285-86 (10th Cir. 2002) (holding, even under pre-CAFRA standard, that the test of what constitutes reasonable measures depends on the particular circumstances confronted by the property owner, including his reasonable fears and concerns, his familiarity with crime prevention, and his economic

---

[18] The full text of the provision states:

> (B) (i) For the purposes of this paragraph, ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person, to the extent permitted by law—
>
> (I) gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and
>
> (II) in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property.
>
> (ii) A person is not required by this subparagraph to take steps that the person reasonably believes would be likely to subject any person (other than the person whose conduct gave rise to the forfeiture) to physical danger.

resources); *United States v. 710 Main St., Peekskill, N.Y.*, 753 F. Supp. 121, 125 (S.D.N.Y. 1990) (stating that property owners should not be "substitute police forces");.

One hallmark of the reasonable steps analysis, even before CAFRA was enacted, was the level of police contact and interaction with the property owner. Typically, the police would meet with and often warn the property owner about the level of drug activity at the property and make specific recommendations as to how to alleviate the drug crime. Then, the legal question would turn on whether those suggested steps were reasonable in the light of the property owner's circumstances.[19] This consistent emphasis on interactions between the police and property owners was captured in the language of CAFRA determining whether a property owner "took reasonable actions *in consultation with a law enforcement agency* to discourage or prevent the illegal use of the property." 18 U.S.C. § 983(d)(2)(B)(i)(II) (emphasis added).

Here, the evidence clearly established that the town of Tewksbury never expressed a concern to Mr. Caswell that he should do more than he already did to discourage drug crimes on his property. Trial Tr. 4-9:20–10:2. Moreover, no one from the Tewksbury Police Department made any specific recommendations to Mr. Caswell regarding mitigating crime. Trial Tr. 4-

[19] *See, e.g.*, *United States v. 15 Bosworth St., Boston, Mass.*, 236 F.3d 50, 52 (1st Cir. 2001) (Boston police "repeatedly warned" tavern owner that they would not tolerate illegal activity—gambling and trading in stolen goods—at tavern that was subject of forfeiture proceeding); *United States v. 143-147 E. 23rd St., N.Y., N.Y.*, 77 F.3d 648, 650 (2d Cir. 1996) ("Following several years of investigations by federal and local law enforcement officials into narcotics trafficking at the Kenmore Hotel in Manhattan, and after several attempts by local law enforcement officials to have Jude [Hotel Corporation] take steps to impede use of the Hotel for narcotics activity, the government commenced the present action in June 1994 seeking civil forfeiture of the Hotel "); *United States v. 141st St. Corp.*, 911 F.2d 870, 873 (2d Cir. 1990) (stating that, among other contacts with the property owner, "Officer Richard Lagarda of the New York City police testified that he spoke with Morris Nahmias [superintendent of residential apartment building] three times during the summer of 1987 regarding the drug problem at the building"); *United States v. 3855 S. April St., Montgomery, Ala.*, 797 F. Supp. 933, 935 (M.D. Ala. 1992) (noting that the Captain of the Narcotics and Intelligence Bureau of the Montgomery Police Department visited the property owner on three separate occasions, giving the property owner advice about how to prevent drug activity on the premises). *See also United States v. Lot Numbered One of the Lavaland Annex*, 256 F.3d 949, 954-57 (10th Cir. 2001) (holding that owner is entitled to notice of the particular steps that the government believes it should have taken to prevent drug trafficking and opportunity to present evidence and argument as to why those steps were not reasonable under the circumstances). All of these cases apply pre-CAFRA standards for forfeiture. The Government has pointed to no authority post-CAFRA supporting its ability to subject to forfeiture a business that serves the public solely because of the illegal acts of transient third parties.

11:10-13. Finally, no one from the town of Tewksbury, the United States government or any other governmental body ever approached Mr. Caswell about taking steps to discourage drug activity at the Motel. Trial Tr. 4-45:21–46:7.[20] Moreover, contrary to the Government's claim that Mr. Caswell did nothing to curtail drug activity at the Motel, the evidence demonstrates that he both fully cooperated with the police in their investigations while also proactively taking steps to address criminal activity. Mr. Caswell and his employees called the police to report suspicious activity, including drug activity. Trial Tr. 4-42:16–43:3. He always opened his registration records to the police and made keys to room available to them upon request. Trial Tr. 4-44:3-4. Mr. Caswell provided full and open access to all areas of the Motel. Trial Tr. 4-47:17-22. And, as noted previously, he even provided free rooms upon request to law enforcement while they conducted sting operations and surveillance of guests suspected of drug activity. Trial Tr. 4-47:7-16.

The Government claims that those are examples of Mr. Caswell just complying with the law. Trial Tr. 4-108:11. Not so. Neither Mr. Caswell nor his employees were under any legal obligation to call the police to report suspicious activity, but they consistently did so. Mr. Caswell could have challenged the government on access to the property and for keys to the room by asking questions or demanding search warrants. He could have denied access or charged the police if they wanted to use rooms for drug investigations. But instead he fully cooperated with law enforcement at every turn. Indeed, when the police asked him to improve

---

[20] The Government points to a December 7, 2007 meeting between then-Lieutenant John Voto and hotel/motel managers but, as the evidence at trial demonstrated, that meeting was called for the specific purpose of addressing increased auto theft. Ex. 7 and Trial. Tr. 2B-5:16-24. Despite the fact that auto theft has never been a big problem at the Motel Caswell, *see* Trial Tr. 4-59:12, Mr. Caswell nevertheless sent a representative to the December 7, 2007 meeting as requested by the police. Trial Tr. 2B-6:2-4. No suggestions or recommendations were made about curtailing *drug activity* at the meeting and there was no follow-up to the meeting with either Mr. Caswell or other hotel/motel managers and owners. Trial Tr. 2B-5:16–8:12; 2B-8:21–9:3. As Mr. Voto further admitted, he has no recollection of any meeting with Mr. Caswell or his employees to specifically discuss drug crimes at the Motel. Trial Tr. 2B-9:4-7.

the method by which he registers guests to ensure that the names are legibly written and to make copies of driver licenses, he responded and did what the police asked of him. Trial Tr. 2B-10:7-24; 4-44:5–45:20.[21]

The Government also claims that Mr. Caswell took no affirmative steps to attempt to reduce criminal activity at the Motel. Trial Tr. 4-108:22-24. Again, that is simply not the case. In addition to reporting suspicious activity and cooperating with the police, Mr. Caswell also put in security cameras, one in the office before the instant action was filed and additional security cameras in the parking lots a few years later. Trial Tr. 48:11–49:3.[22] He has lighting in the front and the back of the Motel to enhance security. Trial Tr. 4-68:11–69:1. He posts a sign in the lobby of the Motel, which has been there for at least ten years, asking patrons to call the police if they see any suspicious activity. Trial Tr. 4-47:23–48:10. He established a do-not-rent list for individuals that have caused problems at the Motel. Trial Tr. 4-78:3-17. And, perhaps most significantly, he has a desk clerk on-site 24 hours a day, seven days a week, to help with security and to report any problems to the police. Trial Tr. 4-49:10-16. As Mr. Caswell testified, it is not particularly economical to do this, since it is relatively rare for a guest to check in after midnight, but he keeps one there "[f]or security sake, just to keep an eye on things, . . . just call the police if anything crops up, that sort of thing." Trial Tr. 4-49:22-24.

The Government's argument on reasonable steps essentially amounts to after-the-fact nitpicking over the extent to which Mr. Caswell could have improved security beyond the reasonable steps he already took—*e.g.*, he should have put in additional security cameras earlier;

---

[21] As the testimony at the trial made clear, certain problems with registration records were not unique to the Motel Caswell but were present at other hotels and motels in the area. Trial Tr. 2B-9:19–10:6.

[22] Incredibly, the Government seeks to use the fact that Mr. Caswell continued to improve security at his property by adding additional cameras after the lawsuit was filed against him. Trial Tr. 4-75:23-24; 4-107:9-10. The Government should be encouraging property owners to consistently improve security rather than using those improvements as a justification to forfeit one's property.

he should have installed even stronger lights in the back of the Motel; he should have posted no trespassing signs in the Motel in addition to the sign encouraging guests to call the police; he should have maintained a more stringent do-not-rent list that would track all individuals arrested for crimes at the Motel; and he should have hired a security detail in addition to a round-the-clock desk clerk.  Trial Tr. 1-23:3-16; 4-107:1-25.  But one could always come up with additional steps to take to improve security at any given establishment.  The question is whether the owner, given the circumstances, took reasonable steps to discourage the illegal use of his property.  And, here, Mr. Caswell unquestionably did.

In its closing, the Government analogized the situation with the Motel Caswell to the irresponsible bar owner that serves underage drinkers.  Trial Tr. 4-96:104.  Setting aside the fact that the penalties for permitting underage drinking are typically fines and the possible loss of a liquor license rather the forfeiture of an entire parcel of real estate, the analogy is completely inapt because bar owners unquestionably know the nationwide drinking age:  21.  They can take a simple step to find out if the person is underage: demand a valid ID.  Mr. Caswell, in contrast, cannot demand to search the person, car, luggage and rooms of every guest.  Moreover, the Government did not once come to Mr. Caswell to let him know what steps it thought were reasonable and effective to curtail illegal drug activity at the Motel.  Nevertheless, Mr. Caswell fully cooperated with law enforcement and took reasonable steps on his own that he thought would curb illegal acts at the Motel.

Effective law enforcement and efforts to curtail drug activity cannot occur in a vacuum. It must be done "in consultation with a law enforcement agency."  18 U.S.C. § 983(d)(2)(B)(i)(II).  Mr. Caswell has no higher education, no experience in law enforcement, and no training in drug investigations.  Trial Tr. 4-20:3-11; 4-40:13-18.  He thought he was

taking reasonable steps to curb crime at his property, including drug activity. And, in fact, he was. But he received no guidance from the police—the professionals on crime prevention and drug enforcement—along the way. To now declare that the reasonable steps he took on his own were not enough—when he never received any feedback along the way—would lead to a truly perverse result. Property owners would bear all the responsibility for drug crime while law enforcement would not participate or consult with a property owner until a forfeiture proceeding—where the government would then declare that the reasonable steps the owner took were not enough and that the owner must therefore forfeit his property.

Even if this Court finds a substantial connection between the Motel and the drug crimes presented by the Government, and even if this Court adopts the negligence theory of constructive knowledge that is contrary to CAFRA and has been explicitly rejected by other courts, judgment in favor of Mr. Caswell is still warranted because Mr. Caswell took reasonable steps to stop or discourage the illegal use of his Motel.

## CONCLUSION

For the foregoing reasons, this Court should find:

- The Motel Caswell is not subject to forfeiture under 21 U.S.C. § 881(a)(7) because it was not instrumental in or used in furtherance of a forfeitable drug offense. Instead, the Motel was merely incidental to the crimes as the fortuitous location of unrelated drug crimes committed by transient third parties without the involvement, participation or prior knowledge of claimant Mr. Caswell.

- There is no substantial connection between the Motel Caswell and the various forfeitable drug crimes committed by transient third parties.

- Mr. Caswell is an innocent owner because at the time the illegal conduct was occurring or prior to its discovery by police, Mr. Caswell did not have actual knowledge of the illegal activity.

- Mr. Caswell was not willfully blind to the unrelated drug crimes that occurred on his property where he never saw any drug crimes occurring or ignored suspicious activity.

- Mr. Caswell is an innocent owner because he took reasonable steps to stop the unauthorized use of his property for drug crimes.

Accordingly, judgment should be entered in favor of Claimant.

Dated: November 29, 2012

Respectfully submitted,

/s/ Scott G. Bullock
Scott G. Bullock, *pro hac vice*
Lawrence G. Salzman, *pro hac vice*
Darpana M. Sheth, *pro hac vice*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682–9320
Fax: (703) 682–9321
sbullock@ij.org; lsalzman@ij.org; dsheth@ij.org
*Attorneys for Claimant*

George W. Skogstrom, Jr. (BBO #552725)
Tiffany L. Pawson (BBO # 672713)
SCHLOSSBERG | LLC
35 Braintree Hill Office Park, Suite 204
Braintree, MA 02184
Tel: (781) 848–5028
Fax: (781) 848–5096
gskogstrom@sabusinesslaw.com
tpawson@sabusinesslaw.com
*Local Counsel for Claimant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing Claimant's Post-Trial Brief was filed with the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Scott G. Bullock
Scott G. Bullock, *pro hac vice*