# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 09-11635-JGD |
| 434 MAIN STREET, | ) | |
| TEWKSBURY, | ) | |
| MASSACHUSETTS, | ) | |
| Defendant, | ) | |
| | ) | |
| TEWKSBURY REALTY TRUST, | ) | |
| Claimant. | ) | |
| | ) | |

## UNITED STATES' POST-TRIAL BRIEF

The United States submits this post-trial brief, which sets forth (1) the basis for the

forfeiture of the real property located at 434 Main Street, Tewksbury, Massachusetts, including

all buildings, appurtenances and improvements thereon, as described in more detail in a deed

recorded in Book 2056, Page 118 of the Middlesex North County Registry of Deeds (hereinafter,

the "Defendant Property") and denial of Claimant's[1] oral motion at trial pursuant to Federal Rule

of Civil Procedure 52(c) ("Rule 52(c)"), and (2) the United States' Supplemental Proposed

Findings of Fact and Conclusions of Law.

## I.   APPLICABLE LAW

Title 21, United States Code, Section 841(a)(1) ("Section 841") makes it unlawful for any

person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent

to manufacture, distribute, or dispense, a controlled substance.  Title 21, United States Code,

---

[1] The "Claimant" in this case is the Tewksbury Realty Trust, which is represented by its Trustee, Russell Caswell.  Docket No. 10.  The beneficiaries of the Tewksbury Realty Trust are Russell Caswell and Patricia Caswell.  *Id.*

Section 846 ("Section 846") makes it unlawful for any person to attempt or conspire to commit a violation of Section 841. Title 21, United States Code, Section 881(a)(7) ("Section 881") makes forfeitable any real property used to facilitate a violation of Section 841 and/or 846.

### A.    Forfeitability

To prevail in a civil forfeiture action under Section 881, the United States must establish, by a preponderance of the evidence, that the Defendant Property was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of Sections 841, 846 and/or 856. Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983(c)(1). "Facilitate" in the context of this statute is quite broad and means that the property need only make the prohibited conduct "less difficult or 'more or less free from obstruction or hindrance.'" *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990).

Where, as here, the Government's theory of forfeiture is that the Defendant Property was used to facilitate ongoing criminal drug activity, the United States must establish a "substantial connection" between the Defendant Property and the drug activity. 18 U.S.C. § 983(c)(3). *See United States v. One Parcel of Real Prop.*, 900 F.2d 470, 472 (1st Cir. 1990). As the First Circuit explained, for Section 881(a)(7) cases, such as the instant case, to establish a substantial connection, the Government must show a nexus between the real estate and some specified illegal activity. *United States v. 15 Bosworth St.*, 236 F.3d 50, 54 (1st Cir. 2001)(citing *United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1st Cir. 1992)); *United States v. Parcel of Land (28 Emery St.)*, 914 F.2d 1. 3-4 (1st Cir. 1990); *United States v. Parcels of Real Prop. (1933 Commonwealth Ave.)*, 913 F.2d 1, 3 (1st Cir. 1990)).

It is important to note, however, that whether the property's role is integral, essential or indispensable to the crime is irrelevant in determining the property's substantial connection to the crime. *Schifferli*, 895 F.2d at 990 ("[T]he language of §887(a)(7) makes clear that it is irrelevant whether the property is even used at all in the commission of a crime, so long as it is intended to be used…It is also irrelevant whether the property's role in the crime is integral, essential or indispensable. The term 'facilitate' implies that the property need only make the prohibited conduct less difficult or more or less free from obstruction or hinderance.")(internal citations and quotations omitted). Under First Circuit law, the fact that the illegal activities could have occurred elsewhere is not a defense against forfeiture. *United States v. Heldeman*, 402 F.3d 220, 222 (1st Cir. 2005). Moreover, while establishing a pattern of activity is one method by which the Government can demonstrate a substantial connection between a defendant property and illegal drug activity,[2] "[j]ust one use of the property may be enough, given that a single violation is sufficient under § 881(a)(7)." *United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave.*, 903 F.2d 490, 494 (7th Cir. 1990).

---

[2] *See, e.g., United States v. Real Prop. Located at 3234 Washington Ave., Minneapolis, Minnesota*, 480 F.3d 841, 843 (8th Cir. 2007) (although ultimately reversing summary judgment in favor of Government on other grounds, court notes that evidence of widespread illegal drug activity at defendant property, if credited by the trier of fact, would satisfy the Government's burden to prove a "substantial connection"); *United States v. 3402 53rd St. West, Bradenton, Florida*, 178 Fed.Appx. 946, 947-48 (11th Cir. 2006) (circumstantial evidence, including testimony that multiple drug sales had occurred at forfeited residence, established a substantial connection); *United States v. All That Lot . . . Located at 31 Endless St.*, 1993 WL 441804, at *2 (4th Cir. Sept. 27, 1993) (evidence that included 21 drug transactions on defendant property helped to establish "substantial connection"); *United States v. 475 Cottage Dr.*, 433 F.Supp.2d 647, 655-656 (M.D.N.C. 2006) (evidence of over a decade of drug activity at defendant property helped to establish a substantial connection); *United States v. One Parcel of Real Prop. with Bldgs...Known as 352 Northup St.*, 40 F.Supp.2d 74, 79-80 (D.R.I. 1999) (court looked at, among other things, a history of behavior aimed at concealing financial dealings when determining whether defendant property was linked to drug proceeds); *United States v. 8848 S. Commercial St.*, 757 F.Supp. 871, 879 (multiple drug-related arrests and seizures at defendant property allowed Government to satisfy its burden).

The evidence adduced at trial establishes that over a period of at least fourteen years, from at approximately September 1994 through November 2008 (*i.e.*, the period covered by the Findings of Fact in Section II, *infra*), the Defendant Property was the scene of continual illegal drug activity; at trial, the Government presented specific examples of the drug activity that occurred at the Defendant Property (hereinafter referred to as the "Drug Crimes"). The uncontroverted evidence at trial revealed the Motel Caswell, which is located on the Defendant Property, was the common dominator across all of the Drug Crimes, uniting the illegal drugs and dealers and users. Through lax oversight by the Claimant and no security at the Defendant Property, the Motel Caswell, in effect, invited the Drug Crimes and made detection of the Drug Crimes, as well as deterrence of future drug activity, less likely. For example, drug trafficking, drug possession, and even drug manufacturing, were less detectable because those activities occurred in the rooms of the Motel Caswell. The lack of security measures at the Motel Caswell also made it easier to complete a drug transaction. Quite simply, as long as a drug dealer or a drug user paid for a room, the Claimant and its Motel Caswell staff would turn a blind eye to drug activity.

In addition, some of the Drug Crimes that the Motel Caswell helped to facilitate resulted in individuals receiving a sentence of imprisonment of more than one year. Thus, the United States clearly carried its forfeitability burden at trial.

Claimant, however, incorrectly argued at trial that the United States did not establish forfeitability of the Defendant Property because the Government did not tie the Drug Crimes to the Claimant. Neither Congress, when it enacted CAFRA, nor the relevant caselaw impose such a requirement. Civil forfeitures are *in rem* proceedings, with the issue of forfeitability dependent on the property and the *property's* (not an individual's) connection to crime. In contrast to

criminal forfeiture, civil *in* rem forfeiture, is not limited to forfeiture of property belonging to principals or conspirators in the underlying illegal activity; civil judicial forfeiture can be ordered even if there is no criminal violation by a claimant. *See United States v. All Right, Title and Interest...143-147 East 23rd Street (Kenmore Hotel)*, 77 F.3d 648 (2d Cir. 1996)(forfeiture of hotel where claimants were not personally involved in underlying drug conduct that was the basis for forfeiture); *United States v. One Parcel of Real Estate at 1012 Germantown Road, Palm Beach County, Fla.*, 963 F.2d 1496 (11th Cir. 1992)(finding forfeiture of convenience store that was site of numerous drug offenses where claimant was not personally involved in underlying conduct, but remanding for new trial based on improper jury instruction regarding "reasonable efforts"); *United States v. All Monies in Account No. 90-3617-3, Israel Disc. Bank*, 754 F.Supp. 1467, 1476 (D. Haw. 1991)(citing *United States v. Leong Chinese Merchants Assn. Building*, 918 F.2d 1289, 1293 (7th Cir. 1990))(court rejected claimant's argument that the facilitation theory should be confined to property belonging to principals or conspirators in the underlying criminal activity and noted that, while many cases may have applied the facilitation theory in such instances, nothing suggests that the limitation was intended by Congress).

This is not to say that an owner's participation in (or knowledge of) the crimes is irrelevant to civil forfeitures. This information is clearly relevant to any innocent owner defense. The role of the owner in the relevant crimes, however, is irrelevant to the first inquiry into forfeitability.

**B.**     **Innocent Owner Defense**

Once the Government establishes forfeitability of the Defendant Property, the burden shifts to the Claimant to demonstrate, by a preponderance of the evidence, that it is an innocent owner of the Defendant Property to avoid forfeiture of the Defendant Property. 18 U.S.C.

§§ 983(d)(1) and (d)(6).  An "innocent owner" is an owner[3] who (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property subject to forfeiture.  18 U.S.C. § 983(d)(2)(A).

### i.   Claimant Knew About, Or At Best Was Willfully Blind To, The Drug Activity At The Defendant Property

The "knowledge" element of the innocent owner defense incorporates both a claimant's actual knowledge about, as well as a claimant's willful blindness to, the criminal activity that a defendant property is being used to facilitate.  *See United States v. Collado*, 348 F.3d 323, 327 (2d Cir. 2003)(property owner who is willfully blind to the distribution of illegal drugs on her property by her son does not qualify as innocent owner); *United States. v. 874 Gartel Dr.*, 79 F.3d 918, 924 (9th Cir. 1996)(rejecting claimants innocent owner defense after finding that claimants knew about, or were willfully blind to, false statements on a loan application); *United States v. One Parcel of Real Prop., Located at 755 Forest Rd., Northford, Connecticut*, 985 F.2d 70, 72 (2d Cir. 1993)("However, where an owner has engaged in 'willful blindness' as to activities occurring on her property, her ignorance will not entitle her to avoid forfeiture."); *United States v. Real Prop. Located at 1044 Cherry Dr., Township of Elderon*, 2010 WL 519861 at *3 (W.D. Wis. Feb. 9, 2010)(stating that knowledge includes willful blindness or a failure to investigate because one is afraid of what such an inquiry would yield); *United States v. Funds Seized From Account No. 20548408 at Baybank, N.A.*, 1995 WL 381659, at *6 (D.Mass. June 16, 1995)("In the context of an 'innocent owner' defense, willful blindness of structuring activity

---

[3] An "owner" for purposes of the innocent owner statute "means a person with an ownership interest in the specific property sought to be forfeited" and does not include "a nominee who exercises no dominion or control over the property."  18 U.S.C. §§ 983(d)(6)(A) and (B)(iii). The United States did not contest Claimant's ownership of the Defendant Property at trial.

is tantamount to knowledge."). "Willful blindness has been defined as a conscious course of deliberate ignorance that is meant to be imposed when a claimant refuses to take basic investigatory steps."[4] *United States v. Certain Real Prop. Located at 16397 Harden Circle*, 1998 WL 245991 (6th Cir. 1998). Thus, to prove that Claimant is an innocent owner of the Defendant Property, Claimant must establish that it did not know of, or was not willfully blind to, the drug crimes giving rise to forfeiture of the Defendant Property.

Claimant, however, argues that the knowledge prong may only be established if the *Government* can demonstrate that Claimant had *actual* knowledge of the drug activity at the Defendant. Claimant's position is incorrect in several respects.[5]

First, it is Claimant, *not* the United States, that carries the burden to demonstrate, by a preponderance of the evidence, that Claimant did *not* have knowledge of the drug activity occurring at or on the Defendant Property. 18 U.S.C. § 983(d)(1) and (2)(A)(i); *United States v. 45 Claremont Street*, 395 F.3d 1, 5 (1st Cir. 2004)("The burden in this case was not on the

_____

[4] One of the ways to establish willful blindness is to present evidence of a history and/or pattern of conduct (not limited to that which would give rise to forfeiture) demonstrating that Claimant knew about or was willfully blind to the criminal conduct giving rise to forfeiture. *See, e.g., Collado*, 348 F.3d at 327-28 (upholding grant of summary judgment in favor of Government after finding that claimant was willfully blind; court found that claimant was willfully blind based on the history and amount of criminal drug activity conducted at or near the defendant property); *United States v. Prop. Identified as 1813 15th St., N.W.*, 956 F.Supp. 1029, 1036 (D.C. Cir. 1997)(evidence of knowledge of claimant included multiple drug raids on the defendant property). *See also 31 Endless St.*, 1993 WL 441804, at *2-3 (appellate court affirmed district court's finding that claimants had knowledge of criminal activity at defendant property based, at least in part, on longevity of pattern of drug activity).

[5] Claimant further asserted during its closing argument at trial that CAFRA changed the knowledge element of the innocent owner defense to ensure that the element is established only by showing actual knowledge, and not willful blindness. Here, too, Claimant's position is incorrect. The innocent owner defense to forfeiture predates CAFRA, and, in fact, the knowledge prong of Section 983(d)(2)(A)(i) is the same as it was pre-CAFRA. Accordingly, pre-CAFRA caselaw defining "knowledge" for purposes of the innocent owner defense is applicable to the statute. *See United States v. One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F.Supp.2d 1379, 1382-83 (S.D. Fla. Sept. 2, 2003); *2001 Honda Accord*, 245 F.Supp.2d 602, 611.

government to establish that [the claimant] had knowledge of the [illegal activity]; to the contrary, it was on [the claimant] to establish that she lacked knowledge of the [illegal activity].”); *United States v. 15 Bosworth Street*, 236 F.3d 50, 55 (1st Cir. 2001)(when discussing the innocent owner defense raised by a claimant in a civil forfeiture case, the court states that “the proponent of an affirmative defense will have to supply evidence to sustain that defense.”).

Second, as discussed *supra*, Claimant ignores the breadth of caselaw that holds that willful blindness constitutes “knowledge” for purposes of the innocent owner defense.  It is well-established that a claimant who was willfully blind to the criminal use of its property cannot establish an innocent owner defense based on lack of knowledge.  *See, e.g., United States v. Premises and Real Prop. at 731 Gabbey Rd., Pembroke, New York*, 58 F.3d 841, 844-845 (2d Cir. 1995)(mother who knew of son’s prior drug arrest and had access to areas of property where marijuana and drug paraphernalia were stored was willfully blind to marijuana cultivation at her property); *45 Claremont St.*, 395 F.3d at 4 (claimant should have known about the illegal drug activity where drugs, scale, wrappers and cash were openly found in kitchen and claimant could not get to her bathroom without going through kitchen); *755 Forest Rd.*, 985 F.2d at 72-73 (claimant was willfully blind to husband’s illegal drug activity when drugs and instruments used to deal drugs were discovered throughout her bedroom); *United States v. Milbrand and 731 Gabbey Rd.*, 58 F.3d 841, 844-845 (claimant was willfully blind where drugs were hidden in drawers and cabinets of rooms that claimant routinely used).  Where an owner has engaged in “willful blindness” as to activities occurring on a defendant property, the owner’s ignorance will not entitle it to avoid forfeiture. *755 Forest Rd.*, 985 F.2d at 72 (citing to *United States v. Leasehold Interest in 121 Nostrand Ave. Apt. 1C,* 760 F.Supp. 1015, 1031-32 (E.D.N.Y.1991)).

At trial, Claimant failed to carry its burden of establishing, by a preponderance of the evidence, that it did not have knowledge of, and was not willfully blind to, drug activity at the Defendant Property.  To the contrary, the evidence, including the trial testimony of Russell Caswell, Claimant's representative, established that Claimant had knowledge (including from arrests at the motel, police execution of search warrants, use of Motel Caswell rooms for surveillance, checks of guest registration cards, and news media reports) of the fact that the Defendant Property was being used for and was the scene of illegal drug activity.[6]  *See* Section II, *infra.*  Accordingly, Claimant's innocent owner defense must fail.

### ii.    Claimant Did Not Take All Reasonable Steps Under The Circumstances To Deter The Drug Activity At The Defendant Property

A claimant with knowledge of the criminal drug activity giving rise to forfeiture of a defendant property may still prevail on an innocent owner defense, but *only* if the claimant can

---

[6] CAFRA does not require Claimant to know about the drug activity occurring at the Motel Caswell *before* it occurs or even *while* it is occurring.  *See United States v. All Right, Title and Interest…785 St. Nicholas Ave.*, 983 F.2d 396, 404 (2d Cir. 1993)(where husband-wife claimants owned rental properties that were sites of multiple drug offenses, some of which involved claimants and some of which did not, court held that properties were forfeitable because "Nothing in the record suggests [claimants] involvement in or presence near drug sales had diminished or that they took reasonable steps to prevent *others* from using their property to peddle narcotics"; in other words, claimants, after discovering defendant properties were being used to commit drug crimes, did nothing going forward to prevent such use by others); *United States v. Prop. Identified as 1813 15th Street, N.W.*, 956 F. Supp. 1029, 1037 (D.D.C. 1997) (following execution of search warrant and arrests of residents in defendant property, claimant took "ineffectual steps" to prevent return of drug offenders and from defendant property from being used to commit drug offenses again).  The plain language of CAFRA's innocent owner provision demonstrates this, as it does not impose any temporal limitations to the knowledge element.  *See* 18 U.S.C. § 983(d)(2)(A)(i).  In fact, the statute contemplates that an owner may be put on notice of conduct giving rise to forfeiture and imposes conditions *after* the owner has notice of such conduct.  18 U.S.C. § 983(d)(2)(A)(ii) (an innocent owner is someone who "*upon learning of the conduct giving rise to the forfeiture*, did all that reasonably could be expected under the circumstances to terminate such use of the property")(emphasis added).

demonstrate that it "did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A)(ii). *See United States v. 16328 South 43rd E. Ave.*, 275 F.3d 1281, 1286 (10th Cir. 2002)(court holds that woman who failed to call the police, evict her son who was growing marijuana on her property, or otherwise more thoroughly investigate his activities could not establish lack of consent); *785 St. Nicholas Ave.*, 983 F.2d at 404 (even though neighborhood may be infested with drug activity, owners of rental property must take reasonable steps under the circumstances to prevent property from facilitating drug trafficking); *United States v. Real Prop. in Santa Paula*, 763 F.Supp.2d 1175, 1193 (C.D. Cal. 2011)(applying pre-CAFRA caselaw to Section 983(d)(2) and holding that a parent who knew of, or was willfully blind to, an adult child's use of his property to cultivate marijuana did not satisfy the "all reasonable steps" test when he failed to inspect his property to learn the full extent of the cultivation and failed to contact law enforcement); *United States v. $20,560, More or Less, in U.S. Currency*, 2010 WL 3702590 at *3 (S.D. W. Va. Sept. 13, 2010)(court rejected wife's innocent owner claim to currency her husband was using to conduct drug business because it was "very difficult to believe" that she did not know what he was doing and offered no evidence of having taken any steps to stop it).

It is not sufficient for a claimant to show that it took *some* reasonable steps to deter criminal activity. Rather, "[u]nless an owner with knowledge can prove *every* action, reasonable under the circumstances, was taken to curtail the drug-related activity, consent [to the criminal drug activity] is inferred." *United States v. Certain Real Prop. and Premises Known as 418 57th Street, Brooklyn, NY*, 922 F.2d 129, 132 (2d Cir. 1990)(emphasis added).[7]

---

[7] Notably, CAFRA does not require that a claimant be successful in deterring all criminal drug activity at or on a defendant property, but it does require a claimant take all reasonable measures to attempt to deter such crime.

In particular, courts have held that it is not sufficient for a claimant who is a landlord, motel owner, or other person who leases its premises to third parties – such as the Claimant in the case at bar — are required to institute procedures (*e.g.*, restricting access to the property to registered motel guests or tenants, evicting criminals, checking the exterior of the property) that are likely to be effective in preventing continued criminal activity.  *See, e.g., 1813 15th St., N.W.,* 956 F.Supp. at 1037 (D.D.C. 1997)(court found that landlord's steps, which included locking doors at night, attempting to monitor the flow of visitors, and verbally forbidding residents to engage in illegal activity while on the property, were not sufficient; the steps were reasonable, but they did not constitute all reasonable steps that the landlord could have taken).[8]

In the instant case, the evidence at trial makes clear that, despite Claimant's knowledge of illegal drug activity occurring on or at the Defendant Property over a period of many years, Claimant failed at any time during that period to take any reasonable or meaningful action to terminate or reduce such use of the Defendant Property.  *See* Section II, *infra*.  Claimant failed to take any reasonable or meaningful steps even after the discovery of a methamphetamine laboratory in a room at the Defendant Property, after the discovery of the body of an individual who had died from a heroin overdose in a Motel Caswell room, or after the November 2007 meeting between the TPD and representatives of local motels and hotels (including from the Caswell Motel) at which TPD suggested specific measures to prevent crimes at such businesses. *Id.*

---

[8] Notably, in many ways, federal civil forfeiture law imposes similar obligations on a property owner as state law.  For example, under state tort law, an owner must take affirmative steps to abate a nuisance on a property, once the owner is on notice of that nuisance.  *See Maynard v. Carey Const. Co.*, 19 N.E.2d 304, 305-306 (Mass. 1939)(holding that after a licensing owner who could resume control at will over a property is put on notice of a public nuisance on the property, the owner is required to use all reasonable means within its power to abate that nuisance).

Claimant, however, wants the Court to overlook its failure to take reasonable steps to deter drug activity at the Defendant Property.  Instead, Claimant argued throughout the trial that, unless law enforcement conducted outreach to Russell Caswell concerning the steps he could take to deter criminal drug activity at the Defendant Property, then Claimant *de facto* did all that it could reasonably be expected to do under the circumstances.

In making this argument, Claimant first relied on *United States v. Lot Numbered One of the Lavaland Annex*, 256 F.3d 949 (10th Cir. 2001).  Nothing in the *Lavaland* decision, however, shifts the burden away from a claimant (and onto law enforcement) to establish that a claimant took all reasonable steps to deter drug activity at a property.

In *Lavaland*, the claimant, a motel owner, took certain steps to deter drug activity at his motel.  The steps included instructing his sons to call the police when illegal activity occurred, calling the police about drug activity in the parking lot, asking people to leave the property, and being a member of a motel association.  *See id.* at 952.  At trial, the Government neither argued to the court, nor notified the claimant, that additional reasonable steps should have been taken. *See id.* at 955.  Nevertheless, the court determined that the claimant should have taken certain additional steps to deter drug activity at claimant's motel and identified three such steps in its findings of fact; based on this finding, the court held that the claimant had failed to establish an innocent owner defense.  *Id.*  The Tenth Circuit remanded the case to the district court, stating that if the Government or court believed that claimant could have taken additional reasonable steps to deter drug activity at its motel, then the claimant must be provided with notice (either before or at trial) of those additional steps so that the parties can present evidence and argument at trial concerning those steps.  *Id.* at 955-956.  The appellate court stated that doing so would "assist the court in grounding the application of the innocent owner defense on evidence rather

than speculation." *Id.* at 957.  However, the *Lavaland* court never held that the burden to demonstrate that claimant took "all reasonable steps" should be shifted away from a claimant and placed on law enforcement.  *See id.* at 953, 956.

Moreover, *Lavaland* is inapposite to the case at bar.  In the instant case, as described in the Findings of Fact, *infra*, Claimant *was* placed on notice of specific types of reasonable steps by TPD (through various TPD officers and at a November 2007 meeting with motel and hotel owners).  Yet, Claimant failed to take those reasonable steps.

In addition, during its closing argument, Claimant argued that CAFRA requires law enforcement to coordinate with a claimant, and failure to do so establishes a claimant's innocent owner defense.  Claimant's interpretation of CAFRA's requirements, however, is belied by the language of the statute, which states in relevant part:

> For the purposes of this paragraph, *ways in which a person may show that such person did all that reasonably could be expected may include* demonstrating that such person, to the extent permitted by law—
>
> (I)    Gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and
>
> (II)   in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property.

18 U.S.C. § 983(d)(2)(B)(i) (emphasis added).

This provision of CAFRA provides one manner in which a claimant can demonstrate that it took "all reasonable steps" to deter drug activity on a defendant property.  It creates no affirmative duty on the part of law enforcement and, to the contrary, suggests what an "innocent owner" should do (*i.e.*, timely notifying law enforcement of conduct giving rise to forfeiture,

timely revoking permission to use the property for such conduct, consulting with law enforcement on other reasonable actions).  Furthermore, to hold that the onus is on law enforcement to demonstrate a claimant did not take reasonable steps would ignore the plain language of the Section 983(d)(1), which states that the "claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence."

Accordingly, based on the foregoing, it is clear that Claimant has failed to carry its burden of demonstrating by a preponderance of the evidence that it took all reasonable steps to deter the criminal drug activity at the Defendant Property.  (In fact, Russell Caswell testified that he did not investigate what was occurring at the Motel Caswell, that he failed to take security measures to deter drug crimes, and that he did not have policies and procedures concerning criminal drug activity at the Defendant Property.  *See* Section II, *infra*.)  Thus, Claimant's innocent owner defense must fail.

## II.   <u>FINDINGS OF FACT</u>

The United States submits the following proposed findings of fact, which are being supplemented subsequent to trial in this case.

### A.  <u>Background</u>

1. The defendant property in this civil forfeiture matter is the real property located at 434 Main Street, Tewksbury, Massachusetts, including all buildings, appurtenances and improvements thereon (hereinafter, the "Defendant Property").  *See* Docket No. 105.

2. On September 29, 2009, the United States filed a Verified Complaint for Forfeiture *in Rem* (the "Complaint") against the Defendant Property.  *See* Docket No. 1.

3. The Complaint alleges that the Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7) because it was used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, a violation of 21 U.S.C. §§ 841, 846 and/or 856.  *Id.* at 2.

4. Title to the Defendant Property is held by the Tewksbury Realty Trust (the "Trust"). Docket No. 105.

5. The Claimant in this case is the Trust, which is represented by its Trustee, Russell H. Caswell ("Russell"), and the beneficiaries of the Trust are Russell and his wife, Patricia Caswell ("Patricia"). *Id.*; Trial Transcript Day 4 (hereinafter, "Day 4 Transcript") at 22, 50.[9]

6. Located on the Defendant Property is a 56-room motel called the Motel Caswell. Docket No. 105; Day 4 Transcript at 23.

7. Russell and Patricia have owned the Motel Caswell since 1984. *Id.*; Trial Ex. 1; Day 4 Transcript at 21.

8. Russell and Patricia live at 442 Main Street, in Tewksbury, Massachusetts, adjacent to the Defendant Property. Docket No. 105; Day 4 Transcript at 19, 50; Docket No. 1. In fact, Russell and Patricia's residence is only about a one-minute walk from the Motel Caswell. Day 4 Transcript at 50. One entrance to the Defendant Property is also the driveway to Russell and Patricia's residence. Day 4 Transcript at 52-53; Trial Ex. 1. A second entrance to the Defendant Property is just a short distance away from Russell and Patricia's residence. *Id.*

9. Russell and Patricia have resided at 442 Main Street in Tewksbury, Massachusetts since at least 1994. Docket No. 105; Day 4 Transcript at 19.

10. Russell oversees the Motel Caswell and actively participates in the facility's management and daily operation. Docket No. 105; Day 4 Transcript at 22, 50-52.

11. Russell is at the Motel Caswell almost every day, and sometimes more than once during the same day. Day 4 Transcript at 22, 50-51.

12. When he is not at the Motel Caswell, Russell can be reached via cellphone. Day 4 Transcript at 52. At one point, there was even a telephone extension connecting the Motel Caswell and Russell and Patricia's residence. *Id.*

13. Russell's job duties include overseeing the operation of the Motel Caswell. *Id.* at 51. This includes filling in at the front desk, maintenance of the property, and hiring subcontractors. *Id.* at 51-52.

**B. Evidence Concerning the Forfeitability of the Defendant Property**

14. The Defendant Property was considered a high crime area. Trial Transcript Day 2 Morning Session (hereinafter "Day 2 Morning Transcript") at 11.[10]

---

[9] The "Day 4 Transcript" can be found at Docket No. 116.
[10] The "Day 2 Morning Transcript" can be found at Docket No. 113.

**September 1994**

15. In September 1994, the Tewsbury Police Department ("TPD"), including Lieutenant Dennis Peterson ("Lt. Peterson"), conducted surveillance of the Defendant Property and observed several individuals, on several occasions, enter Room 237 of the Defendant Property, stay for short periods of time, and then exit Room 237. Trial Transcript Day 1 (hereinafter, "Day 1 Transcript") at 43-44.[11] The TPD suspected that the occupant of Room 237, Abilio Bolarihno ("Bolarihno"), was dealing drugs out of the room, as the behavior observed during surveillance of the room was consistent with behavior associated with the sale and distribution of illegal narcotics, and TPD suspected that a drug dealer was occupying Room 237. *Id.* at 44. The TPD also conducted two controlled buys[12] of suspected crack cocaine,[13] from Room 237. *Id.* at 42-43.

16. Subsequently, TPD obtained a search warrant to search Room 237, which was executed on September 30, 1994; the search uncovered materials used to package narcotics for sale, as well as some written materials with beeper numbers and telephone numbers on it. *Id.* at 42-44, 49, 51-52.

17. On September 30, 1994, prior to executing the search warrant, TPD observed and approached Bolarihno outside of Room 237. *Id.* at 48. A subsequent search of Bolarihno uncovered a quantity of crack cocaine. *Id.* at 49; Trial Ex. 2. Bolarihno was then arrested and transported from the Defendant Property in a marked cruiser. Day 1 Transcript at 50. He was subsequently sentenced to one year of imprisonment. Trial Ex. 48A, Bates-stamped USA1228-29.

18. After the arrest of the occupant of Room 237, the TPD called one of the numbers uncovered during the search of Room 237 and ordered a quantity of crack cocaine to be delivered to the Defendant Property. *Id.* at 51. Approximately thirty to forty-five minutes after the call was placed, an individual arrived at the Defendant Property to make the delivery. *Id.* at 51-52. As soon as the individual got out of his car, TPD approached him, and he was taken to the ground and searched. *Id.* at 52. As he was being taken to the ground, the individual threw a tinfoil container containing crack cocaine to the side. *Id.*; Trial Ex. 2. The individual, identified to be Nestor Rodriguez, was subsequently arrested and transported from the Defendant Property in a marked cruiser. Day 1 Transcript at 53.

---

[11] The "Day 1 Transcript" can be found at Docket No. 118.

[12] A controlled buy involves the purchase of narcotics by a willing participant who is given a quantity of money to make a purchase of narcotics at a predetermined location, and who returns to provide law enforcement with the purchased narcotics at a predetermined location. *See, e.g., id.* at 42, 57-58; Day 2 Afternoon Transcript at 23-24.

[13] "Crack" or "crack cocaine" is made of cocaine and is in a form that is easily smoked. *Id.* at 54.

## July 1997

19. In July 1997, TPD obtained information from a confidential informant who was a guest at the Motel Caswell regarding a method of purchasing narcotics. Day 2 Morning Transcript at 14. Based on the information from the confidential informant, former TPD Officer Robert Budryk ("Officer Budryk") conducted surveillance of the Defendant Property and observed suspects driving a white Acura Legend. *Id.* at 16. During surveillance, Officer Budryk observed the Acura occupants visit various rooms at the Defendant Property, which indicated narcotics dealing. *Id.* Officer Budryk also observed a hand-to-hand transaction between a subject and the operator of the Acura. *Id.* at 17. Based on seeing this hand-to-hand transaction, Officer Budryk arrested a subject in the Defendant Property parking lot. *Id.* TPD transported the arrestee from the Defendant Property in a marked cruiser. *Id.*

20. On July 17, 2007, Officer Budryk and another TPD officer rented Room 248 and conducted two separate controlled buys of heroin. *Id.* at 18. Using information from the same confidential informant described in paragraph 19, above, TPD initiated such controlled purchases by sending a code to a specific pager. *Id.* at 15. The code consisted of two sets of numbers: the first number represented the room number at the Defendant Property to which the delivery should be made, and the second number represented the amount of drugs. *Id.* at 14. TPD confirmed this pager code by placing two separate orders to Room 248 several hours apart. *Id.* at 15. With each order, TPD obtained heroin, which was delivered to Room 248. *Id.* at 15; Trial Ex. 3. Following these controlled buys, TPD ultimately arrested Benito Castro-Eusebio ("Castro-Eusebio") and Cedano Celines after they had departed the Defendant Property. *Id.* at 20. Castro-Eusebio was sentenced to one year of imprisonment. Trial Ex. 48B, Bates-stamped USA1230-32.

## August 1997

21. In August 1997, TPD obtained information from a confidential informant who was a guest at the Defendant Property regarding the operator of a blue Chrysler New Yorker who sold drugs to residents at the Defendant Property. Day 2 Morning Transcript at 21. Based on the information from the confidential informant, Officer Budryk conducted surveillance of the Defendant Property and observed targets arrive and leave in a blue Chrysler New Yorker. *Id*. at 22. During surveillance, Officer Budryk observed the Chrysler occupants visit various rooms at the Defendant Property, which indicated narcotics dealing. *Id.*

22. On August 18, 1997, Officer Budryk saw the blue Chrysler New Yorker arrive at the Defendant Property, made himself known to the vehicle's operator, and searched the operator and his female passenger. *Id*. at 22-23. TPD Officer Budryk and other TPD officers discovered five heat-sealed bags containing heroin on the male operator and seven heat-sealed bags containing heroin on the female passenger. *Id*. at 23, 25; Trial Ex. 4. TPD arrested the two subjects at the Defendant Property and transported them separately in marked cruisers. Day 2 Morning Transcript at 26.

## February 2001

23. In February 2001, TPD obtained information from a guest staying in Room 241 at the Defendant Property that a suspected drug dealer was residing in a room adjacent to the informant at the Defendant Property. Day 2 Morning Transcript at 29-30. Based on this information, Officer Budryk and Lowell Detective Jim Hodgdon conducted surveillance from Room 241 and observed targets arrive at the Defendant Property on February 8, 2001. *Id*. at 30. One target entered Room 241, at which point police officers identified themselves and confiscated seven clear bags of cocaine and 30 heat-sealed bags of heroin. *Id*.; Trial Ex. 5.

24. Law enforcement discovered the second target in Room 240 of the Defendant Property. Day 2 Morning Transcript at 31. Room 240's door was ajar, and Officer Budryk saw the second target ingesting a substance believed to be cocaine. *Id*. When Officer Budryk opened the door, the second target gestured as if to run. *Id*. Officer Budryk then displayed his firearm, shouted for him to raise his hands, and the target complied. *Id*. at 31-32. Inside Room 240, TPD discovered three large bags of cocaine, a clear plastic bag containing 190 smaller bags of heroin, a heat sealing machine. *Id*. at 31-32; Trial Ex. 5. TPD eventually arrested the two subjects, Miguel Cotto ("Cotto") and Israel Cortez ("Cortez"), and transported them in separate marked cruisers from the Defendant Property. *Id*. at 33. TPD informed the clerk at the Defendant Property of Cotto's and Cortez's arrest. *Id*. at 34.

## March 2001

25. In early 2001, TPD conducted controlled buys of suspected cocaine and suspected heroin from the occupants of Room 254 and 252 at the Defendant Property. Day 2 Morning Transcript at 36. Subsequent to those controlled buys, on March 1, 2001, TPD executed two search warrants on Room 254 and 252 at the Defendant Property. *Id*. at 35-36. Officer Budryk knocked and announced police presence and ultimately forced entry to Room 254, since a master key for the room did not work. *Id*. at 37. Inside, TPD discovered a female subject, one bag of suspected heroin, a large bag containing about 900 unused bags and U.S. currency, which was indicative of narcotic distribution. *Id*. at 39. During the search of Room 254, a second, male suspect arrived in a black Ford Explorer. *Id.* at 40. TPD searched the Ford and discovered narcotics suspected to be heroin and marijuana. *Id*. TPD ultimately arrested Hector Cruz and Sujeiry Garrastequi from Room 254 and transported them separately in marked cruisers from the Defendant Property. *Id.* at 40-41.

26. TPD arrested Carmen Hardin ("Hardin") and Peter Witts ("Witts"), the occupants of Room 252 at the Defendant Property, in the parking lot of the Wal-mart, approximately half a mile from the Defendant Property. Day 2 Morning Transcript at 42. When TPD executed the search warrant on Room 252, officers discovered 44 heat-sealed bags containing heroin, a hypodermic needle and a syringe. *Id.* at 43; Trial Ex. 6. TPD left a copy of the search warrant in Room 252 and returned the

master key to the desk clerk at the Defendant Property.  *Id.* at 44.  Officer Budryk informed the clerk of the drug arrests that day.  *Id.* at 45.

27. Hardin, who resided in Room 252 and was arrested on March 1, 2001, did not appear in court the day after her arrest.  Day 2 Morning Transcript at 45.  TPD arrested her about a week later at the Defendant Property, in a different room.  *Id.*  Hardin was sentenced to 18 months of imprisonment and Witts was sentenced to two years of imprisonment.  Trial Exs. 48D, Bates-stamped USA1257-58, and 49E, Bates-stamped USA1292-93.

## September 2003

28. On September 27, 2003, now-TPD Deputy Chief Voto ("Deputy Chief Voto") was on patrol and saw Yonny Sean ("Sean") standing next to a pay phone on the Defendant Property that had been historically used in drug transactions.  Day 2 Morning Transcript at 99-100.  Sean had a key to Room 242.  *Id.* at 101.  Deputy Chief Voto and other TPD officers then went to Room 242 and discovered an individual named San Say, along with baking soda and another substance that field-tested positive for cocaine.  *Id.*; Trial Transcript Day 2 Afternoon Session (hereinafter "Day 2 Afternoon Transcript") at 3.[14]  At least two marked TPD cruisers were at the Defendant Property that day.  Day 2 Morning Transcript at 102.

## February 2004

29. In early 2001, TPD obtained information from a confidential informant that Vernon Smith ("Smith") was dealing narcotics out of a room at the Defendant Property.  Day 2 Afternoon Transcript at 22.  Officer James Hollis ("Officer Hollis") and other TPD members conducted surveillance of the room and two controlled buys of suspected cocaine from the suspect through the informant.  *Id.* at 23-24.  TPD conducted field tests on the suspected cocaine purchased to test for positive narcotics.  *Id.* at 25.  Subsequent to the controlled buys, and based on Smiths' violent history and the possibility of a firearm being in the room, TPD obtained a no-knock, nighttime search warrant for Smith's room at the Defendant Property.  *Id*. at 26-27.  Officer Hollis and other TPD members executed the search warrants on February 13, 2004, with the assistance of the Special Operations Unit of the Northeastern Massachusetts Law Enforcement Council.  *Id*. at 27.  The Special Operations Unit used a battering ram to break down the door at the Defendant Property and then secured the occupants of the room, Smith and Patricia Conroy ("Conroy").  *Id*. at 28-29.  Smith and Conroy were arrested for possession of a hypodermic needle.  *Id*. at 30.  Marked cruisers and uniformed officers were at the Defendant Property that day.  *Id*. at 31-32.

## November 2004

30. In November 2004, the TPD received information from confidential informants that an individual named William Mercier ("Mercier") was selling and distributing heroin

---

[14] The "Day 2 Afternoon Transcript" can be found at Docket No. 119.

from the Motel Caswell. Day 1 Transcript at 55-57. During the TPD's investigation of Mercier, he changed rooms at the Motel Caswell, ultimately ending up in Room 209 of the Motel. *Id.* at 56, 58. The TPD conducted two controlled buys of heroin from Mercier at the Motel Caswell; one controlled buy occurred at Mercier's original room, and the other one at Room 209. *Id.* at 58. Subsequently, the TPD obtained a search warrant for Room 209, and the search warrant was executed on November 20, 2004. *Id.* at 55.

31. Prior to the execution of the search warrant on November 20, 2004, Mercier was observed and approached by TPD outside of Room 209. Day 1 Transcript at 59-60. Mercier was subsequently brought by TPD to Room 209 after being informed of the search warrant. *Id.* at 60. Inside Room 209, TPD also found another individual, Lydia Farrell ("Farrell"), who was known to the TPD because of prior interactions with the TPD. *Id.* at 60-61.

32. The search of the Room 209 revealed quantities of heroin in the room. *Id.* at 61; Trial Ex. 9. Mercier and Farrell were both arrested and transported in separate marked cruisers to the TPD station. Day 1 Transcript at 62. Farrell was later sentenced with regard to three drug violations; she received a one year sentence (six months to serve, 6 months of probation) on each of the three counts (to run concurrently). Trial Ex. 48, Bates-stamped USA01252-53. Mercier was also later sentenced to two and a half years imprisonment. Trial Ex. 48G, Bates-stamped USA001262-64.

### October 2005

33. TPD arrested an individual for passing counterfeit money that led to the discovery of a methamphetamine laboratory in Room 255 at the Defendant Property. Trial Transcript Day 3 (hereinafter, "Day 3 Transcript") at 128, 131.[15] Massachusetts State Police Sergeant Shawn Murray responded to the Defendant Property on October 9, 2005, based on TPD's discovery of the lab in Room 255. Day 2 Afternoon Transcript at 57; Trial Ex. 27. Several TPD marked cruisers and uniformed officers were at the Defendant Property that evening. Day 2 Afternoon Transcript at 59. The room was "frozen" overnight by posting a uniformed TPD officer by the door until law enforcement could obtain a search warrant for the Defendant Property and to search and seize the methamphetamine lab. *Id.* at 65.

34. The next day, on October 10, 2005, approximately eight members of the "Clandestine Lab Enforcement Team" ("CLET"), along with a specially designed vehicle, arrived at the Defendant Property to process, inventory and dispose of the methamphetamine lab items. *Id.* at 66-67, 70; Trial Ex. 10. TPD officers were also present. Day 2 Afternoon Transcript at 97; Trial Ex. 10. The CLET members were at the Defendant Property for approximately four to six hours on October 10, 2005. Day 2 Afternoon Transcript at 77, 101. After the CLET members completed processing the scene, they placed a placard on the door of the lab site (*i.e.*, Motel Caswell Room 255) to provide notice that a drug lab was in that particular area and to warn that hazardous chemicals

---

[15] The "Day 3 Transcript" can be found at Docket No. 114.

may still be present. *Id*. at 79-80, 95. Drug Enforcement Administration ("DEA") Special Agent Michael Cashman told a desk clerk at the Defendant Property to inform management that a drug lab was there. *Id*. at 101-102. The DEA also sent a notification letter to Russell Caswell regarding the methamphetamine lab. *Id*. at 82-83; Trial Ex. 11.

## February 2006

35. On February 13, 2006, former TPD Officer David Godin observed two individuals conducting a suspected drug transaction at the Dunkin Donuts, near the Defendant Property. Day 3 Transcript at 98. The individuals then fled from TPD by running into Room 225 at the Defendant Property and escaping out the window. *Id*. at 99. TPD later apprehended the two individuals down the street from the Defendant Property, and the pair informed TPD that they went to Room 225 to purchase marijuana. *Id*. at 99-100. After returning to Room 225, TPD discovered a large amount of marijuana, United States currency, a scale and some plastic baggies. *Id*. at 100; Trial Ex. 24. While in Room 255, TPD officers discovered and answered a cell phone, which individuals called to ask for marijuana. Day 3 Transcript at 102.

## December 2007

36. Six officers responded to one of the rooms on the Defendant Property and discovered an individual who had died of a heroin overdose on December 7, 2007. *See* Day 3 Transcript at 36; Trial Ex. 26.

## October 2008

37. On October 9, 2008, TPD officers responded in a marked cruiser to the Defendant Property after someone at the Defendant Property complained about an unwanted party. Day 3 Transcript at 82-83. Officer Kimberly O'Keefe ("Officer O'Keefe") went to Room 229 and discovered Melanie Quadros ("Quadros")*,* who had an outstanding warrant issued against her. *Id*. at 84. After discovering a warrant had been issued against Quadros, Officer O'Keefe arrested her and found ecstasy pills and other drug paraphernalia on Quadros. *Id*. at 84, 85; Trial Exs. 27, 48H. A week after Quadros' October 9, 2008 arrest, Officer O'Keefe again arrested Quadros, incident to a warrant, at the Defendant Property. Day 3 Transcript at 88.

## November 2008

38. On November 18, 2008, Lieutenant Casey conducted a controlled purchase of crack cocaine from the occupant of Room 254 at the Defendant Property. Day 3 Transcript at 58; Trial Ex. 28. About ten days later, TPD conducted another controlled buy from the same occupant for crack cocaine. Day 3 Transcript at 58; Trial Ex. 28. At that time, the guest in Room 254 consented to a search of the room, where TPD discovered another bag of crack cocaine. Day 3 Transcript at 59; Trial Ex. 28.

39. On November 22, 2008, Officer Brian O'Neill ("Officer O'Neill") responded to the Dunkin Donuts near the Defendant Property for a stolen purse. Day 3 Transcript at 38. When reviewing surveillance video of the incident, Officer O'Neill recognized one of the larceny suspects as Melanie Quadros. *Id.* On November 30, 2008, while Officer O'Neill was doing a routine check of the Defendant Property, he recognized Quadros outside of Room 232. *Id.* at 39. Quadros' companion, Yonny Sean ("Sean"), was registered to Room 232, but Quadros was not. *Id.* 45-46. Pursuant to a consent search, Officer O'Neill discovered in Room 232 hundreds of various sized-baggies, hypodermic needles, smoking devices, cocaine, heroin and oxycodone. *Id.* at 40; Trial Exs. 29, 30. TPD arrested Quadros and Sean and transported them in a marked cruiser. Day 3 Transcript at 40-41.

40. Based on the above incidents, it has been established that the Defendant Property was used or was intended to be used, to commit, or to facilitate the commission of, criminal drug activity punishable by at least one year of imprisonment.

41. The drug crimes described above were a sampling of the drug activity at the Motel Caswell and are not the only crimes, or even the only drug crimes, committed at or on the Defendant Property. *See* Day 1 Transcript at 39-42; Day 2 Morning Transcript at 9-10, 65, 77; Day 2 Afternoon Transcript at 17-19; Day 3 Transcript at 28-29, 52-53, 63, 73-74; 96.

## C. **Evidence to Rebut Claimant's Innocent Owner Defense**

### **Claimant's Knowledge**

42. Claimant knew that drug crimes occurred at or on the Defendant Property. Day 4 Transcript at 32-34, 54.

43. Claimant knew that police had executed search warrants at or on the Defendant Property. *Id.* at 55.

44. Claimant knew that individuals had died in Motel Caswell rooms from drug overdoses. *Id.* at 56.

45. Claimant knew that individuals had been arrested for possessing drugs at or on the Motel Caswell. *Id.* at 57.

46. Claimant knew that individuals had been arrested for selling drugs at or on the Defendant Property. *Id.* at 56-57.

47. Claimant knew that drug crimes occurred at or on the Defendant Property because Claimant had read about drug arrests at or on the Defendant Property in the newspaper. *Id.* at 57.

48. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because former TPD Officer Budryk informed Russell or Motel Caswell

employees about why the TPD was at the Defendant Property and the nature of arrests made at or on the Defendant Property.  Day 2 Morning Transcript at 34-35, 44-45, 47, 56.

49. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because former TPD Lieutenant Dennis Peterson informed *Motel Caswell* employees about why TPD was at the Defendant Property and the nature of arrests made at or on the Defendant Property.  Day 1 Transcript at 54-55, 63, 65-66, 77-78, 96-98.

50. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because, in November 2007, TPD Deputy Chief Voto, then Chief of Detectives, invited representatives of Tewksbury hotels and motels to a meeting to discuss crime prevention measures.  Day 2 Morning Transcript at 110; Trial Ex. 7. Neither Russell nor Patricia Caswell attended.  Day 2 Morning Transcript at 116.  A representative of the Defendant Property did attend that meeting, held on December 11, 2007.  *Id.*  During the 2007 meeting, Voto explained to attendees that motor vehicle breaks are often committed by people with drug habits.  *Id.* at 113.  At this meeting, Voto suggested measures to prevent crime at hotels, such as lighting in parking lots, video cameras, obtaining proper and true identification from guests, requiring that guests register their vehicles, and barring problem tenants.  *Id.* at116-18, 123; Day 2 Afternoon Transcript at 11.  Also during the December 11, 2007 meeting, Voto handed out a summary of crime statistics to each motel or hotel, which reflected statistics for all major crimes, including drugs, at each location.  *Id.* at 121.

51. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because TPD officers left copies of search warrants in the rooms at the Defendant Property.  Day 1 Transcript at 54, 63; Day 2 Morning Transcript at 44. Sometimes the door to a Motel Caswell room was damaged during the execution of a search warrant, so the Claimant would need to get it fixed.  Day 2 Afternoon at 27-28, 33.

52. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because TPD uniformed officers often responded to the Defendant Property in police cruisers and also transported suspects from the Defendant Property in marked police vehicles.  Day 2 Morning Transcript at 17, 24-26, 33, 40-41, 50, 69, 102; Day 2 Afternoon Transcript at 31-32, 59; Day 3 Transcript at 37, 41, 81-82, 87.

53. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because TPD has a public records system to publicly disseminate information.  Day 2 Morning Transcript at 90.  Such records contain names, locations of arrests, reasons for arrests, and witness information.  *Id.*  Public records, along with arrest reports, are now available on-line and are updated at least weekly.  *Id.* at 91. Prior to public records being available on-line, which began about five or six years ago, such information was available in an incident book kept in the dispatcher's area at the TPD.  *Id.*  That incident book was updated every eight hours.  *Id.*

54. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because local newspapers published articles about arrests that occurred at the Defendant Property. Day 2 Morning Transcript at 92-93; Day 2 Afternoon Transcript at 19; Day 3 Transcript at 74; Day 4 Transcript at 34, 57; Trial Ex. 50.

55. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because a police raid and arrest was captured on film and broadcast three times on a local cable news show. Day 2 Morning Transcript at 76; Trial Ex. 49. The cable news show was on Channel 6, which, at the time, had 80,000 subscribers in Lowell, Tewksbury and Chelmsford. Day 2 Morning Transcript at 61. In 1994, Lowell had a population of 95,000, Tewksbury had a population of 25-30,000, and Chelmsford had a population of about 27,000. *Id.* at 84.

56. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because its employees who worked at the Motel Caswell front desk, which was always staffed, could view, through a large window positioned next to the front desk, police activity in the front parking lot of the Defendant Property. Day 4 Transcript at 49, 53. *See* Day 2 Afternoon Transcript at 35; Day 3 Transcript at 80, 87.

57. Claimant knew about or was willfully blind to drug crimes at or on the Defendant Property because TPD officers obtained keys from front desk employees at the Defendant Property to execute search warrants. *See*, *e.g.*, Day 2 Morning Transcript at 37; Day 4 Transcript at 47.

58. Claimant knew about or was willfully blind to the drug crimes at or on the Defendant Property because TPD would routinely search guest register cards to check if individuals staying at the Motel Caswell had outstanding warrants. Day 1 Transcript at 44-45; Day 3 Transcript at 30; Day 4 Transcript at 43-44. The guest register cards were located behind the front desk. Day 1 Transcript at 46.

59. Claimant knew about or was willfully blind to the drug crimes at or on the Defendant Property because Motel Caswell maids found hypodermic needles in the Motel Caswell. Day 4 Transcript at 67-68.

60. Claimant knew about or was willfully blind to the drug crimes at or on the Defendant Property because TPD would sometimes conduct surveillance from rooms provided by Claimant and the Motel Caswell employees. Day 4 Transcript at 47.

## **Methamphetamine Laboratory in Motel Caswell Room 255**

61. Claimant knew that a methamphetamine laboratory had been operating out of Motel Caswell Room 255. Day 4 Transcript at 32-33, 36-37, 69.

62. Claimant was informed about the methamphetamine laboratory by the Tewksbury Police Department.  Day 4 Transcript at 36-37, 70.

63. Claimant was informed about the methamphetamine laboratory by the U.S. Drug Enforcement Administration.  Day 2 Afternoon Transcript at 79-83, 85; Trial Ex. 11.

64. Claimant was informed about the methamphetamine laboratory by a Motel Caswell employee.  Day 4 Transcript at 33, 70.

65. Claimant was informed about the methamphetamine laboratory by the Tewksbury Board of Health.  Day 4 Transcript at 38.  The Tewksbury Board of Health informed Claimant that Room 255, *i.e.*, the room in which the methamphetamine laboratory was operating, needed to be cleaned by an environmental clean-up company. *See* Day 4 Transcript at 38-39.

66. Claimant knew that a methamphetamine laboratory had been operating out of Room 255 because Claimant's representative, Russell Caswell, had to have the room cleaned and tested before renting it again.  In October 2005, Russell Caswell contacted Mill City Environmental to conduct air sampling at the Defendant Property because a meth lab had been closed down by the police.  Day 3 Transcript at 9, 23-24; Trial Ex. 16.  Mill City Environmental Senior Project and Compliance Manager Julie Davies had to test Room 255 twice because it had not been cleaned prior to her arrival on October 27, 2005.  Day 3 Transcript at 13, 17, 18; Day 4 Transcript at 38-39; Trial Exs. 17-19.

67. Claimant knew that a methamphetamine laboratory had been operating out of Room 255 because, on October 9, 2005, the TPD froze the room and posted a TPD uniformed officer at the door to the room for several hours.  Day 2 Afternoon Transcript at 64-65.  The next day, on October 10, 2005, the DEA's CLET processed the drug evidence in the room while wearing protective suits.  Day 2 Afternoon Transcript at 67-70, 72-77, 96-97.  Numerous law enforcement personnel, including the TPD and CLET members, were at or on the Defendant Property for several hours as the evidence from Room 255 was processed.  Day 2 Afternoon Transcript at 77, 101.

68. Claimant knew that a methamphetamine laboratory had been operating out of Room 255 because Motel Caswell employees were present as the evidence from Room 255 was processed.  Trooper Murray saw a Motel Caswell cleaning person just a couple of rooms away from Room 255.  Day 2 Afternoon Transcript at 89.  DEA Agent Mark Cashman informed the Motel Caswell front desk employee to notify her employer about the methamphetamine laboratory.  *Id.* at 101-102.

69. Claimant knew that a methamphetamine laboratory had been operating out of Room 255 because the door to the room had a red, self-adhesive sticker indicated that a methamphetamine laboratory had been operating in that room.  Day 2 Afternoon Transcript at 79-80, 95-96; Trial Ex. 10.

70. The Claimant is not an innocent owner under 18 U.S.C. § 983(d)(2) because Claimant, through its representative, Russell Caswell, either had knowledge about, or was willfully blind to, the criminal drug activity that occurred at the Defendant Property beginning at least in 1994 through 2008.

**Claimant Failed to Take Reasonable Steps to Deter Drug Activity**

71. Upon learning of the criminal drug activity that gave rise to forfeiture of the Defendant Property, Caswell did not do what could reasonably be expected to terminate such use of the Defendant Property.

72. Claimant did not contact the TPD to discuss information provided at the 2007 meeting called by Deputy Chief Voto, described *supra*. Day 4 Transcript at 58-59.

73. Claimant, through its employee who attended the 2007 meeting called by TPD Deputy Chief Voto, described *supra*, learned of reasonable steps that it could be expected to take under the circumstances to deter criminal drug activity at the Defendant Property. Day 2 Morning Transcript at 113, 116-119. Claimant did not implement those reasonable steps. Day 4 Transcript at 58-59.

74. Claimant offered no evidence that it ever revoked permission or made a good faith attempt to revoke permission for those engaging in drug activity at or on the Defendant Property. In fact, two individuals who were arrested for drug crimes checked back into the Motel Caswell shortly after their drug arrests. Day 1 Transcript at 96-97; Day 2 Morning Transcript at 27, 45; Day 3 Transcript at 88, 92-93.

75. Claimant did not trespass anyone who was arrested at the Motel. Day 4 Transcript at 74; *see also* Day 1 Transcript at 72, 94. A trespass is a form that a property owner may provide to an individual who they do not want to return to the property. Day 1 Transcript at 71, 94. The trespass form can be obtained at the police department, but must be completed and issued by a property owner. *Id.* at 71, 94.

76. Claimant had no policies or procedures to address criminal drug activity that occurred at or on the Defendant Property. Day 4 Transcript at 66-67.

77. Claimant's employees kept a list of names of individuals who were not to be rented rooms at the Motel Caswell. Day 4 Transcript at 61-63. To get on the list, an individual must have caused a problem at the Motel Caswell. *Id.* However, Claimant had no policy or procedure to define what constituted a problem or when to add a name to the do-no-rent list. *Id.* at 61-63, 66-67. It was up to each individual employee to determine what constituted a problem or when to add a name to the do-not-rent list. *Id.* at 67.

78. Claimant did not instruct any Motel Caswell employee to add the names of the individuals arrested in connection with the above-described drug crimes (including

Abilio Bolarihno, Nestor Rodriguez, Benito Castro-Eusebio, Miguel Cotto, Israel Cortez, Hector Cruz, Sujeiry Garrastequi, Carmen Hardin, Peter Witts, Yonny Sean, San Say, Vernon Smith, Patricia Conroy, William Mercier, Lydia Farrell, and Melanie Quadros) to the do-not-rent list, described *supra*. *See* Day 4 Transcript at 61-63, 67.

79. Claimant had no policies or procedures concerning drug arrests at or on the Defendant Property. Day 4 Transcript at 66-67.

80. Claimant had no policies or procedures concerning what to do if someone who was arrested for a drug crime tried to check back into the Motel Caswell. Day 4 Transcript at 66. In fact, individuals who were arrested for drug crimes could check back into the Motel Caswell. *See* Day 1 Transcript at 90-91, 96-97; Day 3 Transcript at 84-88, 92-93; Day 2 Morning Transcript at 27, 45.

81. Claimant had no policies or procedures concerning what to do if drugs or drug paraphernalia were found at or on the Defendant Property. Day 4 Transcript at 66-68.

82. Claimant made no changes to its policies or procedures after finding out that a methamphetamine laboratory had been operating out of Room 255 of the Motel Caswell. Day 4 Transcript at 72-74.

83. Russell Caswell, Claimant's representative, testified that the Motel Caswell always obtained identification from its guests upon check-in. Day 4 Transcript at 60. His testimony is not credible, however, as numerous officers testified that they have reviewed guest register cards at the Motel Caswell that contained inaccurate or missing guest information. Day 1 Transcript at 45-47; Day 2 Morning Transcript at 118-20; Day 3 Transcript at 30-34, 78-80.

84. Claimant understands that requiring identification upon check-in or requiring complete and accurate guest information upon check-in to a motel could deter criminal activity. Day 4 Transcript at 59.

85. Claimant has not joined any trade groups or organizations to learn about measures that Claimant could take to deter criminal drug activity at or on the Defendant Property. Day 4 Transcript at 74.

86. Other motels and hotels in the area have security measures, such as a security detail during certain time periods and surveillance cameras. *See* Day 2 Afternoon Transcript at 38-40. The TPD did not have to inform the other motels and hotels in the area to take these measures. Day 4 Transcript at 16-18.

87. Claimant has never hired a security detail to patrol the Defendant Property. *See* Day 4 Transcript at 18.

88. Closed-circuit televisions have not always been at the Defendant Property.  Day 2 Afternoon Transcript at 40.  They were installed only after the complaint in this case was filed.  Day 4 Transcript at 75-76.  There was nothing to prevent their installation prior to the filing of the instant case.  Day 4 Transcript at 76.

89. The Claimant is not an innocent owner under 18 U.S.C. § 983(d)(2) because, upon learning of the conduct giving rise to forfeiture, Claimant did not do all that reasonably could be expected under the circumstances to terminate such use of the Defendant Property.

## III.   CONCLUSIONS OF LAW

The United States submits the following proposed conclusions of law, which are being

supplemented subsequent to trial in this case.

### A.   Forfeitability

1. Under 21 U.S.C. § 881(a)(7), all real property which is used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, a violation of the Controlled Substances Act under 21 U.S.C. § 801, *et seq.* shall be subject to forfeiture to the United States and no property right shall exist in them.

2. For the Defendant Property to be forfeitable under 21 U.S.C. § 881(a)(7), the United States must establish by a preponderance of the evidence that: (1) there was a violation of 21 U.S.C. § 801, *et seq.* which was punishable by more than one year's imprisonment; (2) the real property, including any appurtenances or improvements thereon, was used or intended to be used in any manner or part to commit or to facilitate the commission of the violation; and (3) there was a substantial connection between the property to be forfeited and the violation. *See* 18 U.S.C. § 983(c)(3).

3. "Facilitate" in the context of this statute is quite broad and means that the property need only make the prohibited conduct "less difficult or 'more or less free from obstruction or hindrance.'"  *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990).

4. Under a facilitation theory, the Government is not limited to forfeiture of property belonging to principals or conspirators in the underlying illegal activity; forfeiture can be ordered even if there is no wrongdoing on the part of a claimant.  *See United States v. All Right, Title and Interest…143-147 East 23rd Street (Kenmore Hotel)*, 77 F.3d 648 (2d Cir. 1996)(forfeiture of hotel where claimants were not personally involved in underlying drug conduct that was the basis for forfeiture); *United States v. One Parcel of Real Estate at 1012 Germantown Road, Palm Beach County, Fla.*, 963 F.2d 1496 (11th Cir. 1992)(finding forfeiture of convenience store that was site of numerous drug offenses where claimant was not personally involved in underlying conduct, but remanding for new trial based on improper jury instruction regarding

"reasonable efforts"); *United States v. All Monies in Account No. 90-3617-3, Israel Disc. Bank*, 754 F.Supp. 1467, 1476 (D. Haw. 1991)(citing *United States v. Leong Chinese Merchants Assn. Building*, 918 F.2d 1289, 1293 (7th Cir. 1990))(court rejected claimant's argument that the facilitation theory should be confined to property belonging to principals or conspirators in the underlying criminal activity and noted that, while many cases may have applied the facilitation theory in such instances, nothing suggests that the limitation was intended by Congress).

5.  The plain language of 21 U.S. C. § 881(a)(7), "any manner or part," indicates that Congress intended the statute to be broadly interpreted. *See United States v. Littlefield*, 821 F.2d 1365, 1367 (9th Cir.1987) ("By specifying that property is subject to forfeiture if it was used 'in any manner or part' to commit or facilitate a drug offense, Congress plainly provided for forfeiture of property even when only a portion of it was used for the prohibited purposes.").

6.  To establish a substantial connection in Section 881(a)(7) cases, such as the instant civil forfeiture case against the Defendant Property, the Government must show a nexus between the real property and some specified illegal activity. *See United States v. 15 Bosworth St.*, 236 F.3d 50, 54 (1st Cir. 2001)(citing *United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1st Cir. 1992)); *United States v. Parcel of Land (28 Emery St.)*, 914 F.2d 1. 3-4 (1st Cir. 1990); *United States v. Parcels of Real Prop. (1933 Commonwealth Ave.)*, 913 F.2d 1, 3 (1st Cir. 1990)).

7.  A substantial connection between a defendant property and illegal drug activity may be established after a single drug violation. *See United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave.*, 903 F.2d 490, 494 (7th Cir. 1990).

8.  Whether or not a real property's role is integral, essential or indispensable to the conduct giving rise to forfeiture is irrelevant in determining the real property's substantial connection to the crime. *Schifferli*, 895 F.2d at 990. In the First Circuit, the fact that the conduct giving rise to forfeiture could have occurred elsewhere is not a defense against forfeiture. *United States v. Heldeman* , 402 F.3d 220, 222 (1st Cir. 2005).

9.  The United States has the burden of establishing that the Defendant Property is forfeitable by a preponderance of the evidence. 18 U.S.C. § 983(c)(1).

10. The United States has met its burden to prove by a preponderance of the evidence that the Defendant Property is forfeitable under 21 U.S.C. § 881(a)(7).

11. The evidence presented at trial established by a preponderance of the evidence the first element of 21 U.S.C. § 881(a)(7): that there was a violation of the Controlled Substances Act.

12. The United States established by a preponderance of the evidence the second element of 21 U.S.C. § 881(a)(7): that the defendant property was used in any manner or part to commit or to facilitate the commission of the violation.

13. The United States has established by a preponderance of the evidence the third element of 21 U.S.C. § 881(a)(7): that there was a substantial connection between the property to be forfeited and the criminal drug violations.

14. The Defendant Property, therefore, is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7) because it was used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, a violation of 21 U.S.C. §§ 841, 846 and/or 856.

15. Because the United States has carried its burden to establish by a preponderance of the evidence that the Defendant Property is subject to forfeiture, Claimant's motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) is denied.

### B. **Innocent Owner Affirmative Defense**

16. Once the United States establishes that the Defendant Property is subject to forfeiture under 21 U.S.C. § 881(a)(7), Claimant may raise the "innocent owner" defense under 18 U.S.C. § 983(d).

17. Under 18 U.S.C. § 983(d)(1), "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."

18. To establish that it is an innocent owner under 18 U.S.C. § 983(d)(2), Claimant must show that it either: (1) had no knowledge of the criminal activity; or (2) upon learning of the conduct giving rise the forfeiture, did all that could reasonably be expected to terminate such use of the property.

19. Claimant, not the Government, has the burden of proving that it is an innocent owner under 18 U.S.C. § 983(d)(2) by a preponderance of the evidence.  18 U.S.C. § 983(d)(1).  *See United States v. 45 Claremont Street*, 395 F.3d 1, 5 (1st Cir. 2004)("The burden in this case was not on the government to establish that [the claimant] had knowledge of the [illegal activity]; to the contrary, it was on [the claimant] to establish that she lacked knowledge of the [illegal activity].");  *United States v. 15 Bosworth Street*, 236 F.3d 50, 55 (1st Cir. 2001)(when discussing the innocent owner defense raised by a claimant in a civil forfeiture case, the court states that "the proponent of an affirmative defense will have to supply evidence to sustain that defense.").

20. Willful blindness to illegal activity is equivalent to knowledge of the illegal activity under 18 U.S.C. § 983(d)(2)(A)(i), and precludes Claimant's "innocent owner" defense.  *See United States v. Collado*, 348 F.3d 323, 327 (2d Cir. 2003)(property

owner who is willfully blind to the distribution of illegal drugs on her property by her son does not qualify as innocent owner); *United States. v. 874 Gartel Dr.*, 79 F.3d 918, 924 (9th Cir. 1996)(rejecting claimants innocent owner defense after finding that claimants knew about, or were willfully blind to, false statements on a loan application); *United States v. One Parcel of Real Prop., Located at 755 Forest Rd., Northford, Connecticut*, 985 F.2d 70, 72 (2d Cir. 1993)("However, where an owner has engaged in 'willful blindness' as to activities occurring on her property, her ignorance will not entitle her to avoid forfeiture."); *United States v. Real Prop. Located at 1044 Cherry Dr., Township of Elderon*, 2010 WL 519861 at *3 (W.D. Wis. Feb. 9, 2010)(stating that knowledge includes willful blindness or a failure to investigate because one is afraid of what such an inquiry would yield); *United States v. Funds Seized From Account No. 20548408 at Baybank, N.A.*, 1995 WL 381659, at *6 (D.Mass. June 16, 1995)("In the context of an 'innocent owner' defense, willful blindness of structuring activity is tantamount to knowledge.").

21. Under 18 U.S.C. § 983(d)(2)(A)(ii), if an individual who claims to have no actual knowledge of the illegal activity giving rise to the forfeiture becomes aware of the criminal conduct, to qualify as an innocent owner it must establish by a preponderance of the evidence that upon learning of the conduct giving rise to the forfeiture she took all possible steps to prevent the activity.

22. Claimant has failed to show by a preponderance of the evidence that it is an "innocent owner" under 18 U.S.C. § 983(d) (2).

23. Claimant had actual knowledge of, or at a minimum was willfully blind to, the illegal activities giving rise to forfeiture of the Defendant Property.  *See United States v. One 1988 Checolet 410 Turbo Prop Aircraft, Dominican Republic Registration Tail No. H1698CT*, 282 F.Supp.2d 1379, 1383 (S.D.Fla.2003) ("'actual knowledge' may be proven by inference from circumstantial evidence suggesting a high probability of a property's involvement with drug trafficking, and that a property owner may not 'turn a blind eye' toward such evidence and still claim 'innocent owner' status under CAFRA").

24. The knowledge of the Claimant's employees is imputed to Claimant.  *See United States v. One Parcel of Land Locate at 7326 Highway 45 North...Oneida County, Wisconsin*, 965 F.2d 311, 316 (7th Cir. 1992); *United States v. 141st St. Corp.*, 911 F.2d 870, 876 (2d Cir. 1990); *United States v. Nissan Van 1987 Vin JN8HD16Y8HWO14378*, 45 F.3d 438, 1994 WL 711941 at *3 (9th Cir. Dec. 20, 1994).

25. Upon learning of the criminal drug activity that gave rise to forfeiture of the Defendant Property, Claimant did not do all that reasonably could be expected under the circumstances to terminate such use of the Defendant Property pursuant to 18 U.S.C. § 983(d)(2).

26. A claimant may show that it did all that it could reasonably be expected to do under the circumstances by demonstrating that it (a) gave timely notice to an appropriate law enforcement agency of information that led the claimant to know the conduct giving rise to a forfeiture would occur or has occurred, *and* (b) in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use a defendant property, or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property. 18 U.S.C. § 983(d)(2)(B)(i). The burden to demonstrate this beyond a preponderance of the evidence remains with the Claimant. 18 U.S.C. § 983(d)(1).

27. As Claimant failed to trespass any person, offer evidence of any revocation of permission to use the Defendant Property, or even keep a list of individuals who were arrested for or convicted of criminal activity at the Defendant Property, Claimant has failed to demonstrate that it, in a timely fashion, revoked or made a good faith attempt to revoke permission for those engaging in conduct giving rise to forfeiture of the Defendant Property, or that it took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the Defendant Property. *See* 18 U.S.C. § 983(d)(2)(B)(i).

28. Claimant failed to show any policy or procedure or security measure implemented at the Defendant Property in consultation with a law enforcement agency to discourage or prevent the illegal use of the Defendant Property. *See* 18 U.S.C. § 983(d)(2)(B)(i). For example, Claimant failed to implement any of the recommendations provided at the 2007 meeting called by Deputy Chief Voto, described *supra*.

29. All right, title, and interest in the Defendant Property is forfeited to the United States of America under 21 U.S.C. § 881(a)(7).[16]

---

[16] The Court should not entertain an Eighth Amendement "excessive fines" argument unless it finds that the Defendant Property is subject to forfeiture to the United States. *See United States v. Montour*, 2010 WL 1417797, at *2 (W.D.Wash. Apr. 6, 2010)("[I]t would be speculative for the Court to engage in a proportionality analysis when the facts underlying the forfeiture liability have not been established ...The Court declines to weigh the gravity of Defendants' offenses before they have been established in fact."); *United States v. $109,086.00 in U.S. Currency*, 2005 WL 1923613, at *4 n.1 (S.D. Tex. Aug. 10, 2005)(determination concerning excessiveness of forfeiture is proper "after the precise amount of the property forfeited and the evidence of the underlying offense are in the record and can properly be compared); *United States v. One Parcel...32 Medley Lane*, 2005 WL 465421, at *1 (D. Conn. Feb. 11, 2005)(whether a civil forfeiture is constitutionally excessive will be determined by the court following the jury's determination that the defendant property is subject to forfeiture and that the claimant is not an innocent owner; attempt to litigate Eighth Amendment issue during the forfeiture trial denied); *United States v. Funds in the Amount of $170,926.00*, 985 F. Supp. 810, 813 (N.D. Ill. 1997) (motion to dismiss civil complaint on Eighth Amendment grounds denied; court should not address excessive fines challenge until the Government has established forfeitability at trial); *United States v. Ziegler Bolt & Parts Co.*, 19 C.I.T. 13, 23-4 (C.I.T. 1995)("This Court will not act on an argument sounding in the Eighth Amendment before a penalty is even assessed."); *United States v. $633,021.67 in U.S. Currency*, 842 F. Supp. 528, 535 (N.D. Ga. 1993) (pretrial

Respectfully submitted,

UNITED STATES OF AMERICA,

By its attorney,
CARMEN M. ORTIZ
United States Attorney
/s/ Sonya Rao
 /s/ Veronica Lei
SONYA RAO
VERONICA LEI
ANTON GIEDT
Assistant United States Attorneys
1 Courthouse Way
Suite 9200
Boston, MA 02210
Dated:  November 29, 2012          (617) 748-3100

---

determination of yet-to-occur forfeiture would be premature).  Should the Court find in favor of
the United States, and if the Claimant subsequently raises an Eighth Amendment affirmative
defense, the Government requests that it be allowed to supplement its post-trial briefing,
including its findings of fact and conclusions of law.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>/s/  Sonya Rao</u>
SONYA RAO

Dated:  November 29, 2012                    Assistant U. S. Attorney