UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-11635-JGD |
| 434 MAIN STREET, TEWKSBURY, | ) | |
| MASSACHUSETTS, | ) | |
| | ) | |
| Defendant, | ) | |
| _____ | ) | |
| | ) | |
| RUSSELL H. CASWELL, as Trustee | ) | |
| of the Tewksbury Realty Trust, | ) | |
| | ) | |
| Claimant. | ) | |

## FINDINGS OF FACT AND RULINGS OF LAW

January 24, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

The United States has brought this civil forfeiture action pursuant to the Civil

Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983(c)(1), seeking the forfeiture of

the Motel Caswell, located at 434 Main Street, Tewksbury, Massachusetts ("Motel" or

"Property"), on the grounds that the Property was used to facilitate ongoing criminal drug

activity and there was a "substantial connection" between the Motel and the drug activity.

The Claimant owner of the Motel denies that the Property is subject to forfeiture, and

further asserts that, even if it is subject to forfeiture, the owner qualifies as an "innocent

owner." A jury-waived trial was held before this Court on November 5-8, 2012, and the parties have submitted post-trial briefs.

After careful consideration of the evidence, pleadings, and argument of counsel, this Court concludes that the Government has failed to meet its burden of establishing that the Motel is subject to forfeiture. In addition, this Court concludes that the Claimant has met his burden of proving that he is the innocent owner of the Property. Therefore, and for the reasons detailed more fully herein, judgment shall be entered in favor of the Claimant and the forfeiture action shall be dismissed.

## II.  <u>FINDINGS OF FACT</u>[1]

### <u>Overview</u>

1.     After reviewing the scores of cases cited by the parties, I find this case to be notable in several critical respects, including (1) the Government has identified only a limited number of isolated qualifying drug-related incidents spread out over the course of more than a decade, none of which involve the Motel owner or employees; and (2) the witnesses unanimously confirmed that no efforts were undertaken to work with the Motel owner to try and reduce drug crimes at the Property prior to the institution of the forfeiture action, nor was any warning given as to the possibility of forfeiture prior to suit being filed. As a result, the instant case is easily distinguishable from other cases where

---

[1]  Transcript citations are to the day of trial (IIA being the morning of the second day, IIB being the afternoon of that day) followed by the page number. The transcripts are filed as Docket Nos. 113, 114, 116, 118 and 119.

the "draconian" result of forfeiture was found to be appropriate.[2]  See, e.g., United States

v. 143-147 East 23rd Street, 77 F.3d 648, 650-51 (2d Cir. 1996) ("Following several

years of investigations by federal and local law enforcement officials into narcotics

trafficking at the Kenmore Hotel in Manhattan," including evidence that "'security

guards' were taking bribes from individuals seeking entry into the building," "and after

several attempts by local law enforcement officials to have [the hotel owner] take steps to

impede the use of the Hotel for narcotics activity, the government commenced the present

action . . . seeking civil forfeiture of the Hotel.").

### The Basis for This Action

2.      The Motel Caswell is located at 434 Main Street, Tewksbury, Massachu-

setts.  On September 29, 2009, the United States filed a Verified Complaint for Forfeiture

in Rem seeking the forfeiture of all buildings, appurtenances and improvements on the

Property.

3.      The Complaint alleges that the Property is subject to forfeiture pursuant to

21 U.S.C. § 881(a)(7) because it was "used, or intended to be used, in any manner or

part, to commit, or to facilitate the commission of, a violation of [the Controlled

Substances Act] punishable by more than one year of imprisonment."

---

[2]  See United States v. 221 Dana Avenue, 261 F.3d 65, 74 (1st Cir. 2001) (it is a "well established rule that federal forfeiture statutes must be narrowly construed because of their potentially draconian effect." (citations omitted)).

4.      The Motel is owned by the Tewksbury Realty Trust, which is the Claimant in this action.  Russell H. Caswell ("Mr. Caswell") is the Trustee of the Trust, and represents the Claimant.[3]  Mr. Caswell and his wife, Patricia Caswell, are the beneficiaries of the Trust.  There are no mortgages or encumbrances on the Property, except for the Government's lien in connection with this forfeiture action.

## The Motel and Its Owners

5.      Mr. Caswell has lived in Tewksbury since 1955.  He is 69 years old, and a graduate of Tewksbury High School.  Mr. Caswell has had no further formal education.  He has had no training in law enforcement or investigation, or in drug detection.

6.      Mr. Caswell lives at 442 Main Street, Tewksbury, right next door to the Motel, with his wife, Patricia, his 92 year old mother-in-law, his son Joseph (called Jay), Jay's wife, and their 9 year old daughter.  He has lived there since at least 1994.

7.      Patricia Caswell ("Mrs. Caswell") is 71 years old, and in poor health.  The Caswells have been married since 1964.  They have two grown children, Julie and Jay, and three grandchildren.

8.      The Caswells' home was included in the view taken by the court at the beginning of the case.  It is modest, well-maintained, nicely furnished and decorated, and apparently the gathering place of a close-knit family, as evidenced by numerous family photos and memorabilia.

---

[3]  References to Mr. Caswell are to Russell Caswell individually and as the representative of the Trust unless the context dictates otherwise.

9.     There is no contention in this case that anyone from the Caswell family has been involved in any criminal activity either at the Motel or elsewhere.  It is undisputed that they are a law-abiding family.  Mr. Caswell testified that he had never been charged with any crime in his life.  (IV:32).

10.     The Motel Caswell was built in 1955 by Mr. Caswell's father, who sold it to Mr. Caswell in 1984.  It is a 56-room "budget motel" and rents out about 14,000 rooms per year.  It serves a mixture of semi-permanent and transient guests.

11.     As Mr. Caswell testified, the guests reflect a "kind of a cross-section of society.  We get some workers come in from out of town if they're working in the area, working crews.  People are between apartments, either moving in or moving out.  And the same with houses, moving in or moving away or into the area, that sort of thing.  Some people just live there pretty much permanently.  We've had some there for a lot of years.  And then some are there for a month or two or whatever, . . . it varies."  (IV:24).

12.     The Motel is located directly on Main Street and easily visible from the road.  It is surrounded by residences, restaurants and small businesses.

13.     Mr. Caswell runs the Motel and is there virtually every day, sometimes several times a day.  When he is not at the Motel, Mr. Caswell or his family can be reached if needed.  At one point, there was a telephone extension connecting the Motel Caswell and Mr. Caswell's residence.  Mr. Caswell does not use the internet or email.

14.     Mrs. Caswell used to work at the Motel as well, but she is too ill at the present time.  Jay Caswell is responsible for maintenance at the Motel, works at the desk

5

one night a week, and also fills in on the desk as needed.  Julie Caswell is the

bookkeeper.  There are approximately eight other employees at the Motel – three or four

maids and five people on the desk.  As Mr. Caswell testified, "It's a budget motel.  You

know, it's an older place, but we do our best to keep it in good condition."  (IV:23).

15.     Based on the evidence presented and my observation of the witnesses

during trial, I find that Mr. Caswell is appropriately concerned with the events that take

place at the Motel and that he recognizes that it is in his interest and in the interest of his

family to operate as safe an enterprise as possible.

16.     The Motel Caswell is licensed every year by the Town of Tewskbury, and

there has never been any problem getting the license renewed.  There has never been a

nuisance action or threat of litigation against the Motel, and there has never been any

charge that it has been operated in violation of any law.

17.     There have not been any complaints by neighbors of the Motel to the Town

concerning health or safety conditions at the Property.

18.     Prior to initiating the instant forfeiture action, neither the Town of

Tewksbury nor any other person or agency ever advised the Caswells that the Property

may be subject to forfeiture.

## Security at the Motel

19.     The Motel is on Main Street in Tewksbury, a well-traveled road.  There are

tall, overhead floodlights in the front of the Motel for safety purposes.

20.    There is different lighting in the back parking lot, but that area appears to be sufficiently lit as well.  There are lights at every door and spotlights up on top of the building.

21.    There is a big picture window in the front of the Motel from which the desk clerk can see the front parking lot.

22.    The front desk is staffed 24/7.  This is done for security purposes, as there is generally no need for desk assistance in the early morning hours.  Thus, the desk clerk is supposed to "keep an eye on things" and to "call the police if anything crops up, that sort of thing."  (IV:49).

23.    There has been a security camera in the front office for several years.  More recently, a security camera has been added to the back parking lot, along with a sign stating that the property is under surveillance.  The additional camera was added when the system was upgraded so that it could handle more than one camera.

24.    Over the years, when requested Mr. Caswell has provided tapes from the security cameras to the police.

25.    While it appears that the second camera was added after the forfeiture action was commenced, I find that if anyone had suggested an additional camera to Mr. Caswell, and/or had indicated that he might risk losing the Motel if additional security measures were not taken, the camera would have been installed immediately.  I make this finding based on the importance the Motel has to Mr. Caswell and his family, and the fact that he has cooperated with the police over the years.

26.     The police station is approximately one mile down the road from the Motel. Some police regularly drive through the Motel property "three or four times a night" on patrol.  They are welcome on the Property and no efforts are made to stop them.  The police drive through other motels in town as well.  According to Tewksbury Deputy Chief of Police, John Voto, there is basically a police presence at the Motel daily.  (IIA:94).

27.     The police also regularly drive through the Motel parking lots to check license plates to see if there are outstanding warrants, a practice they follow at other motels in town as well.  No one from the Motel has ever interfered with these efforts by the police.

28.     For at least 10 years, there has been a sign in the Motel lobby asking patrons to call the police if they see any suspicious activity.  The sign was provided by the police department.

29.     Motel employees, including maids and desk clerks, have called the police on a number of occasions to report suspicious activity.

30.     Mr. Caswell has called the police on a number of occasions to report suspicious activity.

31.     No Motel employees have interfered with or impeded any police investigations.

32.     As described below, numerous Tewksbury police officers testified at trial. While Officers Dennis Peterson and Robert Budryk testified that they did not have complete trust in Motel staff, there is no evidence that their concerns were well-founded.

8

Such concerns were not universally shared by the other law enforcement witnesses. Moreover, even Officers Peterson and Budryk testified that they received helpful information from Motel employees, including reports of suspicious behavior.

33.     All witnesses testified that whenever the police have requested room keys for whatever purpose, keys have been provided by the Motel staff without any problem.

34.     Similarly, it has been the Motel's policy to provide free rooms to law enforcement for stakeouts whenever requested.

35.     The police have also conducted surveillance on the Property without interference.

36.     The police regularly review the registration cards of guests.  The cards are kept behind the front desk, and the police apparently feel free to walk behind the desk to check the cards whenever they want.  The cards include the name of the guest and the license plate of their car.

37.     On some occasions over the years, some police officers have complained to the desk clerks at the Motel Caswell (as well as at other hotels) that the registration cards were not being completed fully or accurately by the guests, and have suggested that the clerks fill the cards out themselves.  According to all the law enforcement witnesses, however, this complaint was never made to Mr. Caswell, and the situation was apparently not serious enough to notify Mr. Caswell of the need to alter the procedure used by the desk clerks.

38.     There is evidence that the registration cards were accurately completed at least some of the time even before this litigation was commenced.  For example, as detailed below, to the extent that the cards were used by the police in connection with the incidents on which this forfeiture action is based, the cards were accurate.

39.     I find credible Mr. Caswell's testimony that it was his practice to tell the clerks to make sure that the information on the cards was accurate.  (See IV:44).

40.     At some point, someone, possibly a police officer, suggested to Mr. Caswell that photocopies be made of the guests' drivers' licenses, and that is now the procedure that is being followed at the Motel.  Thus, the photocopy is attached to the registration card and, as in the past, the license plate information continues to be recorded.

41.     The date this procedure was instituted is unclear.  If this procedure changed as a result of the filing of this forfeiture action, I again find that it could have been accomplished much earlier if anyone had made the suggestion to Mr. Caswell and/or indicated that his failure to photocopy drivers' licenses might result in the forfeiture of the Motel.

42.     The Motel has never been fined or otherwise reprimanded for failure to keep accurate registration cards.  There is no evidence that the lack of information on a registration card interfered, impeded or hindered the police in any specific investigation.

43.     The Motel also maintains a "no-rent" list for problem guests.  While there is no effort to specifically include (or exclude) on the list guests who have been arrested at

the Property, the list is intended to advise the next shifts of desk clerks which guests were problematic at the Motel.

### Other Potential Safety Steps

44.     The evidence was consistent that no law enforcement personnel ever attempted to communicate with Mr. Caswell about any potential safety measures which could have been taken at the Motel Caswell to reduce drug crime at the Property. Moreover, the numerous law enforcement witnesses offered very few suggestions even at trial which are not already in use at the Motel.

45.     Specifically, but without limitation, Dennis Peterson was a member of the Tewksbury Police Department from 1975 through his retirement in 2007, rising through the ranks from patrolman to lieutenant.  Although he testified anecdotally to being on the Property with regularity, he also testified that he never made any recommendations to Mr. Caswell for his employees to do more than they were doing to discourage criminal activity at the Motel.  (See I:70, 77).

46.     Officer Peterson also testified that, if Mr. Caswell had asked him, he would have suggested that guests check in with a photo ID, that the Motel send "trespass notices" to any individual who was arrested saying that they were no longer welcome on the Property and if they returned they would be subject to arrest, and that desk clerks be instructed not to let any person who had been arrested back into the Motel.  (I:71-72). The legality and/or practicality of such a decision to bar individuals who had been

arrested was not explored at trial.  It is undisputed that Motel employees now photocopy guests' drivers' licenses.

47.     Robert Budryk was a Tewksbury Police Officer from 1989 to 2008, rising from patrolman to lieutenant.  Although he testified that he was familiar with the Motel and Mr. Caswell, he also testified that in all his years, he never had an in-depth conversation with Mr. Caswell, and never made any suggestions about actions Mr. Caswell could take to reduce crime at the Motel.  He further testified that he did not believe that Mr. Caswell would compromise any police investigation, and that he never expressed any concerns to Mr. Caswell about any of his employees.  (See IIA:53, 54).

48.     John Voto, the Deputy Chief of Police of the Tewksbury Police Department, also testified.  He has been a member of the Department since 1996, when he started as a patrolman.  Although Mr. Caswell has lived next door to the Motel throughout this period, Officer Voto never met Mr. Caswell before this litigation started. (IIA:103).

49.     James Hollis joined the Tewksbury Police Department in 1995.  He was a patrolman, a detective and then returned to being a patrolman, a rank he presently holds. Officer Hollis also testified that to his knowledge the Tewksbury Police Department has never communicated with Mr. Caswell about ways to reduce the amount of drug activity at the Motel, and he never suggested any specific steps that could have been taken to discourage drug crime at the Property.  (IIB:42).

50.     Officer Hollis suggested that to deter criminal activity a motel could conduct surveillance, or put up signs, although he was uncertain about what the appropriate verbiage would be.  (IIB:38-39).  When pressed at trial, he suggested a sign to the effect that "Illegal activity will be reported."  (IIB:39).  There is such a sign in the Motel lobby.

51.     Brian O'Neill is a Detective of the Tewksbury Police Department and has been on the force for eight years.  Although he has suggested to some of the Motel clerks that they should make sure that the registration cards were legible, he never made that suggestion to Mr. Caswell.  (III:33-34).  Moreover, he never made any other suggestion to Mr. Caswell or the Motel employees that they take any other action to discourage drug use at the Property.  (III:47-48).  Officer O'Neill testified that he always found the clerks to be cordial and cooperative.  (III:33, 47).  He acknowledged that the guests' IDs are now photocopied.  (III:32).

52.     Thomas Casey is a Lieutenant of the Tewksbury Police Department and has been on the force for 12 years.  He is now the patrol supervisor on the midnight shift.  Lt. Casey testified that he always had a "very good relationship" with the clerks at the Motel, that he found the employees "cordial" and "very helpful," and that he "enjoyed being there and making them feel safe, especially on a Friday night or Saturday night, making myself available to them."  (III:64).  Lt. Casey never suggested that the Motel refuse to rent to someone, and he never proposed any suggestions to anyone as to how they might deter criminal activity at the Motel.  (III:64-65).

53.     Kimberly O'Keefe is a Tewksbury Patrol and Domestic Violence Officer. While she has spoken to Mr. Caswell on various occasions, and even gotten room keys from him, she has never advised him that he should do more to curtail criminal activity at the Motel.  (III:91-92).

54.     David Godin was a Tewksbury Police Officer from 2000 - 2007.  While he is familiar with the Motel, he never met Mr. Caswell before this litigation began.  He never discussed with employees of the Motel any concerns about the amount of crime, and he never suggested any actions that they could take to reduce crime on the Property. (III:106-07).

55.     Patrick Harrington has been a Tewksbury Police Officer for approximately 10 years.  He always found the front desk clerk to be cooperative when he asked for keys or needed information about someone staying at the Motel.  (III:125-26).  He never discussed arrests or investigations with Mr. Caswell.  (III:124).

56.     Marcus McMahon has been a Tewksbury Police Officer for 12 years.  He never spoke to Mr. Caswell before this case started, although he always found the employees cooperative when he wanted to look at registration cards.  (III:133-34).

57.     Timothy Sheehan is the Chief of Police of the Tewksbury Police Department.  He testified in his capacity as the representative of the Town of Tewksbury pursuant to Federal Rule of Civil Procedure 30(b)(6).  As Chief Sheehan testified, with the exception of the meeting of December 11, 2007 discussed infra, which he did not attend, neither the Town nor the Police Department have ever expressed to Mr. Caswell

that he should be doing more than he does to discourage drug crime at the Property. (IV:9-12).

58.     Chief Sheehan testified that some other hotels have "surveillance systems in the lobby for guests that come in and register.  Some of them hire details on the weekends.  Some have their own private officers that do security at the hotel."  (IV:17-18).  As noted above, the Motel Caswell has had a surveillance system in the lobby for many years, and the nearby police regularly patrol the Property.

59.     In sum, although the Court heard testimony from more than 10 present or former law enforcement officers from the Tewksbury Police Department who had familiarity with the Motel Caswell, the evidence was consistent that no one from either law enforcement or the Town ever took any steps to work with Mr. Caswell in an attempt to reduce drug crime at the Motel.  Moreover, as Chief Sheehan testified, no one ever informed Mr. Caswell that the failure to take any steps could result in the forfeiture of the Motel.  (IV:10).

## Meeting of December 11, 2007

60.     Faced with the complete lack of communication between the Tewksbury Police Department and the owners and employees of the Motel Caswell regarding steps that could be taken to deter drug crime at the Property, the Government has attempted to clothe a meeting on December 11, 2007 with far more significance than the evidence supported.  According to the evidence presented, this is the only time during the decades

at issue in this case that the Tewksbury Police Department called a meeting with

hotel/motel representatives to discuss any safety issues

61.     The Government argued that this meeting was designed to convey drug

crime-fighting information to area motel owners, and that the Caswells sent a "desk

clerk" because they "couldn't even bother to drive the one mile down to the police station

to meet with the police when expressly invited."  (IV:106).  This highly derogatory argu-

ment was not supported by a scintilla of evidence.  Not only was the meeting apparently

called because of auto thefts in the area, but there also was no evidence that the repre-

sentative sent by the Motel was inappropriate in any way.  If it was the Government's

contention that Mr. Caswell "couldn't bother" to attend the meeting, it should have at

least inquired what Mr. Caswell was doing at the time and/or established that the

representative the Motel sent was inappropriate.

62.     The actual evidence before this court was as follows.  On November 7,

2007, John Voto, then a Lieutenant and Chief of Detectives of the Tewksbury Police

Department, sent a letter to "Hotel/Motel Managers" in Tewksbury.  (Exhibit 7).  The

letter read in full as follows:

> Dear Managers/Owners;
>
> I am writing this letter **because of the increased amount of Motor
> Vehicle thefts** which have occurred this year in all of the
> Hotels/Motels in Tewksbury.  I believe that some of these **thefts**
> could have been prevented with cooperation between yourself and
> the Police Department.

16

I am assembling a meeting of all of the Hotel/Motel owners and managers of the Town of Tewksbury. In this meeting we will discuss how to take some preventative measures to ensure the **safety and protection of the property of your customers. I believe that these measures will help ensure that your customers are satisfied and will continue to stay at your establishment.** It will also, in turn, help reduce the number of crimes in Tewskbury and protect our citizens from any criminals coming into the town to commit these crimes.

This meeting will be held on Tuesday, December 11, 2007. The meeting will take place at the Tewksbury Police Training Room from 9am to 11am. **I am asking that each establishment send a representative to this meeting** and any questions or concerns will be addressed directly.

Please call and let me know how many people will be attending, so refreshments can be arranged. I thank you in advance for your cooperation. Any questions or concerns please feel free to call me at 978-851-7373 ext 225.

> John S. Voto
> Lieutenant
> Chief of Detectives

(Exhibit 7 (emphasis added)).

63.     I find that no one receiving this letter would reasonably understand that the meeting was being called to discuss how to reduce drug crimes at the motels/hotels.

64.     Seven establishments sent representatives to the meeting. (Exhibit 8). According to Lt. Voto's notes, these included the Fairfield Inn by Marriott ($99/night), Residence Inn by Marriott ($139/night), Towne Place Suites by Marriott ($109/night), Holiday Inn ($134/night), Extended Stay ($84/night), Motel 6 ($60/night) and the Motel Caswell ($56/night). (Exhibit 8). Towne Place Suites sent two representatives: the

17

operations manager and the general manager; the Fairfield Inn, Residence Inn and Motel 6 sent general managers; and the identity of the representative of Extended Stay is unknown. Thus, there is no evidence that other owners of the hotels/motels attended.

65.     Despite the fact that thefts from automobiles were not a big problem at the Motel Caswell, the Motel Caswell sent Arthur Love, one of the night clerks, to the meeting. (IV:41). Mr. Love had been employed by the Motel for several years as of 2007, and he is still employed by the Motel today. (IV:41). Thus, it appears that Mr. Love was and is a responsible member of the Motel's staff. Mr. Caswell discussed the meeting with him afterwards. (IV:58-59). There is no evidence that Mr. Love was in any way an inappropriate representative of the Motel for purposes of attending the meeting.

66.     Lt. Voto's testimony confirmed that if drug crimes were mentioned at the meeting, they were incidental to the purpose of the meeting, which was to prevent automobile thefts. As he testified, the meeting was set up because "at the time we were having a lot of crime in the hotels, especially car breaks, . . . I believe one night there was like 27 car breaks at four or five different mot - hotels, and so, I thought it would be good to get everyone together so that we can take some preventive measures to keep the car breaks from happening." (IIA:110). The preventive measures discussed were "just like lighting in the parking lots, video cameras, notifying their customers to make sure they secure all their valuables, taking the GPS out of the windows, not leaving pocketbooks and wallets out in plain view. I gave them a list of some preventive measures that came right off our website." (IIA:116). The list was not introduced at trial.

18

67.     As noted above, there are lights in the parking lots of the Motel Caswell and video cameras.  It is unclear whether any of these were added as a result of suggestions made at the meeting.

68.     According to Lt. Voto, he also discussed the need for the hotels to obtain proper ID from people and register the car to the room to assist the police in locating individuals who had outstanding warrants.  (IIA:118).  Such information, according to Lt. Voto, would also be helpful in the case of medical emergencies.  (IIA:118-19).  The problems with the registration process existed at various hotels and motels.  Lt. Voto also told the hotel representatives to report suspicious activity.   He learned that the hotels shared information about people they had evicted for non-payment, and he suggested that they call each other about unruly guests as well.  (See generally IIA:122-23, IIB:9).

69.     According to Lt. Voto, other crimes were discussed at the meeting, and he recalls talking "some about drugs" and "about some other issues."  (IIA:121).  The only information Lt. Voto testified to discussing about drugs was that "crimes like this, like motor vehicle breaks, a lot of times these are people with drug habits.  What they'll do is go and look for a GPS or iPads or anything that they can pawn that is very simple and easy money, and they will go to a pawnshop to get money for those things."  (IIA:113). Lt. Voto handed out crime statistics for each of the hotels to show them what kinds of crimes were happening at their hotels.  (IIA:120).  These statistics were not introduced at trial.  Nor did the Government introduce any statistical evidence about the type or frequency of crimes either at the Motel Caswell or in Tewksbury in general.

19

70.     As all the law enforcement witnesses testified, there was no follow-up with motel/hotel owners after the meeting and no similar meetings were ever held before or again in Tewksbury.  Lt. Voto had no idea whether or not the Motel Caswell followed any of the suggestions presented at the meeting.  (IIA:123).

71.     This court rejects any argument that this one meeting was meant to provide information to Mr. Caswell (or the attendees) about what would constitute reasonable efforts to prevent drug crimes at the Motel.

## Crime at the Motel Caswell

72.     As noted above, the Government provided no statistical information about the level or type of crimes at the Motel Caswell.  Instead, it elected to introduce information about 15 specific drug-related incidents during the period of 1994 to 2008.[4] It should be noted that during this 14 year period, the Motel Caswell rented out approximately 196,000 rooms.

73.     To be forfeitable, the Government must show that "the defendant property was intended to be used in a drug crime punishable by a year's imprisonment."  (IV:98).

---

[4]  As long as the Claimant was given the opportunity to depose the relevant witnesses, the Government was free to determine which specific incidents of drug crimes it would introduce at trial.  The Government was not limited to crimes that had occurred during a particular time period, and it was permitted to present evidence of both felony and misdemeanor drug crimes that had originated at the defendant Property.  (See 8/07/12 Order on Claimant's Motion in Limine (Docket No. 86); 10/09/12 Order on Parties' Motions in Limine (Docket No. 93)).  Although the Government was precluded from introducing "summary evidence" of additional drug crimes at the Property, this court ruled that the Government could make an offer of proof if it determined at trial that such summary evidence was necessary to establish a pattern of drug activity at the Property.  (10/09/12 Order on Parties' Motions in Limine).  The Government did not request an opportunity make any offer of proof during the trial.

Of the 15 incidents introduced by the Government at trial, four cases clearly did not involve drug crimes punishable by more than one year of imprisonment (9/27/03, 2/13/04, 12/7/07, 11/14/08), and in four other cases it is unclear whether the incident involved a drug crime punishable by more than one year of imprisonment.  (8/18/97, 2/8/01, 2/13/06, 11/30/08).[5]

74.     Forfeiture actions cannot be based on "the government's suspicion" that drug crimes are being committed.  See United States v. 28 Emery Street, 914 F.2d 1, 5 (1st Cir. 1990) (absent test results that substances were actually illegal drugs, the fact that untested substances were found and tools of the drug trade were seized is insufficient to grant summary judgment to government in forfeiture case even under pre-CAFRA standard under which the government only needs to establish probable cause for forfeiture).

75.     According to Officer Budryk, the Motel itself was a "high crime area" although the area surrounding the Motel "was a normal residential location that I would not consider a high crime area."  (IIA:11).  Other "high crime areas" in Tewksbury included the Stadium Plaza parking lot and the Motel 6.  (IIA:12).

76.     There was anecdotal evidence that the police were called to the Motel Caswell frequently to handle calls ranging from domestic problems to warrant arrests, disorderly conduct complaints and the like.  As Officer Peterson testified, the calls to the

---

[5] As discussed below, this court recognizes that in the right circumstances one incident may be sufficient to establish forfeitability.  This, however, is not such a case.

Motel "pretty much ran the gamut."  (I:39-40).  There was no evidence introduced as to the actual frequency of such calls, the reasons for such calls, the number of arrests or the number of convictions.

77.     In none of the 15 incidents on which the Government relied did Mr. Caswell or Motel employees have knowledge that the guest was intending to use or distribute drugs, or engage in unlawful activity, at the time they checked in.

78.     Mr. Caswell was not personally familiar with any of the guests involved in the incidents.

79.     To establish Mr. Caswell's knowledge of drug crimes on the Property, the Government relies on the fact that after individuals were arrested they were transported away in marked police cruisers which were visible to the public, and that if persons of different sexes were arrested together, they were transported separately.  In addition, some of the arrests were reported in the newspaper and, on at least one occasion, the police arranged to have a reporter with them when the arrest was made to film it for local television.  When a search was conducted pursuant to a search warrant, there was evidence that the warrant was left in the room, although there was no evidence as to what was done with the warrant thereafter, or if the Motel staff (as opposed to the defendant who was released on bail) actually saw the warrant.

80.     In all of the 15 cases, the drug-related evidence found by the police could have easily been hidden from view when Motel staff entered the room to clean.  Motel

staff were not permitted to go through closed drawers or the personal belongings of guests.

81.     Some police officers testified to informing the desk clerks of the reason for an arrest.  However, there was testimony from Chief Sheehan and others that such disclosure would be against police procedure, which was not to publicly discuss any pending investigation or case.  (<u>E.g.</u>, IV:6-8).  There is no evidence that Mr. Caswell was informed of the reason for any arrest.

82.     Mr. Caswell and the Motel employees were never advised by the police not to rent rooms to any specific individuals.  In some cases, the defendants were released on bail by the court, and there does not appear to have been any reason why they should have been precluded from returning to their rooms.

83.     There is no evidence of any large scale drug operation being conducted out of the Motel.  Most, although not all, of the incidents on which the Government relies involved individual drug users.

84.     I find credible Mr. Caswell's testimony that on some occasions he learned about an arrest after the fact, and that on other occasions he did not.  Mr. Caswell was never informed by the police as to the status of an individual arrested, and he did not make any inquiry about such status.

85.     There is no evidence that Mr. Caswell knew of any drug activities which he did not report to the police.

86.     The incidents on which the Government relies, as listed in Ex. 51, are as follows:

(1)     The first event on which the Government relies occurred on **September 30, 1994**.  After having two confidential informants conduct alleged controlled buys of narcotics from room 237 at the Motel, on September 30, 1994, Officer Peterson of the Tewksbury Police Department executed a search warrant at the room, accompanied by Paul Melaragni, a reporter for the local cable television station who filmed the incident. Officer Peterson expected to and did find Abilio Bolarinho in the room.  Mr. Bolarinho was listed as the occupant of the room in the guest registration card.  (Ex. 32 at Bates No. USA 387, ¶ 6).  During the search, Officer Peterson found clear plastic bags, which could be used for packaging drugs, in a drawer but apparently no other obvious indication of drug dealing in the room.  In connection with the execution of the search warrant, Mr. Bolarinho was searched and a packet of what appeared to be crack cocaine was found in his jacket pocket.  He was transported to the police station in a marked cruiser.  At the police station, additional packets were found in his underwear.  Mr. Bolarinho was arrested and convicted of possession of a Class B Substance with intent to distribute.  He was committed to one year in the House of Corrections.  (Ex. 48 at USA 1228).

During this incident the police located the beeper number of Mr. Bolarinho's supplier, Nestor Rodriguez, and contacted him.  Mr. Rodriguez was not staying at the Motel.  When he arrived to deliver drugs, Mr. Rodriguez was arrested with one packet of cocaine.  The outcome of his arrest is unknown.  The Government does not suggest that

Mr Caswell was aware of the fact that Mr. Bolarinho intended to or was actually using drugs in his room, or that he was aware of the drugs hidden on Mr. Bolarinho's person.

(2)     The second incident on which the Government relies occurred almost three years later, on **July 17, 1997.**  A confidential informant who was staying at the Motel contacted the police and informed on his/her heroin suppliers, who could be contacted by way of a beeper with a code for a room number.  The suppliers were not residing at the Motel.  The police conducted an investigation, including surveillance, and arrested an unidentified alleged customer in the parking lot of the Motel, who was transported away from the Property in a cruiser.  The outcome of this arrest is unknown.  The next day the police rented room 248 and ordered drugs from the suppliers.  The suppliers, Benito Castro-Eusebio and Cedano Celines, were arrested after they delivered drugs and had left the Property.  Castro-Eusebio was committed to one year in the House of Corrections.  The outcome of Celines' arrest is unknown.

There is no evidence that Mr. Caswell or the Motel employees knew the identity of the confidential informant, knew that the informant intended to use drugs in his or her room, or knew of the drug delivery.  There also is no evidence and the Government does not contend that the police informed Mr. Caswell about the confidential informant's role in this incident or suggested that he/she should have been evicted from the Motel.

(3)     About a month later, on **August 18, 1997**, the same confidential informant contacted police about another heroin supplier who was making deliveries to the Motel but who did not reside at the Motel.  Luis Rivera and Denise Rivera were stopped in

their car in the Motel parking lot when they came to make a delivery, and were arrested

when heroin was found on their persons.  They were transported separately in police

cruisers.  The outcome of their arrests is unknown.  Again, there is no evidence and the

Government does not contend that Mr. Caswell knew of the confidential informant's role

or of the drug delivery.

(4)    The next incident on which the Government relies occurred almost

four years later, on **February 8, 2001**.  The Tewksbury Police Department received

information from a guest staying in room 241 at the Motel that a suspected drug dealer

was staying next door.  When the dealer, Miguel Cotto, arrived he was arrested in

possession of cocaine and heroin.  The police went next door and found Israel Cortez

using drugs.  The police confiscated drugs and a heat-sealing apparatus.  The testimony

was that all of the drugs seized could easily have been stored or concealed in a shoe box.

(IIA:52).  Cotto and Cortez were arrested and transported in marked cruisers.  The

outcome of these arrests is unknown.  There is no evidence and the Government does not

contend that Mr. Caswell knew Messrs. Cotto or Cortez or was aware of their drug use.

(5)    The next event on which the Government relies occurred

approximately a month later, on **March 1, 2001**.  After controlled buys of alleged drugs

from the occupants of rooms 254 and 252 at the Motel, the Tewksbury Police executed

search warrants on those rooms on March 1, 2001.  The master key provided by Motel

personnel did not work on room 254 and the police made a forced entry.  Sujeiry

Garrastequi was found inside the room with one bag of suspected heroin, as well as with

unused bags and money, which may be indicative of narcotics distribution.  She was arrested and transported to the police station, but the outcome of this arrest is unknown. Hector Cruz, another occupant of this room, was arrested when he arrived in his vehicle with a small amount of suspected marijuana and heroin in the car.  The outcome of this arrest is also unknown.

In room 252 the police found heroin, a hypodermic needle and a syringe. The police left the search warrant in the room.  Two occupants of the room, Carmen Hardin and Peter Witts, were located in the Walmart parking lot and were arrested there. Ms. Hardin was released on bail, and it appears that she returned to the Motel.  It is unknown whether she got the warrant that was left in the room.  The Motel was not advised that it should not rent a room to her.  She apparently defaulted and was located about a week later in another room at the Motel.  Ms. Hardin was sentenced to 18 months in the House of Corrections, with six months to be served and the rest suspended.  (Ex. 50 at USA 1257).  Mr. Witts was given a two year suspended sentence in the House of Corrections.  (Ex. 50 at USA 1292).  Again, there is no contention that Mr. Caswell knew these individuals or was aware of their drug use at the Motel, and all evidence of drug use could be easily hidden from view.

(6)     The next incident on which the Government relies occurred two and one-half years later, on **September 27, 2003**.  At approximately 1:00 a.m. on this date, Lt. Voto saw Yonny Sean on the street at the pay phone in front of the Motel and thought he looked suspicious.  He searched Mr. Sean and found a key to room 242 at the Motel.  He

went to the room and discovered an individual named San Say and a white substance that allegedly field tested positive for cocaine.  No one was arrested.  In the absence of any arrest, or drug certification, it is unclear why this incident is on the Government's list.  Again, there is no allegation or evidence that Mr. Caswell knew these individuals.

(7)     Several months later, on **February 13, 2004,** the Tewksbury Police obtained a search warrant for a room at the Motel where Vernon Smith, known to them to be a violent criminal, was residing.  Due to fear that Smith was armed, a SWAT team broke the door and made entry into the room.  No narcotics were found.  Smith and his girlfriend, Patricia Conroy, were arrested for possession of a hypodermic needle and were transported in separate marked police cruisers.  The charges against Conroy were dismissed.  (Ex. 49 at USA 1239).  The outcome of Smith's arrest is unknown.  In the absence of any drugs, this incident should not be on the Government's list of drug-related incidents.  Again, there is no allegation or evidence that Mr. Caswell knew these individuals.

(8)     On **November 20, 2004**, the Tewksbury Police received information from a confidential informant that William Mercier was selling heroin at the Motel.  Mr. Mercier was known to the police.  Controlled buys of alleged narcotics were made from Mr. Mercier: the first in one room he occupied, and then in room 209 to which he had moved.  The registration card confirmed that Mr. Mercier was registered to room 209. (Ex. 39 at USA 57).  On November 20, 2004, the police executed a search warrant on room 209 and found packets of heroin inside the drawer in the nightstand.  Mercier and

Lydia Farrell, who was present and also known to the police, were arrested and were transported in separate police cruisers.  Farrell was sentenced on three counts to concurrent terms of one year in the House of Corrections, with six months committed and the balance suspended.  (Ex. 50 at USA 1252-53).  Mercier was sentenced to two and a half years imprisonment.  (Ex. 50 at USA 1262-64).  Again, there is no allegation or evidence that Mr. Caswell knew these individuals, and all evidence of drug use was easily hidden from view.

(9)     Approximately a year later, on **October 9, 2005,** Officer Marcus McMahon of the Tewksbury Police Department arrested a woman, Sara Kover, for passing counterfeit notes at a gas station.  She was with an individual known as Steven Ervin.  Ms. Kover was residing at the Motel in room 255 with her boyfriend, David Bates, who Mr. Ervin was visiting.  While the testimony from Officer McMahon and the police report (Ex. 40 at USA 283) are not entirely consistent, it is agreed that the police escorted these individuals back to the Motel.  From outside of room 255, Officer McMahon did not notice anything amiss.  He did not smell anything and nothing appeared suspicious.  (III:131-32).  He knocked on the door.  Mr. Bates opened it and smoke and a smelly substance poured out of the room.  At that point, Officer McMahon saw chemicals and liquids cooking on a hot plate but he did not know what anything was.  It turned out to be a methamphetamine laboratory.  Other police responded as well.  After they decided that there was not any immediate health or safety concern (Ex. 40 at USA 288), the room was

"frozen" overnight and guarded by a police officer until a search warrant could be obtained.  Several marked police cruisers were on site outside of the room.

The next morning a search warrant was obtained, and several members of the State Police Clandestine Lab Enforcement Team ("CLET") arrived at the Motel to inventory and dispose of the meth lab, including State Trooper Shawn Murray who testified at trial.  CLET arrived in a specially designed vehicle and the officers wore protective clothing as they removed all items relating to the lab and any hazardous materials.  They worked for four to five hours and when they left the premises a large red sticker was placed on the door saying that there had been a drug lab at this facility and that there may still be hazardous chemicals present.

Although Mr. Caswell did not see the CLET truck, he was aware of the incident from his employees.  While he did not have a present memory that the sticker was put on the door, he did not challenge the Government's photographs of the sticker.  This incident generated a number of articles in the local newspapers.

The Government argued that "[t]wo guests polluted Room 255 _for days_, just feet away from the motel's office and just feet away from the Caswells' home."  (IV:99 (emphasis added)).  Again, this is grand rhetoric but not supported by the record.  There was no evidence as to how long the meth lab was in operation.  Rather, Trooper Murray testified that the lab was fashioned out of household items which could be stored in a small duffle bag and quickly set up.  (IIB:106-07).  The meth was in an "unfinished state" — that is, it was in the process of cooking and had not been completed when the police

30

arrived.  (IIB:108-09).  Thus, Trooper Murray testified that he did not know how long the

lab had been in operation.  There was no factual support for the Government's contention

that the lab had been in operation for days.

After CLET left, the room was contaminated and needed to be cleaned by a

contract company.  A form letter was sent by the U.S. Drug Enforcement Administration

to Mr. Caswell, the Chief of Police and the Board of Health notifying them that "a

clandestine laboratory was seized and/or hazardous chemicals were found" in room 255 at

the Motel, and "warning" them "that there may still be hazardous substances or waste

products at or on the property."  (Ex. 11, 12, 14).

Mr. Caswell hired Mill City Environmental, a company which provides

hazardous waste abatement and remediation, among other things.  Julie Davies of Mill

City Environmental testified that the company was hired to do air sampling.  When she

arrived on October 27, 2005, the room had trash in it and furniture, but no bed or mattress.

There was no sign on the door.  Mr. Caswell told her that the room had been wiped down

by housekeeping, and that the bed and mattress had been removed.  Ms. Davies took air

samples for volatile organic compounds, and got a high hit in one area, where the bed had

been removed.  She told Mr. Caswell that the room had to be cleaned again.  He said that

it would be cleaned immediately and asked her to come back later, which she did.  When

she returned, everything had been removed from the room and it had been cleaned.

Further testing revealed no evidence of chemicals.  Therefore, she issued a report that

there was "no residual air contamination in the room."  (Ex. 20 at USA 446).

The initial proposal for the Mill City Environmental work was $530 plus a 9% surcharge.  (Ex. 17).  Because Ms. Davies had to come back a second time, the final bill was $850 plus a 9% surcharge for a total of $926.50.  (Ex. 19; 21).  Mr. Caswell paid the bill in full in a timely manner.  (Ex. 22).

Again in a gross exaggeration, the Government argued that Mr. Caswell "doesn't even care enough to clean up one of the motel rooms after a meth lab was there. In fact, Mr. Caswell has to be told twice before he has the room, which was filled with chemicals feet away from his family's home, cleaned."  (IV:109).  There is no record support for this claim.  As an initial matter, there were no chemicals remaining in the room after the CLET cleanup.  More importantly, the Government did not question Mr. Caswell about why the room was not completely cleaned the first time Ms. Davies came to inspect it.  A more logical inference is that Mr. Caswell (or the housekeeper) was not sure how much should be cleaned without knowing the extent of air contamination.  Obviously Mr. Caswell wanted to rent the room, and would not have done so with trash and without a bed and mattress in the room.  Nor is there any reason to believe that Mr. Caswell was the type of person who would voluntarily increase the cost of the cleanup for no reason.  The only evidence is that Mr. Caswell incurred the additional expense of having Ms. Davies return again to test the room which was appropriately cleaned.  The Government's expressed disdain is not justified on the record evidence.

The Government also challenged Mr. Caswell about not following up to find out how to prevent another meth lab from operating at the Motel.  As Mr. Caswell testified

convincingly, however, he asked if anyone had seen or heard or smelled something, and everyone said no.  According to Mr. Caswell, the guest had only been at the Motel for two days, and this was the only time in his 60 years of involvement with the Motel that there was such an incident.  Since it had not occurred either before or after, Mr. Caswell was justified in testifying "So, no, I don't know any way to prevent that from happening." (IV:73).  It is hard to imagine what else Mr. Caswell should have done to prevent another non-existent meth lab from operating since whatever else he was doing was apparently sufficient.

       (10)    The next incident on which the Government relies occurred on **February 13, 2006**.  According to former Tewksbury Police Officer David Godin, on this day he saw two men conducting a suspected drug transaction at the Dunkin' Donuts across the street from the Motel.  They fled and he chased them into room 225 at the Motel, where they escaped out the window, but were later apprehended.  In the room, the police found what appeared to be marijuana, money, a scale and plastic baggies, and a phone which may have been used by a drug dealer.  No one was arrested in connection with this incident.  The room was rented to Gerald Fraize.  There is no allegation or evidence that Mr. Caswell knew Mr. Fraize or had any information about drug use in the room.

       (11)    Almost a year later, on **December 7, 2007**, a guest, Jason Mahoney, died in a room at the Motel as a result of a heroin overdose.  The police had no reason to believe that Mr. Caswell or any employees knew that the guest had drugs with him or that he was taking drugs.  (III:47).

(12)    Almost a year after the last incident, on **October 9, 2008,** the front desk clerk called to have the police remove the guest in room 229 because she had stayed longer than she was supposed to.  Officer Kimberly O'Keefe arrived and met the guest, Melanie Quadros, and found out that she had an outstanding warrant.  Ms. Quadros was arrested and a pat-down search revealed some drug paraphernalia and ecstasy pills.  Ms. Quadros was released by the court, and she returned to the Motel.  The Motel was not instructed not to rent to her again.  Although the record is not clear, it appears that Ms. Quadros was arrested a week later at the Motel on a warrant, although the basis of that warrant is unknown.  She was apparently released again by the court, and returned to the Motel.  (See incident of November 30, 2008 below).  Obviously, the Motel was not aware of Ms. Quadros' drug use and was not trying to hide it from the police since it was a Motel employee who called the police to remove Ms. Quadros in the first place.

(13)    It is unclear why the next incident of **November 14, 2008** has been proffered by the Government.  After conducting controlled buys of alleged drugs from Keith Moran in room 219 at the Motel, the police executed a search warrant of the room on November 14, 2008.  The search did not disclose any contraband.  Testing of the controlled buys came back negative.

(14)    The next incident occurred on **November 28, 2008**.  The Tewksbury Police Department had information that Vincent Cecil in room 254 at the Motel was distributing drugs.  An undercover officer made an alleged buy from Mr. Cecil, and a

consent search of the room revealed another bag of cocaine.  Although Mr. Cecil was

charged, the case against him was dismissed for failure to prosecute.  (Ex. 48 at USA

1244-45).  Again, there is no allegation or evidence that Mr. Caswell knew Mr. Cecil or of

his drug use.

(15)    The final event on which the Government relies occurred on

**November 30, 2008**.  According to Officer Brian O'Neill of the Tewksbury Police

Department, he saw a video of Melanie Quadros, who was known to him, stealing the

purse of a Dunkin' Donuts employee on November 22, 2008.  He knew that Ms. Quadros

frequented the Motel Caswell so he went there and saw her outside of room 232, where

she was staying with Yonny Sean.  Mr. Sean matched the description of the male on the

video.  There was a consent search of the room, which revealed some suspected drugs.

Ms. Quadros and Mr. Sean were both arrested, transported to the police station and

charged.  Ms. Quadros was released, absconded, and is in default.  The charges against

Mr. Sean were dismissed.  (III:42)

87.    The Government points to this incident as evidence of the Motel Caswell

renting to "repeat offenders."  Again, this is stretching the evidence.  Mr. Sean had been

stopped by Lt. Voto five years earlier for looking suspicious, but was not arrested.

Therefore, there is no evidence to support the Government's contention that it was

improper for the Motel to rent to him again.  As for Ms. Quadros, it appears that the court

released her several times in the months of October and November 2008 despite several

arrests.  There does not appear to be a basis for the Motel to refuse to rent a room to her upon her release.

88.     After considering all the evidence and the testimony of numerous witnesses, this court agrees with the Claimant that at most these 15 incidents show "that the Motel Caswell was the scene of drug activity by a relatively small number of third parties not engaged in an ongoing criminal enterprise."  (IV:90).  While there was general evidence of other criminal activity at the Motel, as discussed infra, there was no evidence of the blatant and pervasive drug activity which supported forfeiture in the other cases on which all parties rely.

## RULINGS OF LAW

### Overview - Forfeitability

1.     "Forfeitures are not favored; they should be enforced only when within both the letter and the spirit of the law."  United States v. One 1936 Model Ford V-8 De Luxe Coach, 307 U.S. 219, 226, 59 S. Ct. 861, 865, 83 L. Ed. 1249 (1939).

2.     This forfeiture proceeding is governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), relevant portions of which are codified in 18 U.S.C. § 983(c). Under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]"  18 U.S.C. § 983(c)(1).  In the instant case, the Government bases its claim to forfeiture on 21 U.S.C. § 881(a)(7), a provision of the Controlled Substances Act that makes forfeitable "[a]ll real property . . . which is used, or intended to be used, in any manner or part, to commit, or to

facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment."

3.      To "facilitate" the commission of a crime, the property must make the prohibited conduct "less difficult or 'more or less free from obstruction or hindrance.'" United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990) (quoting United States v. 3639-2nd Street N.E., 869 F.2d 1093, 1096 (8th Cir. 1989)) (additional citations omitted); see also United States v. 3234 Washington Avenue N., 480 F.3d 841 (8th Cir 2007).

4.      Where, as here, "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense," then the Government must also "establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3).

5.      The requirement of a "substantial connection" "is consonant with the congressional intent that the instrumentalities of the drug trade be reached, while ensuring that property only fortuitously connected with drug trafficking be preserved."  United States v. Santoro, 866 F.2d 1538, 1542 (4th Cir. 1989).  Thus, to be forfeitable, "the property must have more than an incidental or fortuitous connection to criminal activity." Schifferli, 895 F.2d at 990.  The Government may rely on evidence of misdemeanors to establish a substantial connection between the Property and the offenses giving rise to forfeiture.  See, e.g., 3234 Washington Avenue N., 480 F.3d at 841 (government could rely on evidence of on-going drug activity at property to support substantial connection between property and the offense).

6.     CAFRA "heightens the government's evidentiary burden in civil

forfeitures."[6]  See United States v. $30,670 in U.S. Currency, 403 F.3d 448, 454 (7th Cir.

2005).  Previously, the government only had to demonstrate probable cause that a property

was subject to forfeiture, at which time the burden shifted to the claimant "to demonstrate

by a preponderance of the evidence that the property was not subject to forfeiture."

Santoro, 866 F.2d at 1544 (citing 21 U.S.C. § 881(d)).  The government's burden of

showing probable cause was "a relatively light burden[.]"  United States v. Plat 20, Lot 17,

Great Harbor Neck, 960 F.2d 200, 205 (1st Cir. 1992).  In addition, courts varied as to

whether there needed to be a "substantial connection" between the qualifying crime and

the property.  See United States v. 916 Douglas Avenue, 903 F.2d 490, 492-94 (7th Cir.

1990) (discussing various standards).

7.     In sum, under present law, for the Claimant's Property to be forfeitable

under 21 U.S.C. § 881(a)(7), the United States must prove, by a preponderance of the

evidence, that (1) there was a violation of 21 U.S.C. §§ 801 *et seq.* which was punishable

by more than one year's imprisonment; (2) the real property, including any appurtenances

or improvements thereon, was used or intended to be used in any manner or part to

commit or to facilitate the commission of the criminal offense; and (3) there was a

---

[6]  Nevertheless, it is still "appropriate to rely upon forfeiture case law decided before the enactment of CAFRA.  Although those cases applied the less-burdensome probable cause standard, factors that weighed in favor of forfeiture in the past continue to do so now - with the obvious caveat that the government must show more or stronger evidence establishing a link between forfeited property and illegal activity."  United States v. $21,510.00 in U.S. Currency, 144 F. App'x 888, 890 n.2 (1st Cir. 2005) (internal quotation and punctuation omitted).

substantial connection between the property to be forfeited and the forfeitable drug offense.

### Overview - Innocent Owner Defense

8.      "[E]ven if the government satisfies the requirements of §§ 881(a)(7) and 983(c), it does not necessarily follow that there will be a forfeiture" if the claimant qualifies as an innocent owner.  <u>United States v. 45 Claremont Street</u>, 395 F.3d 1, 4 (1st Cir. 2004).

9.      18 U.S.C. § 983(d), which contains the innocent owner defense, provides, in relevant part:

> (1)   An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.

> (2)(A)  With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who –

>> (i)   did not know of the conduct giving rise to forfeiture; or

>> (ii)  upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

10.     Pursuant to 18 U.S.C. § 983(d)(2)(B)(i) & (ii), "ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person, to the extent permitted by law –

> (I) gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and

39

> (II) in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property.
>
> (ii)  A person is not required by this subparagraph to take steps that the person reasonably believes would be likely to subject any person (other than the person whose conduct gave rise to the forfeiture) to physical danger."

11.     Finally, if the court were to find the Property forfeitable, the next issue would be whether such forfeiture was unconstitutionally excessive.  See 18 U.S.C. § 983(g).  In the instant case, the parties agreed that evidence regarding this issue would be deferred pending the outcome of the trial.

## **Discussion - Forfeitability**

This Court concludes that the Government has failed to meet its burden of proving, by a preponderance of the evidence, that the Motel Caswell was "substantially connected" to the forfeitable drug crimes.  In so ruling, I recognize that the boundaries of what constitutes a "substantial connection" are not well defined, and that each case must be considered on its own facts.  See Schifferli, 895 F.2d at 991 ("the facts of each case will determine whether forfeiture is appropriate").  However, none of the myriad of cases cited by the parties present facts substantially similar to the facts presented here.[7]  Given the limited number of qualifying drug-related crimes which occurred at the Motel over an extended period of time, the limited evidence of other drug-related crimes, the owner's lack of involvement in any drug-related incidents, the limited amount of drugs involved in

---

[7]  This court will not attempt to address (or distinguish) all the cases cited by the parties.

each incident, and the fact that the crimes were committed by different transient guests at a property which, by definition, caters to transient guests, this Court concludes that finding a "substantial connection" would be inconsistent with "both letter and spirit of the law." One 1936 Model Ford V-8 De Luxe Coach, 307 U.S. at 226, 59 S. Ct. at 865, 83 L. Ed. 1249.

As an initial matter, this court finds it significant that neither Mr. Caswell, nor anyone in his family, nor anyone over whose behavior he had any control, was involved in any of the drug-related incidents.  Admittedly, it is not necessary that the forfeited property be owned by a culpable person.  See United States v. Collado, 348 F.3d 323, 327-28 (2d Cir. 2003) (defendant's mother forfeits property out of which she allowed son to conduct an extensive drug trafficking business).  Nevertheless, forfeiture laws were premised on the "American colonial judges' belief that the spectre of forfeiture could wield great power as a deterrent to crime" and "wresting the res from the owner's grasp served to punish the owner at common law, and such punishment was recognized as one of the purposes of forfeiture."  United States v. Two Tracts of Real Property in Carteret Cnty., N.C., 998 F.2d 204, 213 (4th Cir. 1993) (citation omitted).  In the instant case, punishing Mr. Caswell by forfeiting the Motel obviously would not punish those engaged in the criminal conduct.  Thus, as the Fourth Circuit held:

> We do not mean to suggest that a culpable person *must* possess a
> legal interest in property for it to be forfeitable. Such a requirement
> would fly in the face of the fundamental assumption underlying all
> civil forfeiture statutes: property devoted to an unlawful purpose is
> tainted as an instrumentality of crime and therefore must be

41

condemned. Section 881(a) civil forfeitures directed in rem are remedial civil sanctions brought directly against the property itself, and designed to protect the government from financial loss. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 548-49, 63 S. Ct. 379, 386-87, 87 L. Ed. 443 (1943). **Yet the fact that the guilty party has no legal interest in the property necessarily renders the connection between the land and the underlying criminal activity less "substantial" and more tenuous.** Therefore, we merely follow the lead of *Santoro* and *Schifferli*[8] when we observe that the existence of a legal interest may be one factor to consider in applying the "substantial connection" test.

Id.  (bold emphasis and footnote added).

In some cases, a "guilty owner's intent" may establish "a sufficient connection with crime to render the property forfeitable[.]" Two Tracts of Real Property, 998 F.2d at 212 (rejecting contention that land which drug dealer routinely crossed to get from boat to main street, owned by an innocent third-party, was substantially connected to criminal activity even though it concealed the crime from public view).  The Government cannot rely on such intent in the instant case.  Mr. Caswell's lack of involvement in the criminal activity, which took place on property rented by thousands of unrelated individuals who

---

[8]  See Santoro, 866 F.2d at 1542 (where home owner made repeated sales of cocaine out of home, there was a "substantial connection between the property and the underlying criminal activity" even though only a small amount of drugs were sold); Schifferli, 895 F.2d at 991 (court finds a substantial connection between defendant's office building and his conviction for illegally distributing and dispensing controlled substances where he "used his dentist office over forty times during a four-month period to write illegal prescriptions for eight individuals" and office "provided an air of legitimacy and protection from outside scrutiny[.]").

could have committed their illegal business elsewhere, weighs heavily against a finding of substantial connection.[9]

Similarly of importance is the fact that there was nothing about the Motel Caswell *per se* or its operation that made it particularly connected to the drug crimes, other than the fact that it consisted of budget rooms that were rented to transient guests. The mere fact that "land is the situs of crime" does not, in and of itself, render it forfeitable. Two Tracts of Real Property, 998 F.2d at 212; see also Schifferli, 895 F.2d at 991 (in light of the "severity of forfeiture" court expressly rejects the idea "that any writing of an illegal prescription on a given property automatically renders the property forfeitable."). In the Kenmore Hotel case, where the forfeiture of a hotel was upheld, the court found a substantial connection between the property and crimes where "under the claimant's management, the Kenmore Hotel provided a degree of seclusion for drug activity in excess of the seclusion that one could obtain from an ordinary hotel." 143-147 East 23rd Street, 77 F.3d at 656. In particular the court relied on the fact that "[t]he physical decay of the hotel itself provided drug traffickers with unlocked, vacant rooms in which to store their

---

[9] This conclusion is not inconsistent with United States v. Heldeman, 402 F.3d 220, 222 (1st Cir. 2005), in which the court found that a dermatologist's house was forfeitable under the criminal forfeiture statutes. In that case, the property at issue served as the location where the dermatologist wrote medically unnecessary prescriptions for steroids and oxycodone in exchange for sexual favors. While the court rejected the defendant's defense "that his activities could have been undertaken elsewhere[,]" it relied on the fact that the defendant's apartment served as his base of operations. Id. In the instant case, the Motel did not serve as Mr. Caswell's base of operations for any wrongdoing. The fact that the transient guests could conduct their illegal activities elsewhere is much more compelling in the instant case than the fact that the defendant himself could have conducted his illegal business elsewhere in the Heldeman case.

drugs, and the defective door buzzer and the location of the security camera monitor facilitated illicit access to the building." Id.  Moreover, the tenant-guards in the building accepted bribes in return for access to the hotel by drug dealers.  See id.  In the instant case, however, no similar conditions existed.  The crimes seem to have occurred at the Motel solely due to the "seclusion that one could obtain from an ordinary hotel."  Id.

Similarly, in Schifferli, where the court allowed the forfeiture of the defendant dentist's office building where the defendant had issued numerous illegal prescriptions, the court found more of a connection than the fact that prescriptions had been written there.  Rather, the court ruled that "Dr. Schifferli's dentist office was hardly incidental to these illegalities; on the contrary, it provided an air of legitimacy and protection from outside scrutiny, precisely because a dentist office is where prescriptions are usually written.  Thus, the office was actually used in the course of his crimes and made the crimes 'more or less free from obstruction or hindrance.'"  Schifferli, 895 F.2d at 991.  In the instant case, not only was the property owner not engaged in illegal conduct, but also there was nothing inherent in the Motel which protected its guests from public scrutiny.  Rather, as the evidence made clear, there were security cameras at the Property, the parking lots were well-lit, the police regularly checked license plates and registration cards to determine if there were warrants outstanding on any guests, the police regularly drove through the property and conducted surveillance, and suspicious activity was reported by Motel staff.  In this way the Motel afforded the guests less privacy than their own residences.

44

Where, as here, "the government seeks the forfeiture of property on the basis that it was substantially connected to the crime by shielding the illegal activity from public view, it must show 'more' than that the property 'tends to conceal' the crime." United States v. 1999 Freightliner Tractor, 827 F. Supp. 2d 950, 954 (S.D. Iowa 2011) (quoting One 1998 Tractor, etc., 288 F. Supp. 2d 710, 714 (W.D. Va. 2003) (government's motion for summary judgment seeking forfeiture of trailer owned by defendant's innocent employer denied, where trailer was used to haul legitimate loads)).  The Government has not met this burden in the instant case.

The fact that many of the forfeitable events also involved small amounts of drugs and different individuals also weighs against a finding of a substantial connection.  Again, I recognize that, as a general principle, a small amount of drugs may be sufficient to render a property forfeitable and that one transaction may be sufficient.  See Santoro, 866 F.2d at 1542.  Nevertheless, to apply such principles here would eviscerate the higher standard of proof which Congress demanded under CAFRA.

The case of United States v. 3234 Washington Avenue N., 480 F.3d 841 (8th Cir. 2007), is instructive.  There the District Court granted summary judgment to the United States in a civil forfeiture action relating to the clubhouse for the Minnesota chapter of the Hell's Angels Motorcycle Club.  The property was owned by a non-profit organization formed by the Club's organizers to buy and hold the clubhouse property, and the government claimed that drugs were regularly used and sold at the clubhouse.

In reversing the grant of summary judgment, the Eighth Circuit discounted the disputed evidence of ongoing drug trafficking and drug use at the clubhouse. That left "one piece of objective evidence, the .75 grams of methamphetamine found in the clubhouse during a warrant search." Id. at 846. The issue presented, therefore, was "whether one member's possession of a user quantity of methamphetamine proves a substantial connection between the institutional claimant's real property and drug trafficking." Id. As the Court explained:

> Here, the government's witnesses testified that the clubhouse was acquired and fortified to create a safe haven for Club members' illegal drug trafficking and use. If that testimony is credible, the property should clearly be forfeited. **But many legitimate non-profit institutions own real property, and it is not unrealistic to posit an institutional owner's otherwise innocent premises being used for illicit drug trafficking by agents misusing their right of access and authority. CAFRA should be construed in a manner that protects such institutions from unwarranted or disproportionate forfeitures. Thus, while one seizure of a small quantity of an illegal drug at the clubhouse supports the government's forfeiture case, it does not by itself justify summary judgment forfeiting the property.** *See United States v. 3639-2nd Street N.E.*, 869 F.2d 1093, 1098 (8th Cir. 1989) (R. Arnold, J., concurring) ("the *quality* of the relationship between the property and the crime must be substantial").

Id. (emphasis added). In the instant case, Mr. Caswell's involvement is even more attenuated, since the drug users were not his agents. Rather, they were transient guests who were frequenting premises which, by their nature, are designed to provide temporary shelter to an ever-changing population. CAFRA should not be construed in such a manner as to hold the property owner liable for such individual persons' misuse of the property.

"At minimum, the property must have more than an incidental or fortuitous connection to criminal activity" to be forfeitable.  <u>Schifferli</u>, 895 F.2d at 990; <u>see</u> <u>also</u> <u>United States v. Certain Lots in Virgina Beach</u>, 657 F. Supp. 1062, 1065 (E.D. Va. 1987) (where drugs and a scale were in the dealer's home only for a few hours after the government informant insisted that the drug sale take place there, the court found no substantial connection because the brief use of the house "was merely incidental to the transaction, and was not essential or even important to its completion").  While the exact parameters of what constitutes a "substantial connection" is not defined, the instant case presents virtually no facts in support of a finding of any significant connection.  To find a substantial connection in the instant case would render that requirement meaningless.  Consequently, I find that the Government has not met its burden of proving, by a preponderance of the evidence, that the Motel Caswell is forfeitable.[10]

### Discussion - Innocent Owner

This court also finds that the Claimant has met his burden of proving that he is an innocent owner of the Property.  He did not have actual knowledge of the forfeitable drug crimes before or while they were occurring, and there is no evidence that he should have known that they were likely to occur.  I further find that Mr.Caswell has met his burden of

---

[10]  The Claimant argues that the facts which mitigate against a finding of a substantial connection also negate a finding that the Property was used "to commit or facilitate" a forfeitable drug offense.  In light of the lack of substantial connection, this Court does not need to address whether the Government has met its burden on this element.

proving that he was not willfully blind to the drug crimes.  Finally, I find that Mr. Caswell took all reasonable steps to prevent drug crime on the Property.

Under CAFRA, "an 'innocent owner' is one who *either* lacks knowledge of the illicit activities giving rise to the forfeiture, *or* who has knowledge of the activity but has evinced his lack of consent by affirmatively attempting to stop it."  United States v. One 1988 Checolet 410 Turbo Prop Aircraft, 282 F. Supp. 2d 1379, 1382 (S.D. Fla. 2003) (emphasis in original).  "Actual, rather than constructive, knowledge of wrongdoing is required to rule out the defense."  United States v. $463,497.22 in U.S. Currency, 853 F. Supp. 2d 675, 690 (E.D. Mich. 2012) (citations omitted).  "Actual knowledge can be proven by circumstantial evidence."  Id.  "In addition, 'a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.'"  Id. (quoting United States v. Prince, 214 F.3d 740, 761 (6th Cir. 2000)).  "Proof of willful blindness includes 'two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  $463,497.72 in U.S. Currency, 853 F. Supp. 2d at 690-91 (quoting Global-Tech Appliances, Inc. v. SEB S.A., – U.S. – ,  131 S. Ct. 2060, 2070, 179 L. Ed. 2d 1167 (2011) (addressing willful blindness in the context of patent infringement)).

**Actual Knowledge**

In the instant case, the government argues that Mr. Caswell had "actual knowledge" of drug-related crimes because he was aware of the arrests after they took place, or because the crimes were reported in the newspaper.  However, after-the-fact knowledge

does not negate Mr. Caswell's status as an innocent owner.  See 221 Dana Avenue, 261

F.3d at 71, 73 (in pre-CAFRA case, court holds that a wife who was ignorant of her

husband's drug dealings in the marital home at the time it was occurring, but learned of it

before he deeded the house to her and then committed suicide, was an innocent owner

since "she did not have knowledge of, or consent to, [her husband's] criminal activity at

the time the activity occurred.").  The evidence was undisputed that Mr. Caswell did not

know the guests involved in the drug crimes, did not know of their anticipated criminal

behavior at the time they registered as guests, and did not know of the drug crimes while

they were occurring.  Not only did Mr. Caswell testify to these facts, but also the law

enforcement witnesses confirmed that they had no reason to doubt the veracity of Mr.

Caswell's statements.  As detailed more fully in the facts above, all of the evidence of

criminal conduct could easily be hidden from view in the guests' rooms, and even the

meth lab was not apparent from outside the room.  This court finds credible and

persuasive Mr. Caswell's denial of knowledge of the drug crimes, and "[t]he Government

has failed to prove any complicity on [Mr. Caswell's] part" in the illegal activity that

would suggest otherwise.  United States v. 2001 Honda Accord EX, 245 F. Supp. 2d 602,

612 (M.D. Pa. 2003) (court accepts uncontradicted evidence that mother did not know son

was using her car for drug transaction).

Admittedly, knowledge and consent to illegal behavior can come about in a

"myriad" of ways.  "For example, property owners might know about ongoing criminal

activity through conversations with the participants, or by involvement in ancillary matters

(e.g., financing the acquisition of the contraband), or from third parties who seek to inform them of what is happening on their premises." United States v. 15 Bosworth Street, 236 F.3d 50, 56 (1st Cir. 2001) (owners of tavern where three employees, including their son, were engaged in extensive drug trafficking business out of the tavern, failed to establish an innocent owner defense where, among other things, "undercover investigation that led to the forfeiture action followed on the heels of a police inquiry during which the authorities warned [the property owner] in no uncertain terms about criminal activity on the premises." Id. at 56 n.3); see also United States v. 1813 15th Street N.W., 956 F. Supp. 1029, 1036 (D.D.C. 1997) (where several drug raids revealed drugs in plain view near claimant's bedroom, and "[p]olice and government officials warned claimant on more than one occasion about the rampant drug problems present on her property" court finds claimant had actual knowledge of the drug crimes).  In the instant case, however, the evidence all points to the contrary: Mr. Caswell did not have prior knowledge of the limited number of drug crimes committed by transient guests over the course of an extended period of time, and the police did not advise him of those crimes.

Moreover, this Court finds that the Government has failed to establish that drug crime was so blatant and pervasive at the Motel that Mr. Caswell had "actual knowledge" that drug crimes were likely to occur frequently at the Motel.  In this respect, this case is distinguishable from virtually every other even remotely similar case in which a forfeiture was upheld.  For example, in United States v. One Parcel Property Located at Lot 22, and the North 5 Feet of Lot 24, on Lawrence Avenue, No. 94-1264-JTM, 1996 WL 695404

(D. Kan. Nov. 14, 1996), a hotel was found forfeitable where the owners were found to have actively assisted the drug dealers, directed customers their way and warned dealers of police presence on the property.  Moreover, the drug trafficking was blatant and pervasive. As the Court found:

> overwhelming evidence establishes the Courtesy Inn was used for the sale of narcotics on a large scale.  Curbside crack cocaine sales occurred in the motel's parking lot.  On any given evening, 75 to 100 crack customers could be observed at the Courtesy Inn.  One crack dealer testified he had 40 to 50 customers a day.  The narcotics problem at the motel was worse and more open than at other area motels, and in fact was so pervasive that at times persons driving into the Courtesy Inn parking lot would be immediately approached by persons selling drugs.

Id. at *2; see also United States v. Lot Numbered One of the Lavaland Annex, 256 F.3d 949, 952 (10th Cir. 2001) (court remands case for lower court to reconsider its rejection of the innocent owner defense on grounds that property owner did not take reasonable steps to rid property of drug trade; "[d]rug transactions occurred in front of, inside, and behind the motel during the day and night at such high frequency that at times people and vehicles were lined up outside of rooms and in the parking lot to participate"); 143-147 East 23rd Street, 77 F.3d at 651-52 (records established that during 3½ year period there were 189 narcotics arrests and/or narcotics-related activity at the Kenmore Hotel, and of 100 individuals arrested some 70 were convicted, and Hotel was forfeited after several letters sent to owner, a meeting was held, and specific suggestions were made but ignored); United States v. 785 St. Nicholas Avenue and 789 St. Nicholas Avenue, 983 F.2d 396, 399 (2d Cir. 1993) (apartment building forfeited where evidence established "an astonishing

51

number of drug transactions occurring in, near, and related to these properties"; in a 3 year period, there were 66 narcotics-related arrests inside or in front of the building, including arrests of the property owners, their children and employees, resulting in 29 convictions). No remotely comparable evidence was introduced in the instant case.

The conclusion that drug crimes at the Motel Caswell were not so blatant or pervasive as to provide Mr. Caswell with actual knowledge that drug crimes were likely to occur is further buttressed by the fact that never once in the numerous years at issue did the police or town officials have any conversations with Mr. Caswell to the effect that there was a high level of drug crimes at the premises, or suggest any ways to assist in reducing the level of crime.  Under the facts of this case, Mr. Caswell's after-the-fact knowledge of isolated, limited drug crimes is not sufficient to establish "actual knowledge" of forfeitable offenses so as to destroy an innocent owner defense.

Finally, I also find that Mr. Caswell did not engage in "willful blindness" from which the court can infer consent to the drug transactions.  In contrast to other cases on which the Government relies, the facts fully support Mr. Caswell's explanation of events. Compare the instant case with United States v. One Parcel of Real Property, 900 F.2d 470, 475 (1st Cir. 1990) (where property owner was found attempting to flush cocaine down the toilet, 23 bags of cocaine were found in owner's bedroom, and search of home found 3 firearms and drug packaging paraphernalia, court finds claim that items were brought into home by owner's son, without owner's knowledge, to be "ludicrous"); Collado, 348 F.3d at 327-28 (court finds store owner willfully blind to son's narcotics trafficking where

$20 million worth of narcotics transactions occurred in or around the store in a one year period, 646 narcotics-related conversations were held on her grocery store phone over a three month period, she knew her son's history of narcotics trafficking and she warned her son's associates against speaking on the phone).  As found previously, only a small fraction of the thousands of guests at the Motel Caswell were involved in drug transactions, and there was no reason for Mr. Caswell to suspect that every guest, or even a particular guest, who was coming to the Motel would engage in illegal behavior.  Thus, there was no reason for him to "subjectively believe that there [was] a high probability that" guests would be involved in drug transactions.  $463,497.22 in U.S. Currency, 853 F. Supp. 2d at 690-91.  Moreover, the transactions could be easily hidden from view, and as a general statement, involved isolated incidents by different individuals spread out over a lengthy period of time.  I find that Mr. Caswell has met his burden of proving that he did not have actual knowledge of the conduct giving rise to forfeiture, and was not willfully blind to such conduct.[11]  Therefore, I find that he has met his burden of proving the innocent owner defense.

---

[11]  This court also rejects any argument that Mr. Caswell should have done more to find out about the scope of drug activity at the Motel by, for example, reviewing police records as the Government suggests.  "[A]t most [Mr. Caswell] might have been negligent in failing to inquire ... but a showing of negligence alone will not support a finding of willful blindness." $463,497.72 in U.S. Currency, 853 F. Supp. 2d at 686.

### Reasonable Steps

Even assuming, <u>arguendo</u>, that Mr. Caswell had actual knowledge, I also find that "upon learning of the conduct giving rise to the forfeiture, [he] did all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(d)(2)(A)(ii).  "Under this standard, an owner must prove that he or she did all that could reasonably be expected to prevent the illegal use of the property once the owner becomes aware of that use.  In adopting this standard, this Court is cognizant, however, that property owners are not required to take heroic, vigilante or police measures to rid their property of drug activity and that to encourage such a standard would produce a dangerous precedent."  <u>Commonwealth v. 502-504 Gordon Street</u>, 607 A.2d 839, 845 (Pa. 1992) (applying federal standard and citing <u>United States v. 710 Main Street</u>, 753 F. Supp. 121, 125 (S.D.N.Y. 1990)).  Moreover, in assessing the steps undertaken by the claimant, "the question is what measures were reasonable under the particular circumstances confronted by the property owner in question.  Those circumstances may include the property owner's reasonable fears and concerns, its degree of familiarity with crime prevention, and its economic resources."  <u>United States v. 16328 S. 43rd E. Avenue</u>, 275 F.3d 1281, 1285-86 (10th Cir. 2002) (internal quotations and citations omitted).  Moreover, "[i]n deciding whether a claimant has taken all reasonable steps, the court views the facts in light of the particular claimant's individual situation and personal limitations."  <u>United States v. 3855 S. April Street</u>, 797 F. Supp. 933, 938 (M.D. Ala. 1992).

I reject the Government's argument that Mr. Caswell did nothing to safeguard the Property.  Rather, there was a clerk at the front desk 24 hours a day for security purposes. There also was a camera in the main lobby and a sign warning guests that suspicious behavior would be reported during the entire period in question.  Moreover, the Property was well-lit both in the front and back, a security camera was added to the back parking lot, and guests were always required to fill out registration cards, a procedure that was tightened after the police suggested copying drivers' licenses.  In addition, Mr. Caswell and the Motel staff reported suspicious behavior to the police, cooperated fully with the police, gave the police access to rooms and registration cards, and generally maintained good relationships with law enforcement.  Police were free to and did drive through the premises regularly on patrol.  In find that such efforts were sufficient and reasonable.  See, e.g., United States v. 121 Allen Place, 75 F.3d 118 (2d Cir. 1996) (jury finds for claimant apartment building owner who hired maintenance workers to maintain building, evicted tenants for non-payment but believed he could not evict them for narcotics violations unless they had been convicted, and tried to obtain information about ongoing investigations from police but was refused); United States v. 1012 Germantown Road, 963 F.2d 1496, 1506 (11th Cir. 1992) (finding contacting and cooperating with law enforcement authorities sufficient to meet reasonable efforts criteria); 3855 S. April Street, 797 F. Supp. at 938 (court finds property owner "wanted the drug activity in front of her home stopped and that, although she declined to get involved to the extent of taking out trespassing warrants, she did take reasonable steps to achieve this end").  The fact that Mr.

Caswell's efforts were unsuccessful in eliminating all drug crimes, or that counsel can conceive of other steps which may or may not have helped, does not preclude a finding that the steps which Mr. Caswell and his employees did take were sufficient to satisfy the innocent owner defense.  See 502-504 Gordon Street, 607 A.2d at 846 (fact that efforts undertaken were insufficient to eliminate drug crime was not held against the claimants in civil forfeiture action).

The only significant suggestion made by the law enforcement witnesses during the trial which had not already been undertaken by Mr. Caswell was that the Motel hire its own security force to patrol the Property.  As noted above, no such suggestion had ever been made to Mr. Caswell before trial.[12]  In any event, property owners are not obligated to become "substitute police forces." 710 Main Street, 753 F. Supp. at 125.  "Indeed, an owner cannot 'reasonably' be expected to succeed at preventing illegal use of his property when the police have been incapable of doing the same.  Courts do not expect the common

---

[12] Other courts have precluded the government from proposing reasonable steps for the first time at trial.  For example, in Lot Numbered One of the Lavaland Annex, the District Court ordered a small motel where drug transactions occurred with "such high frequency that at times people and vehicles were lined up outside of rooms and in the parking lot to participate" forfeitable, although owners did not participate in the drug crimes.  256 F.3d at 952.  The Court of Appeals remanded the case for further consideration of the innocent owner defense because the government had failed to identify before trial what steps it believed should have been taken by the innocent owner, and the owner did not have the opportunity to present evidence and argument as to why those steps were not reasonable under the circumstances.  See id. at 956-57.  In this case I have considered the proposals made by law enforcement, and even Government counsel, but still find that the steps taken by Mr. Caswell were all that were reasonably necessary under the circumstances presented.

land owner to eradicate a problem which our able law enforcement organizations cannot control." <u>1012 Germantown Road</u>, 963 F.2d at 1506 (internal quotation omitted).

There was also a proposal made that guests who had been arrested (but not necessarily convicted) should not be allowed to rent rooms and should be included in a formal no-rent list.  The legality or appropriateness of such a proposal has not been addressed by any party, and it is certainly not a blanket rule that this court would expect property owners to follow.  <u>See</u> <u>United States v. 418 57th Street</u>, 922 F.2d 129, 132 (2d Cir. 1990) (contacting an attorney could be sufficient to constitute "all reasonable steps" owners could have taken to halt drug activity after learning of arrest of tenant; court finds that there is "a fair dispute" whether government's suggestion that property owners contact authorities to confirm reports of arrests, inspect the premises for signs of drugs or institute eviction proceedings "would have been productive or appropriate under New York law"). Moreover, as detailed above, the evidence did not establish frequent repeat offenders so as to make the suggestion of a "no-rent list" critical to this Court's analysis.  While, as the Government argues, the steps a property owner takes "don't have to be effective or successful" (IV:108), the "draconian" remedy of forfeiture should not be based on an owner's failure to take actions which were not likely to have affected the scope of drug crimes at the Property.

18 U.S.C. § 983(d)(2)(B)(i)(II) provides that one of the "ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person, to the extent permitted by law . . . took reasonable actions

**in consultation with a law enforcement agency** to discourage or prevent the illegal use of the property." (Emphasis added). The Government contends that Mr. Caswell had an affirmative obligation to contact the police, and not <u>vice</u> <u>versa</u>, in order to determine what steps to take to reduce crime at the Property. I do not read this statute as imposing a specific obligation either on the property owner or the police to contact each other. Rather, the claimant's actions must be assessed under the facts of the particular case. However, it is rather remarkable, in this court's view, for the Government to argue in this case that the Property owner should lose his property for failure to undertake some undefined steps in an effort to prevent crime, while putting on evidence that the police drove through the Property routinely, knew the Property owner's identity and that he lived next door to the Motel, and never contacted him in an effort to work together to control crime at the Property. No comparable cases have been cited by the parties, and none have been found. Having failed to notify Mr. Caswell that he had a significant problem, and having failed to take any steps to advise him on what to do, the Government's resolution of the crime problem should not be to simply take his Property.[13]

Considering the measures taken by Mr. Caswell "on his own initiative," and without "a law enforcement background, or even the advice of law enforcement agencies

---

[13] The remedial purposes of the civil forfeiture statute "include removing the incentive to engage in the drug trade by denying drug dealers the proceeds of illgotten gains, stripping the drug trade of its instrumentalities, including money, and financing Government programs designed to eliminate drug-trafficking." <u>Santoro</u>, 866 F.2d at 1544. Since the only remedial purpose the forfeiture of the Motel Caswell would serve would be to fund Government programs, this court finds that forfeiture would not be consistent with the spirit of the forfeiture laws.

to guide him in determining appropriate actions to take[,]" this court finds that Mr.

Caswell has met his burden of proving that he undertook all reasonable efforts.  See <u>710</u>

<u>Main Street</u>, 753 F. Supp. at 124-25 (while government suggested at trial additional steps

which could have been taken by owner of bar and arcade, court finds that property owner

"who was trying to eke out an income from a business located in a drug-infested area that

posed great risks to the safety of him and his family" had taken all reasonable steps to

prevent crime).  "The fact that he was unsuccessful in resolving the drug problem (as were

the well-trained police who patrolled the area) should not be interpreted as his consent to

that activity."  <u>Id.</u> at 125 (citations omitted).

## IV.  <u>CONCLUSIONS</u>

For all the reasons detailed herein, I find:

1.      The Government has not met its burden of proving a substantial connection

between the Motel Caswell and the forfeitable crimes, and, therefore, has not met its

burden of proving that the Property is forfeitable.

2.      The Claimant has met his burden of proving the innocent owner defense.

3.      Judgment shall be entered in favor of the Claimant and the forfeiture action

shall be DISMISSED.

          / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge